# No. 23-11157

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Second Amendment Foundation, Incorporated; Rainier Arms, L.L.C.; Samuel Walley; William Green,

Plaintiffs - Appellants

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives; Steven Dettelbach, in his official capacity Director of the Bureau of Alcohol Tobacco Firearms and Explosives; United States Department of Justice; Merrick Garland, U.S. Attorney General,

Defendants - Appellees
consolidated with

_____

No. 23-11199

_____

William T. Mock; Christopher Lewis; Firearms Policy Coalition, Incorporated, a nonprofit corporation; Maxim Defense Industries, L.L.C.,

Plaintiffs - Appellees

v.

Merrick Garland, U.S. Attorney General, in his official capacity as Attorney General of the United States; United States Department of Justice; Bureau of Alcohol, Tobacco, Firearms, and Explosives; Steven Dettelbach, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendants - Appellants
consolidated with

_____

No. 23-11203

_____

Darren A. Britto; Gabriel A. Tauscher; Shawn M. Kroll,

Plaintiffs - Appellees

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendant - Appellant
consolidated with

_____

No.23-11204

_____

Texas Gun Rights, Incorporated; National Association for Gun Rights, Incorporated,

Plaintiffs - Appellees

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendant - Appellant
consolidated with

_____

No. 23-40685

_____

State of Texas; Gun Owners of America, Incorporated; Gun Owners Foundation; Brady Brown,

Plaintiffs - Appellees

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives; United States Department of Justice; Steven M. Dettelbach, Director of ATF,

Defendants - Appellants

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

**RECORD EXCERPTS**

SUBMITTED BY:
Chad Flores
917 Franklin Street
Houston, TX 77002
713-364-6440

# Table of Contents

| Document | Record Citation | Tab |
|---|---|---|
| Docket Sheet - 3:21-CV-116 | ROA.1-20 | Tab 1 |
| Notice of Appeal | ROA.1025-1026 | Tab 2 |
| Notice of Appeal | ROA.1194 | Tab 3 |
| Amended Complaint | ROA.43-60 | Tab 4 |
| Additional Attachments to Main Document | ROA.1130 | Tab 5 |
| Declaration(s) of Rainier Arms | ROA.1131-1132 | Tab 6 |
| Declaration(s) of SAF | ROA.1133-1134 | Tab 7 |
| Declaration(s) of Samuel Walley | ROA.1135-1136 | Tab 8 |
| Memorandum Opinion and Order | ROA.1152-1193 | Tab 9 |
| Motion for Preliminary Injunction Proceedings held on 10/18/2023 | ROA.1195-1264 | Tab 10 |

**TAB 1**

# U.S. District Court
## Northern District of Texas (Dallas)
## CIVIL DOCKET FOR CASE #: 3:21-cv-00116-B

| | |
|---|---|
| Rainier Arms LLC et al v. Bureau of Alcohol Tobacco Firearms and Explosives et al | Date Filed: 01/15/2021 |
| | Jury Demand: None |
| Assigned to: Judge Jane J Boyle | Nature of Suit: 899 Other Statutes: |
| Related Case:  4:23-cv-00578-O | Administrative Procedure Act/Review or |
| Case in other court:  USCA5, 23-10707 | Appeal of Agency Decision |
| USCA5, 23-11157 | Jurisdiction: U.S. Government Defendant |
| Cause: 05:551 Administrative Procedure Act | |

**Plaintiff**

| | | |
|---|---|---|
| **Second Amendment Foundation Inc** | represented by | **Charles Flores** |
| | | Flores Law PLLC |
| | | 917 Franklin Street |
| | | Suite 600 |
| | | Houston, TX 77002 |
| | | 713-893-9440 |
| | | Email: cf@chadflores.law |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **Caleb Rawls** |
| | | The Law Offices of Caleb Rawls |
| | | 19600 Copperoaks |
| | | Tyler, TX 75703 |
| | | 972/804-9068 |
| | | Fax: 214/723-5932 |
| | | Email: calebrawls@gmail.com |
| | | *TERMINATED: 07/11/2023* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **Daniel Nolan Nightingale** |
| | | Beck Redden LLP |
| | | 1221 Mckinney St |
| | | Suite 4500 |
| | | Houston, TX 77010 |
| | | 713-951-3700 |
| | | Fax: 713-951-3720 |
| | | Email: dnightingale@beckredden.com |
| | | *TERMINATED: 01/21/2022* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **David Michael Jones** |
| | | David Jones Law PC |
| | | 1701 W Northwest Hwy |
| | | Suite 100 |

Grapevine, TX 76051
817-305-0618
Fax: 817-796-2720
Email: djones@dmjlawfirm.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Hannah Lee Roblyer**
Beck Redden LLP
1221 McKinney Street
Suite 4500
Houston, TX 77010
713-951-6236
Fax: 713-951-3720
Email: hroblyer@beckredden.com
*TERMINATED: 06/01/2023*
*Bar Status: Admitted/In Good Standing*

**Matthew A Goldstein**
Clark Hill PLC
1001 Pennslvania Ave NW
Suite 1300 South
Washington, DC 20004
202-550-0040
Fax: 202-552-2371
Email: mgoldstein@clarkhill.com
*TERMINATED: 10/18/2022*
*PRO HAC VICE*
*Bar Status: Not Admitted*

**Plaintiff**

| | | |
|---|---|---|
| **Rainier Arms LLC** | represented by | **Charles Flores**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Bar Status: Admitted/In Good Standing* |
| | | **Caleb Rawls**<br>(See above for address)<br>*TERMINATED: 07/11/2023*<br>*Bar Status: Admitted/In Good Standing* |
| | | **Daniel Nolan Nightingale**<br>(See above for address)<br>*TERMINATED: 01/21/2022*<br>*Bar Status: Admitted/In Good Standing* |
| | | **David Michael Jones**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br>*Bar Status: Admitted/In Good Standing* |
| | | **Hannah Lee Roblyer** |

(See above for address)
*TERMINATED: 06/01/2023*
*Bar Status: Admitted/In Good Standing*

**Matthew A Goldstein**
(See above for address)
*TERMINATED: 10/18/2022*
*PRO HAC VICE*
*Bar Status: Not Admitted*

**Plaintiff**

**Samuel Walley**                              represented by **Charles Flores**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Daniel Nolan Nightingale**
(See above for address)
*TERMINATED: 01/21/2022*
*Bar Status: Admitted/In Good Standing*

**David Michael Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Hannah Lee Roblyer**
(See above for address)
*TERMINATED: 06/01/2023*
*Bar Status: Admitted/In Good Standing*

**Matthew A Goldstein**
(See above for address)
*TERMINATED: 10/18/2022*
*PRO HAC VICE*
*Bar Status: Not Admitted*

**Plaintiff**

**William Green**                              represented by **Charles Flores**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Caleb Rawls**
(See above for address)
*TERMINATED: 07/11/2023*
*Bar Status: Admitted/In Good Standing*

**Daniel Nolan Nightingale**
(See above for address)

*TERMINATED: 01/21/2022*
*Bar Status: Admitted/In Good Standing*

**David Michael Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Hannah Lee Roblyer**
(See above for address)
*TERMINATED: 06/01/2023*
*Bar Status: Admitted/In Good Standing*

**Matthew A Goldstein**
(See above for address)
*TERMINATED: 10/18/2022*
*PRO HAC VICE*
*Bar Status: Not Admitted*

V.

**Defendant**

**Bureau of Alcohol Tobacco Firearms and Explosives**        represented by        **Brian Walters Stoltz-DOJ**
DOJ-USAO
1100 Commerce St
Third Floor
Dallas, TX 75242-1699
214-659-8626
Email: brian.stoltz@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Charles Edward Talmadge Roberts**
US Department of Justice
Civil Division
1100 L Street NW
Washington, DC 20005
202-305-8628
Fax: 202-616-8470
Email: charles.e.roberts@usdoj.gov
*TERMINATED: 01/21/2022*
*Bar Status: Not Admitted*

**Faith Lowry**
DOJ-Civ
Federal Programs Branch
1100 L Street
Washington, DC 20005
202-305-2532
Email: faith.e.lowry@usdoj.gov
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Jody Dale Lowenstein**
US Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202-598-9280
Email: jody.d.lowenstein@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Michael Drezner**
US Department of Justice
Civil Division, Federal Programs Branch
1100 L St
Washington, DC 20005
202-514-4505
Fax: 202-616-8470
Email: michael.l.drezner@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Taylor Pitz**
DOJ-Civ
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202-305-5200
Email: taylor.n.pitz@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Regina Lombardo**
*in her official capacity as Acting Director of the Bureau of Alcohol Tobacco Firearms and Explosives*

represented by

**Brian Walters Stoltz-DOJ**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Charles Edward Talmadge Roberts**
(See above for address)
*TERMINATED: 01/21/2022*
*Bar Status: Not Admitted*

**Faith Lowry**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jody Dale Lowenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Michael Drezner**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Taylor Pitz**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**United States Department of Justice**     represented by     **Brian Walters Stoltz-DOJ**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Charles Edward Talmadge Roberts**
(See above for address)
*TERMINATED: 01/21/2022*
*Bar Status: Not Admitted*

**Faith Lowry**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jody Dale Lowenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Michael Drezner**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Taylor Pitz**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Jeffrey A Rosen**     represented by     **Brian Walters Stoltz-DOJ**
*in his official capacity as Acting*     (See above for address)
*ATTORNEY GENERAL US Department of*     *LEAD ATTORNEY*
*Justice*     *ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Charles Edward Talmadge Roberts**

(See above for address)
*TERMINATED: 01/21/2022*
*Bar Status: Not Admitted*

**Faith Lowry**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jody Dale Lowenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Michael Drezner**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Taylor Pitz**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

V.

**Movant**

| | | |
|---|---|---|
| **The National Rifle Association of America** *Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)* *TERMINATED: 06/30/2023* | represented by | **Matthew Hogan Davis** Brewer, Attorneys & Counselors 1717 Main Street Ste 5900 Dallas, TX 75201 214-653-4000 Email: mhd@brewerattorneys.com *TERMINATED: 06/06/2023* *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* *Bar Status: Admitted/In Good Standing* |

**Noah Barnett Peters**
Brewer Attorneys & Counselors
1717 Main Street
Suite 5900
Dallas, TX 75201
434-466-4641
Email: nbp@brewerattorneys.com
*TERMINATED: 06/30/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**William A Brewer, III**

Brewer, Attorneys & Counselors
1717 Main Street
Suite 5900
Dallas, TX 75201
214-653-4000
Fax: 214-653-1010
Email: wab@brewerattorneys.com
*TERMINATED: 06/06/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/15/2021 | 1 (p.21) | COMPLAINT against BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, Regina Lombardo, Department of Justice, Jeffrey Rosen filed by Second Amendment Foundation Inc, William Green, Samuel Walley, Rainier Arms, LLC. (Filing fee $402; Receipt number 0539-11521619) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.21) Cover Sheet) (Flores, Charles) (Attachment 1 replaced/flattened on 1/19/2021) (mjr). (Entered: 01/15/2021) |
| 01/15/2021 | 2 (p.41) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by William Green, Rainier Arms, LLC, Second Amendment Foundation Inc, Samuel Walley. (Flores, Charles) (Entered: 01/15/2021) |
| 01/15/2021 | 3 (p.43) | AMENDED COMPLAINT *INCLUDING EXHIBITS* against BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, Department of Justice, Regina Lombardo, Jeffrey Rosen filed by William Green, Second Amendment Foundation Inc, Samuel Walley, Rainier Arms, LLC. Clerk to issue summons(es). Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge., COMPLAINT against BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, Department of Justice, Regina Lombardo, Jeffrey Rosen filed by William Green, Second Amendment Foundation Inc, Samuel Walley, Rainier Arms, LLC. (Filer fee note- Clerk to add prior fee payment info here.) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney |

| | | |
|---|---|---|
| | | Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.21) Exhibit(s) A, # 2 (p.41) Exhibit(s) B, # 3 (p.43) Exhibit(s) C, # 4 (p.100) Exhibit(s) D, # 5 (p.102) Exhibit(s) E, # 6 (p.126) Exhibit(s) F, # 7 (p.136) Exhibit(s) G, # 8 (p.138) Exhibit(s) H, # 9 (p.139) Exhibit(s) I, # 10 Exhibit(s) J, # 11 (p.144) Cover Sheet) (Flores, Charles) (Entered: 01/15/2021) |
| 01/15/2021 | 4 (p.100) | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Horan). Clerk to provide copy to plaintiff if not received electronically. (mjr) (Entered: 01/19/2021) |
| 01/19/2021 | 5 (p.102) | Summons issued as to Bureau of Alcohol Tabacco Firearms and Explosives, Regina Lombardo, Jeffrey Rosen, United States Department of Justice, U.S. Attorney, and U.S. Attorney General. (mjr) (Entered: 01/19/2021) |
| 02/05/2021 | 6 (p.126) | SUMMONS Returned Executed as to Bureau of Alcohol Tabacco Firearms and Explosives, Regina Lombardo, Jeffrey Rosen, United States Department of Justice, US Attorney and US Attorney General; served on 01/27/2021. (Roblyer, Hannah) Modified event text on 2/8/2021 (jmg). (Entered: 02/05/2021) |
| 02/19/2021 | 7 (p.136) | NOTICE of Attorney Appearance by Hannah Lee Roblyer on behalf of William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley. (Filer confirms contact info in ECF is current.) (Roblyer, Hannah) (Entered: 02/19/2021) |
| 02/22/2021 | 8 (p.138) | ORDER TO SHOW CAUSE: After reviewing the papers and pleadings on file, the Court notes that no local counsel has appeared on behalf of Plaintiffs as Local Rule 83.10(a) requires. Therefore, the Court ORDERS the following: By Monday, 3/1/2021, Plaintiffs must obtain local counsel or otherwise SHOW CAUSE, in writing, why local counsel has not yet appeared on their behalf. Failure to comply with this Order may result in sanctions. (Ordered by Judge Jane J. Boyle on 2/22/2021) (ctf) (Entered: 02/22/2021) |
| 02/26/2021 | 9 (p.139) | MOTION for Leave to File to Proceed Without Local Counsel and Response to 8 (p.138) Order to Show Cause filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley. (Attachments: # 1 (p.21) Proposed Order) (Roblyer, Hannah) Modified text on 3/1/2021 (mjr). (Entered: 02/26/2021) |
| 03/01/2021 | 10 | ELECTRONIC ORDER denying 9 (p.139) Motion for Leave to Proceed Without Local Counsel. Per Local Rule 83.10(a), Plaintiffs must retain local counsel within fourteen days of the date of this order. (Ordered by Judge Jane J. Boyle on 3/1/2021) (chmb) (Entered: 03/01/2021) |
| 03/11/2021 | 11 (p.144) | NOTICE of Attorney Appearance by Daniel Nolan Nightingale on behalf of William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley. (Filer confirms contact info in ECF is current.) (Nightingale, Daniel) (Entered: 03/11/2021) |
| 03/15/2021 | 12 (p.146) | NOTICE of Attorney Appearance by Daniel Nolan Nightingale for J. Caleb Rawls on behalf of William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley. (Nightingale, Daniel) (Entered: 03/15/2021) |
| 03/15/2021 | 13 (p.148) | DESIGNATION OF LOCAL COUNSEL filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley (Nightingale, Daniel) Modified text and linkage on 3/16/2021 (axm). (Entered: 03/15/2021) |

| | | |
|---|---|---|
| 03/18/2021 | <u>14</u><br>(p.150) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number 0539-11706573) filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley (Attachments: # <u>1 (p.21)</u> Exhibit(s) Certificate of Good Standing)Attorney Matthew A Goldstein added to party William Green(pty:pla), Attorney Matthew A Goldstein added to party Rainier Arms LLC(pty:pla), Attorney Matthew A Goldstein added to party Second Amendment Foundation Inc(pty:pla), Attorney Matthew A Goldstein added to party Samuel Walley(pty:pla) (Goldstein, Matthew) (Entered: 03/18/2021) |
| 03/19/2021 | 15 | ELECTRONIC ORDER granting <u>14 (p.150)</u> Application for Admission Pro Hac Vice of Matthew A. Goldstein. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Jane J. Boyle on 3/19/2021) (chmb) (Entered: 03/19/2021) |
| 03/29/2021 | <u>16</u><br>(p.154) | NOTICE of Attorney Appearance by Charles Edward Talmadge Roberts on behalf of Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Filer confirms contact info in ECF is current.) (Roberts, Charles) (Entered: 03/29/2021) |
| 03/29/2021 | <u>17</u><br>(p.156) | Consent Motion for Extension of Time to File Answer *and Set Briefing Schedule* filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice (Attachments: # <u>1 (p.21)</u> Proposed Order) (Roberts, Charles) Modified on 3/30/2021 (svc). (Entered: 03/29/2021) |
| 03/29/2021 | <u>18</u><br>(p.162) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Roberts, Charles) (Entered: 03/29/2021) |
| 03/30/2021 | <u>19</u><br>(p.165) | ORDER granting <u>17 (p.156)</u> Consent Motion for Extension of Time to File Answer and Set Briefing Schedule. (Ordered by Judge Jane J. Boyle on 3/30/2021) (svc) (Entered: 03/30/2021) |
| 03/31/2021 | <u>20</u><br>(p.167) | NOTICE of Attorney Appearance by Brian Walters Stoltz-DOJ on behalf of Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Filer confirms contact info in ECF is current.) (Stoltz-DOJ, Brian) (Entered: 03/31/2021) |
| 04/12/2021 | 21 | ELECTRONIC ORDER: It has come to the Court's attention that counsel for Plaintiff, Daniel Nolan Nightingale, is not admitted to practice in the Northern District of Texas. Mr. Nightingale is ORDERED to become admitted or seek admission pro hac vice on or before April 26, 2021. (Ordered by Judge Jane J. Boyle on 4/12/2021) (chmb) (Entered: 04/12/2021) |
| 04/23/2021 | <u>22</u><br>(p.169) | NOTICE of *Admission of Daniel N. Nightingale* re: 21 Order, filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley (Attachments: # <u>1 (p.21)</u> Exhibit(s) A) (Nightingale, Daniel) (Entered: 04/23/2021) |
| 04/30/2021 | <u>23</u><br>(p.174) | NOTICE of filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice (Roberts, Charles) (Entered: 04/30/2021) |
| 05/21/2021 | <u>24</u><br>(p.177) | Consent MOTION to Stay filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice |

| | | |
|---|---|---|
| | | (Attachments: # 1 (p.21) Proposed Order) (Roberts, Charles) (Entered: 05/21/2021) |
| 05/24/2021 | 25 | ELECTRONIC ORDER granting 24 (p.177) Agreed Motion to Stay. The Court hereby STAYS this matter. The Court further ORDERS as follows: Pending deadlines are VACATED. The parties will file a joint status report on or before June 14, 2021, indicating whether the matter should remain stayed. If the parties propose at that time that the stay be lifted, the joint status report shall contain a proposed schedule for continuing the litigation. (Ordered by Judge Jane J. Boyle on 5/24/2021) (chmb) (Entered: 05/24/2021) |
| 06/14/2021 | 26 (p.181) | Joint STATUS REPORT filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Roberts, Charles) (Entered: 06/14/2021) |
| 06/15/2021 | 27 | ELECTRONIC ORDER: The Court has received the parties' 26 (p.181) joint status report. The Court agrees with the parties that this matter should remain stayed pending expiration of the public comment period for Defendants' proposed rule on "Factoring Criteria for Firearms With Attached 'Stabilizing Braces.'" Accordingly, the parties are hereby ORDERED to file a joint status report on or before September 21, 2021, indicating whether the matter should remain stayed. If the parties propose at that time that the stay be lifted, the joint status report shall contain a proposed schedule for continuing the litigation. (Ordered by Judge Jane J. Boyle on 6/15/2021) (chmb) (Entered: 06/15/2021) |
| 09/21/2021 | 28 (p.184) | Joint STATUS REPORT filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Roberts, Charles) (Entered: 09/21/2021) |
| 09/28/2021 | 29 | ELECTRONIC ORDER: The Court has received the parties' 28 (p.184) joint status report. The Court agrees with the parties that this matter should remain stayed while the Defendant processes the comments from the Defendant's proposed rule on "Factoring Criteria for Firearms With Attached 'Stabilizing Braces.'" Accordingly, the parties are hereby ORDERED to file a joint status report on or before December 27, 2021, indicating whether the matter should remain stayed. If the parties propose at that time that the stay be lifted, the joint status report shall contain a proposed schedule for continuing the litigation. (Ordered by Judge Jane J. Boyle on 9/28/2021) (chmb) (Entered: 09/28/2021) |
| 11/29/2021 | | Civil Case Administratively Closed per the direction of the U.S. District Judge. (ctf) (Entered: 11/30/2021) |
| 12/27/2021 | 30 (p.188) | Joint STATUS REPORT filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Roberts, Charles) (Entered: 12/27/2021) |
| 12/28/2021 | 31 | ELECTRONIC ORDER: The Court has received the parties' 30 (p.188) joint status report. The Court agrees with the parties that this matter should remain stayed while Defendant responds to the comments from the Defendant's proposed rule on "Factoring Criteria for Firearms With Attached 'Stabilizing Braces.'" Accordingly, the parties are hereby ORDERED to file a joint status report on or before March 28, 2022, indicating whether the matter should remain stayed. If the parties propose at that time that the stay should be lifted, the joint status report shall contain a proposed schedule for continuing the litigation. (Ordered by Judge Jane J. Boyle on 12/28/2021) (chmb) (Entered: 12/28/2021) |
| 01/20/2022 | | |

| | 32 (p.192) | Unopposed MOTION to Withdraw as Attorney *for Daniel N. Nightingale of Beck Redden* filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley (Attachments: # 1 (p.21) Proposed Order) (Nightingale, Daniel) (Entered: 01/20/2022) |
|---|---|---|
| 01/20/2022 | 33 (p.196) | NOTICE of Attorney Appearance by Jody Dale Lowenstein on behalf of Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Filer confirms contact info in ECF is current.) (Lowenstein, Jody) (Entered: 01/20/2022) |
| 01/20/2022 | 34 (p.198) | Unopposed MOTION to Withdraw as Attorney filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice (Roberts, Charles) (Entered: 01/20/2022) |
| 01/21/2022 | 35 | ELECTRONIC ORDER granting 32 (p.192) Attorney Daniel Nolan Nightingale's Unopposed Motion to Withdraw as counsel for Plaintiffs. (Ordered by Judge Jane J. Boyle on 1/21/2022) (chmb) (Entered: 01/21/2022) |
| 01/21/2022 | 36 | ELECTRONIC ORDER granting 34 (p.198) Attorney Charles Edward Talmadge Roberts' Unopposed Motion to Withdraw as counsel for Defendants. (Ordered by Judge Jane J. Boyle on 1/21/2022) (chmb) (Entered: 01/21/2022) |
| 03/28/2022 | 37 (p.201) | Joint STATUS REPORT filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Lowenstein, Jody) (Entered: 03/28/2022) |
| 03/28/2022 | 38 | ELECTRONIC ORDER: The Court has received the parties' 37 (p.201) joint status report. The Court agrees with the parties that this matter should remain stayed while Defendant finalizes the proposed rule on "Factoring Criteria for Firearms With Attached 'Stabilizing Braces.'" Accordingly, the parties are hereby ORDERED to file a joint status report on or before June 27, 2022, indicating whether the matter should remain stayed. If the parties propose at that time that the stay should be lifted, the joint status report shall contain a proposed schedule for continuing the litigation. (Ordered by Judge Jane J Boyle on 3/28/2022) (chmb) (Entered: 03/28/2022) |
| 06/27/2022 | 39 (p.205) | Joint STATUS REPORT filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Lowenstein, Jody) (Entered: 06/27/2022) |
| 06/28/2022 | 40 | ELECTRONIC ORDER: The Court has received the parties' 39 (p.205) joint status report. The Court agrees with the parties that this matter should remain stayed while Defendant finalizes the proposed rule on "Factoring Criteria for Firearms With Attached 'Stabilizing Braces'" but not until January 6, 2023. Accordingly, the parties are hereby ORDERED to file a joint status report on or before September 26, 2022, indicating whether the matter should remain stayed. If the parties propose at that time that the stay should be lifted, the joint status report shall contain a proposed schedule for continuing the litigation. (Ordered by Judge Jane J Boyle on 6/28/2022) (chmb) (Entered: 06/28/2022) |
| 09/26/2022 | 41 (p.209) | Joint STATUS REPORT filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Lowenstein, Jody) (Entered: 09/26/2022) |
| 09/27/2022 | 42 | ELECTRONIC ORDER: The Court has received the parties' 41 (p.209) Joint Status Report. The Court agrees with the parties that this matter should remain stayed while Defendant finalizes the proposed rule on "Factoring Criteria for Firearms With |

| | | |
|---|---|---|
| | | Attached 'Stabilizing Braces,'" which is currently expected in December 2022. Accordingly, the parties are hereby ORDERED to file a joint status report on or before December 28, 2022 indicating whether the matter should remain stayed. If the parties propose at that time that the stay should be lifted, the joint status report shall contain a proposed schedule for continuing the litigation. (Ordered by Judge Jane J Boyle on 9/27/2022) (chmb) (Entered: 09/27/2022) |
| 10/17/2022 | 43 (p.213) | Unopposed MOTION to Withdraw as Attorney *for Matthew A. Goldstein of Clark Hill PLC* filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley (Attachments: # 1 (p.21) Proposed Order) (Goldstein, Matthew) (Entered: 10/17/2022) |
| 10/18/2022 | 44 | ELECTRONIC ORDER granting 43 (p.213) Motion to Withdraw as Attorney. Attorney Matthew A Goldstein is terminated. (Ordered by Judge Jane J Boyle on 10/18/2022) (chmb) (Entered: 10/18/2022) |
| 12/07/2022 | 45 | Court Request for Recusal: Magistrate Judge David L. Horan recused pursuant to Special Order 3-346. Magistrate Judge Renee Harris Toliver assigned for matters that may be referred in this case. (cea) (Entered: 12/07/2022) |
| 12/28/2022 | 46 (p.217) | Joint STATUS REPORT filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Lowenstein, Jody) (Entered: 12/28/2022) |
| 12/30/2022 | 47 | ELECTRONIC ORDER: The Court has received the parties' 46 (p.217) Joint Status Report. The Court agrees with the parties that this matter should remain stayed while Defendant finalizes the proposed rule on "Factoring Criteria for Firearms With Attached 'Stabilizing Braces.'" Accordingly, the parties are hereby ORDERED to file a joint status report on or before January 30, 2023, indicating whether the matter should remain stayed. If the parties propose at that time that the stay should be lifted, the joint status report shall contain a proposed schedule for continuing the litigation. (Ordered by Judge Jane J Boyle on 12/30/2022) (chmb) (Entered: 12/30/2022) |
| 01/30/2023 | 48 (p.220) | Joint STATUS REPORT filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Lowenstein, Jody) (Entered: 01/30/2023) |
| 02/01/2023 | 49 (p.224) | ORDER: The current stay on this case (Doc. 47, Order) shall be lifted on February 17, 2023. Amended Complaint due by 2/17/2023. Motion for preliminary injunction if any by 3/3/2023. Responses due by 3/24/2023. Replies due by 4/7/2023. Answer to amended complaint is extended until either (i) 21 days after the Court resolves any motion for a preliminary injunction; or (ii) March 24, 2023, in the event that plaintiffs do not file a motion for a preliminary injunction. (Ordered by Judge Jane J Boyle on 2/1/2023) (svc) (Entered: 02/02/2023) |
| 02/17/2023 | 50 (p.226) | AMENDED COMPLAINT *of the Second Amendment Foundation, Ranier Arms, and Individual Plaintiffs* against All Defendants filed by Samuel Walley, Rainier Arms LLC, William Green, Second Amendment Foundation Inc. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Flores, Charles) (Entered: 02/17/2023) |
| 02/17/2023 | | Stay Lifted Per Order at Docket 49 (p.224) . (cea) (Entered: 06/09/2023) |

| | | |
|---|---|---|
| 03/03/2023 | 51 (p.252) | MOTION for Injunction filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley (Flores, Charles) (Entered: 03/03/2023) |
| 03/03/2023 | 52 (p.254) | Brief/Memorandum in Support filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley re 51 (p.252) MOTION for Injunction (Attachments: # 1 (p.21) Exhibit(s) 1, # 2 (p.41) Exhibit(s) 2, # 3 (p.43) Exhibit(s) 3, # 4 (p.100) Exhibit(s) 4, # 5 (p.102) Exhibit(s) 5) (Flores, Charles) (Entered: 03/03/2023) |
| 03/23/2023 | 53 (p.383) | Consent MOTION for Leave to File Oversized Brief filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice with Brief/Memorandum in Support. (Attachments: # 1 (p.21) Proposed Order) (Lowenstein, Jody) (Entered: 03/23/2023) |
| 03/24/2023 | 54 | ELECTRONIC ORDER granting 53 (p.383) Motion for Leave to File Oversized Brief. Defendants' Response to Plaintiffs' Motion for a Preliminary Injunction (Doc. 51) may now not exceed 40 pages. (Ordered by Judge Jane J Boyle on 3/24/2023) (chmb) (Entered: 03/24/2023) |
| 03/24/2023 | 55 (p.387) | RESPONSE filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice re: 51 (p.252) MOTION for Injunction (Lowenstein, Jody) (Entered: 03/24/2023) |
| 03/30/2023 | 56 (p.439) | NOTICE of *Supplemental Authority* filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice (Attachments: # 1 (p.21) Exhibit(s) A - Mock v. Garland Opinion) (Lowenstein, Jody) (Entered: 03/30/2023) |
| 04/06/2023 | 57 (p.459) | MOTION for Extension of Time to File Response/Reply to 51 (p.252) MOTION for Injunction , 56 (p.439) Notice (Other), 52 (p.254) Brief/Memorandum in Support of Motion, 55 (p.387) Response/Objection filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley (Attachments: # 1 (p.21) Proposed Order) (Flores, Charles) (Entered: 04/06/2023) |
| 04/07/2023 | 58 | ELECTRONIC ORDER granting 57 (p.459) Unopposed Motion to Extend Time to File a Reply. Plaintiffs' Reply in Support of the Motion for Preliminary Injunction is now due April 10, 2023. (Ordered by Judge Jane J Boyle on 4/7/2023) (chmb) (Entered: 04/07/2023) |
| 04/10/2023 | 59 (p.462) | REPLY filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley re: 51 (p.252) MOTION for Injunction (Flores, Charles) (Entered: 04/10/2023) |
| 05/24/2023 | 60 (p.476) | Brief/Memorandum in Support filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley re 59 (p.462) Reply, 51 (p.252) MOTION for Injunction , 56 (p.439) Notice (Other), 52 (p.254) Brief/Memorandum in Support of Motion, 55 (p.387) Response/Objection (Attachments: # 1 (p.21) Exhibit(s) A - Mock CA5 Decision, # 2 (p.41) Exhibit(s) B - Mock CA5 Motion, # 3 (p.43) Exhibit(s) C - Mock CA5 Response, # 4 (p.100) Exhibit(s) D - Mock CA5 Reply, # 5 (p.102) Exhibit(s) E - Mock CA5 Filing) (Flores, Charles) (Entered: 05/24/2023) |
| 05/25/2023 | 61 (p.571) | RESPONSE filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice re: 60 (p.476) Brief/Memorandum in Support of Motion (Lowenstein, Jody) Modified text on 5/26/2023 (mms). (Entered: 05/25/2023) |

| | | |
|---|---|---|
| 05/25/2023 | 62 (p.574) | ORDER: The Court GRANTS IN PART the 51 (p.252) Motion for Injunction and issues a preliminary injunction as to Plaintiffs in this case only, pending resolution of the expedited appeal in Mock v. Garland, No. 23-10319 (5th Cir.). Upon resolution of the appeal in Mock, the Court will address the remaining relief Plaintiff's request in their Motion. If necessary, the Court will order additional briefing at that time. (Ordered by Judge Jane J Boyle on 5/25/2023) (svc) (Entered: 05/25/2023) |
| 05/30/2023 | 63 (p.577) | MOTION Clarification of Preliminary Injunction re 62 (p.574) Order on Motion for Injunction, filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley with Brief/Memorandum in Support. (Attachments: # 1 (p.21) Exhibit(s) A - Mock Clarification - Order, # 2 (p.41) Exhibit(s) B - Mock Clarification - Motion, # 3 (p.43) Exhibit(s) C - Mock Clarification - Response, # 4 (p.100) Exhibit(s) D - Mock Clarification - Reply) (Flores, Charles) (Entered: 05/30/2023) |
| 05/31/2023 | 64 (p.616) | MOTION to Withdraw as Attorney - *Hannah Roblyer* filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley with Brief/Memorandum in Support. (Flores, Charles) (Entered: 05/31/2023) |
| 05/31/2023 | 65 (p.618) | ORDER granting 63 (p.577) Motion for Clarification of the Court's May 25 Preliminary Injunction Order. The Court confirms that its 62 (p.574) Preliminary Injunction Order applies to both the Second Amendment Foundation, Inc. and its members. (Ordered by Judge Jane J Boyle on 5/31/2023) (chmb) (Entered: 05/31/2023) |
| 06/01/2023 | 66 | ELECTRONIC ORDER denying 64 (p.616) Motion to Withdraw as Attorney. Plaintiffs have not included a certificate of conference. Plaintiffs may refile the motion pursuant to Local Rule 7.1(b). (Ordered by Judge Jane J Boyle on 6/1/2023) (chmb) (Entered: 06/01/2023) |
| 06/01/2023 | 67 (p.621) | Unopposed MOTION to Withdraw as Attorney filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley (Flores, Charles) (Entered: 06/01/2023) |
| 06/01/2023 | 68 | ELECTRONIC ORDER granting 67 (p.621) Motion to Withdraw as Attorney. Attorney Hannah Lee Roblyer has withdrawn as counsel for Plaintiffs in this case and is removed from the service list. (Ordered by Judge Jane J Boyle on 6/1/2023) (chmb) (Entered: 06/01/2023) |
| 06/06/2023 | 69 (p.623) | MOTION to Intervene *(Partially Unopposed)*, MOTION for Injunction *(Partially Unopposed)* () filed by The National Rifle Association of America. Party The National Rifle Association of America added. (Davis, Matthew) (Entered: 06/06/2023) |
| 06/06/2023 | 70 (p.628) | Brief/Memorandum in Support filed by The National Rifle Association of America re 69 (p.623) MOTION to Intervene *(Partially Unopposed)* MOTION for Injunction *(Partially Unopposed)* (Davis, Matthew) (Entered: 06/06/2023) |
| 06/06/2023 | 71 (p.659) | Appendix in Support filed by The National Rifle Association of America re 70 (p.628) Brief/Memorandum in Support of Motion, 69 (p.623) MOTION to Intervene *(Partially Unopposed)* MOTION for Injunction *(Partially Unopposed)* (Attachments: # 1 (p.21) Exhibit(s) Compiled Appendix) (Davis, Matthew) (Entered: 06/06/2023) |
| 06/07/2023 | | |

| | 72 (p.915) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by The National Rifle Association of America. (Clerk QC note: No affiliate entered in ECF). (Davis, Matthew) (Entered: 06/07/2023) |
|---|---|---|
| 06/08/2023 | 73 (p.917) | MOTION to Expedite *Briefing Schedule on Motion to Intervene and for a Preliminary Injunction [Doc. 69]* filed by The National Rifle Association of America with Brief/Memorandum in Support. (Davis, Matthew) (Entered: 06/08/2023) |
| 06/08/2023 | 74 (p.924) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13799899) filed by The National Rifle Association of America (Attachments: # 1 (p.21) Exhibit(s) Certificate of Good Standing)Attorney Noah Barnett Peters added to party The National Rifle Association of America(pty:mov) (Peters, Noah) (Entered: 06/08/2023) |
| 06/08/2023 | 75 (p.929) | RESPONSE filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice re: 73 (p.917) MOTION to Expedite *Briefing Schedule on Motion to Intervene and for a Preliminary Injunction [Doc. 69]* (Drezner, Michael) (Entered: 06/08/2023) |
| 06/08/2023 | 76 (p.933) | NOTICE of Attorney Appearance by Michael Drezner on behalf of Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Filer confirms contact info in ECF is current.) (Drezner, Michael) (Entered: 06/08/2023) |
| 06/08/2023 | 77 (p.935) | REPLY filed by The National Rifle Association of America re: 73 (p.917) MOTION to Expedite *Briefing Schedule on Motion to Intervene and for a Preliminary Injunction [Doc. 69]* (Davis, Matthew) (Entered: 06/08/2023) |
| 06/08/2023 | 78 | ELECTRONIC ORDER granting in part and denying in part 73 (p.917) Motion to Expedite Response. Defendants' response to the NRA's 69 (p.623) Motion to Intervene and for a Preliminary Injunction is due June 22, 2023. Any reply is due seven (7) days from the date of the response. (Ordered by Judge Jane J Boyle on 6/8/2023) (chmb) (Entered: 06/08/2023) |
| 06/09/2023 | 79 | ELECTRONIC ORDER granting 74 (p.924) Application for Admission Pro Hac Vice of Noah Barnett Peters. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Jane J Boyle on 6/9/2023) (chmb) (Entered: 06/09/2023) |
| 06/13/2023 | 80 (p.940) | MOTION to Stay *Proceedings* filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice with Brief/Memorandum in Support. (Attachments: # 1 (p.21) Proposed Order) (Lowenstein, Jody) (Entered: 06/13/2023) |
| 06/13/2023 | 81 (p.953) | Consent MOTION for Extension of Time to File Response to Complaint filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice with Brief/Memorandum in Support. (Attachments: # 1 (p.21) Proposed Order) (Lowenstein, Jody) (Entered: 06/13/2023) |
| 06/14/2023 | 82 | ELECTRONIC ORDER granting 81 (p.953) Unopposed Motion for Extension of Time to File Answer. The Defendants in this case have filed a 80 (p.940) Motion to Stay Proceedings. Defendants' deadline to answer the 50 (p.226) Amended Complaint, however, is June 15, 2023. Accordingly, the deadline for Defendants to respond to the Amended Complaint is stayed pending resolution of the 80 (p.940) Motion to Stay and further direction from the Court. (Ordered by Judge Jane J Boyle |

| | | |
|---|---|---|
| | | on 6/14/2023) (chmb) (Entered: 06/14/2023) |
| 06/22/2023 | 83 (p.958) | RESPONSE filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice re: 69 (p.623) MOTION to Intervene *(Partially Unopposed)* MOTION for Injunction *(Partially Unopposed)* (Attachments: # 1 (p.21) Exhibit 1) (Drezner, Michael) (Entered: 06/22/2023) |
| 06/29/2023 | 84 (p.998) | REPLY filed by The National Rifle Association of America re: 69 (p.623) MOTION to Intervene *(Partially Unopposed)* MOTION for Injunction *(Partially Unopposed)* (Attachments: # 1 (p.21) Exhibit(s) Frazer Declaration) (Davis, Matthew) (Entered: 06/29/2023) |
| 06/30/2023 | 85 (p.1013) | Memorandum Opinion and Order: 69 (p.623) Motion to Intervene is Denied filed by The National Rifle Association of America (Ordered by Judge Jane J Boyle on 6/30/2023) (svc) (Entered: 06/30/2023) |
| 07/03/2023 | 86 (p.1025) | NOTICE OF INTERLOCUTORY APPEAL as to 85 (p.1013) Memorandum Opinion and Order to the Fifth Circuit by The National Rifle Association of America. Filing fee $505, receipt number ATXNDC-13856732. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Attachments: # 1 (p.21) Exhibit(s) A) (Davis, Matthew) (Entered: 07/03/2023) |
| 07/05/2023 | 87 (p.1039) | RESPONSE filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley re: 80 (p.940) MOTION to Stay *Proceedings* (Flores, Charles) (Entered: 07/05/2023) |
| 07/10/2023 | 88 (p.1045) | Unopposed MOTION to Substitute Attorney, added attorney Charles Flores,David Michael Jones for Samuel Walley,David Michael Jones for Rainier Arms LLC,David Michael Jones for William Green,David Michael Jones for Second Amendment Foundation Inc. Motion filed by Samuel Walley, Rainier Arms LLC, William Green, Second Amendment Foundation Inc (Flores, Charles) (Entered: 07/10/2023) |
| 07/10/2023 | 89 (p.1047) | MEMORANDUM OPINION AND ORDER: The Court GRANTS the Motion to Stay Proceedings (Doc. 80 (p.940) ) and STAYS this case pending the Fifth Circuit's decision in Mock v. Garland, No. 23-10319 (5th Cir. filed Mar. 31, 2023) and further order from this Court. (Ordered by Judge Jane J Boyle on 7/10/2023) (svc) Modified text on 7/12/2023 (svc). (Entered: 07/11/2023) |
| 07/11/2023 | 90 | ELECTRONIC ORDER granting 88 (p.1045) Unopposed Motion to Substitute Attorney. Attorney Caleb Rawls is withdrawn as local counsel for Plaintiffs in this case and is substituted by David Jones. (Ordered by Judge Jane J Boyle on 7/11/2023) (chmb) (Entered: 07/11/2023) |
| 07/12/2023 | | USCA Case Number 23-10707 in USCA5 for 86 (p.1025) Notice of Appeal filed by The National Rifle Association of America. (svc) (Entered: 07/12/2023) |

| | | |
|---|---|---|
| 07/21/2023 | | Record on Appeal for USCA5 23-10707 (related to <u>86 (p.1025)</u> appeal): Record consisting of: 1 ECF electronic record on appeal (eROA) is certified,. **PLEASE NOTE THE FOLLOWING:** Licensed attorneys must have filed an appearance in the USCA5 case and be registered for electronic filing in the USCA5 to access the paginated eROA in the USCA5 ECF system. (Take these steps immediately if you have not already done so. Once you have filed the notice of appearance and/or USCA5 ECF registration, it may take up to 3 business days for the circuit to notify the district clerk that we may grant you access to the eROA in the USCA5 ECF system.) To access the paginated record, log in to the USCA5 ECF system, and under the Utilities menu, select Electronic Record on Appeal. Pro se litigants may request a copy of the record by <u>contacting the appeals deputy</u> in advance to arrange delivery. (mcrd) (Entered: 07/21/2023) |
| 08/24/2023 | <u>91 (p.1051)</u> | STATUS REPORT ORDER: Status Report due by 9/4/2023. (Ordered by Judge Jane J Boyle on 8/24/2023) (svc) (Entered: 08/25/2023) |
| 09/04/2023 | <u>92 (p.1053)</u> | Joint STATUS REPORT filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Drezner, Michael) (Entered: 09/04/2023) |
| 09/05/2023 | <u>93 (p.1056)</u> | ORDER: Based on that joint status report, the Court ORDERS the following: 1. The Court's preliminary injunction and stay shall remain in place until the Fifth Circuits mandate is issued in Mock v. Garland, No. 23-10319 (5th Cir. filed Mar. 31, 2023). See Doc. 62, Prelim. Inj. Order; Doc. 89, Stay Order. 2. Plaintiffs will file an unopposed motion to amend the preliminary injunction motion and supplemental brief by September 8, 2023. 3. Defendants will file their responsive supplemental brief by September 15, 2023. (Ordered by Judge Jane J Boyle on 9/5/2023) (ndt) (Entered: 09/05/2023) |
| 09/08/2023 | <u>94 (p.1058)</u> | Unopposed MOTION to Amend Plaintiffs' Motion for a Preliminary Injunction filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley re: <u>51 (p.252)</u> MOTION for Injunction. (Flores, Charles) Modified text and linkage on 9/17/2023 (axm). (Entered: 09/08/2023) |
| 09/08/2023 | <u>95 (p.1061)</u> | Supplemental Brief/Memorandum in Support filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley re <u>51 (p.252)</u> MOTION for Injunction. (Flores, Charles) Modified text and linkage on 9/17/2023 (axm). (Entered: 09/08/2023) |
| 09/11/2023 | 96 | ELECTRONIC ORDER granting <u>94 (p.1058)</u> Plaintiffs' Unopposed Motion to Amend Preliminary Injunction Motion and Supplemental Briefing. The Court notes <u>95 (p.1061)</u> Plaintiffs' Supplemental Brief in Support of their Motion for a Preliminary Injunction was filed on September 8, 2023. (Ordered by Judge Jane J Boyle on 9/11/2023) (chmb) (Entered: 09/11/2023) |
| 09/15/2023 | <u>97 (p.1065)</u> | Supplemental RESPONSE *in Opposition* filed by Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice re: <u>95 (p.1061)</u> Brief/Memorandum in Support of Motion, (Lowenstein, Jody) (Entered: 09/15/2023) |
| 10/03/2023 | <u>98 (p.1077)</u> | Request for an Immediate Ruling on Plaintiffs' Motion for Preliminary Injunction and Supplemental Brief in Support filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley re: <u>51 (p.252)</u> MOTION for Injunction , <u>52 (p.254)</u> Brief/Memorandum in Support of Motion, , <u>59 (p.462)</u> Reply, <u>60 (p.476)</u> Brief/Memorandum in Support of Motion, <u>94 (p.1058)</u> Unopposed |

| | | |
|---|---|---|
| | | MOTION to Amend/Correct, 95 (p.1061) Brief/Memorandum in Support of Motion, 97 (p.1065) Response/Objection, (Attachments: # 1 (p.21) Exhibit(s) A) (Flores, Charles) Modified event text on 10/4/2023 (axm). (Entered: 10/04/2023) |
| 10/05/2023 | 99 | ELECTRONIC ORDER: The Court's preliminary injunction and stay shall remain in place until October 13, 2023. (Ordered by Judge Jane J Boyle on 10/5/2023) (chmb) (Entered: 10/05/2023) |
| 10/10/2023 | 100 (p.1126) | ORDER SETTING HEARING: An evidentiary hearing on Plaintiffs' Motion for a Preliminary Injunction is set for: 10/18/2023 at 10:00 AM in US Courthouse, Courtroom 1516, 1100 Commerce St., Dallas, TX 75242-1310 before Judge Jane J Boyle. No later than 10/17/2023, counsel for each party intending to offer exhibits shall exchange a complete set of marked exhibits (including demonstrative exhibits) with opposing counsel and shall deliver a set of marked exhibits to the Court's chambers (except for large or voluminous items that cannot be easily reproduced). A list of witnesses, if any, shall also be exchanged, with a copy delivered to the Court's chambers, by each party no later than 10/17/2023. The witness lists should provide: (i) the name and address of each witness; (ii) a brief narrative summary of the testimony to be covered by each witness; and (iii) the expected duration of direct or cross-examination of the witness. Each party will be limited to ninety (90) minutes to present its argument and evidence. The current injunction and stay will expire on 10/13/2023 (Doc. 99 ). (Ordered by Judge Jane J Boyle on 10/10/2023) (twd) (Entered: 10/10/2023) |
| 10/12/2023 | 101 (p.1128) | Emergency MOTION Clarification of the Injunction & Stay's End Date re 100 (p.1126) Order Setting Deadline/Hearing, filed by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley with Brief/Memorandum in Support. (Flores, Charles) (Entered: 10/12/2023) |
| 10/13/2023 | 102 | ELECTRONIC ORDER granting 101 (p.1128) Motion for Clarification. The current administrative injunction and stay will expire today, October 13, 2023. (Ordered by Judge Jane J Boyle on 10/13/2023) (chmb) (Entered: 10/13/2023) |
| 10/15/2023 | 103 (p.1130) | ADDITIONAL ATTACHMENTS to 51 (p.252) Motion for Injunction by Plaintiffs William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley. (Attachments: # 1 (p.21) Declaration(s) of Rainier Arms, # 2 (p.41) Declaration(s) of SAF, # 3 (p.43) Declaration(s) of Samuel Walley) (Flores, Charles) (Entered: 10/15/2023) |
| 10/17/2023 | 104 (p.1137) | NOTICE of Attorney Appearance by Faith Lowry on behalf of Bureau of Alcohol Tobacco Firearms and Explosives, Regina Lombardo, Jeffrey A Rosen, United States Department of Justice. (Filer confirms contact info in ECF is current.) (Lowry, Faith) (Entered: 10/17/2023) |
| 10/18/2023 | 105 | ELECTRONIC Minute Entry for proceedings held before Judge Jane J Boyle: Motion hearing held on 10/18/2023 re Plaintiffs' Motion for a Preliminary Injunction. Matter taken under advisement. Attorney Appearances: Plaintiff - Charles Flores; Defense - Jody Lowenstein; Faith Lowry; Taylor Pitz. (Court Reporter: Shawnie Archuleta) (No exhibits) Time in Court - 1:20. (chmb) (Entered: 10/18/2023) |
| 10/21/2023 | 106 (p.1195) | Notice of Filing of Official Electronic Transcript of Plaintiffs' Motion for Preliminary Injunction Proceedings held on October 18, 2023 before Judge Jane J. Boyle. Court Reporter/Transcriber Shawnie Archuleta, Telephone number shawnie_archuleta@txnd.uscourts.gov. Parties are notified of their duty to review |

| | | |
|---|---|---|
| | | the transcript. A copy may be purchased from the court reporter or viewed at the clerk's office. If the transcript contains personal identifiers that must be redacted under MO 61, Fed.R.Civ.P. 5.2 or Fed.R.Crim.P. 49.1, or if the transcript contains the name of a minor child victim or a minor child witness that must be redacted under 18 U.S.C. § 3509, file a Redaction Request - Transcript within 21 days. If no action is taken, the entire transcript will be made available through PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. (69 pages) Redaction Request due 11/13/2023. Redacted Transcript Deadline set for 11/21/2023. Release of Transcript Restriction set for 1/19/2024. (spa) (Entered: 10/21/2023) |
| 10/21/2023 | 107 | Notice of Filing of Official Electronic Transcript of Plaintiffs' Motion for Preliminary Injunction Proceedings held on October 18, 2023 before Judge Jane J. Boyle. Court Reporter/Transcriber Shawnie Archuleta, Telephone number shawnie_archuleta@txnd.uscourts.gov. Parties are notified of their duty to review the transcript. A copy may be purchased from the court reporter or viewed at the clerk's office. If the transcript contains personal identifiers that must be redacted under MO 61, Fed.R.Civ.P. 5.2 or Fed.R.Crim.P. 49.1, or if the transcript contains the name of a minor child victim or a minor child witness that must be redacted under 18 U.S.C. § 3509, file a Redaction Request - Transcript within 21 days. If no action is taken, the entire transcript will be made available through PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. (69 pages) Redaction Request due 11/13/2023. Redacted Transcript Deadline set for 11/21/2023. Release of Transcript Restriction set for 1/19/2024. (spa) (Entered: 10/21/2023) |
| 11/10/2023 | 108 (p.1139) | Supplemental Document by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley as to 51 (p.252) MOTION for Injunction . (Attachments: # 1 (p.21) Exhibit(s) A) (Flores, Charles) (Entered: 11/10/2023) |
| 11/13/2023 | 109 (p.1152) | MEMORANDUM OPINION AND ORDER denying 51 (p.252) Motion for a Preliminary Injunction. (Ordered by Judge Jane J Boyle on 11/13/2023) (cfk) (Entered: 11/13/2023) |
| 11/13/2023 | 110 (p.1194) | NOTICE OF INTERLOCUTORY APPEAL as to 109 (p.1152) Memorandum Opinion and Order to the Fifth Circuit by William Green, Rainier Arms LLC, Second Amendment Foundation Inc, Samuel Walley. Filing fee $505, receipt number ATXNDC-14170240. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Flores, Charles) (Entered: 11/13/2023) |
| 11/15/2023 | | USCA Case Number 23-11157 in USCA5 for 110 (p.1194) Notice of Appeal filed by Samuel Walley, Second Amendment Foundation Inc, William Green, Rainier Arms LLC. (axm) (Entered: 11/15/2023) |



**TAB 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECOND AMENDMENT FOUNDATION,** *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.** | § | |
| | § | |
| *Proposed-Intervenor-Plaintiff*, | § | |
| **vs.** | § | **CIVIL ACTION NO.  3:21-CV-0116-B** |
| | § | |
| **BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,** *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## THE NATIONAL RIFLE ASSOCIATION OF AMERICA'S NOTICE OF APPEAL

Pursuant to Rules 3(a)(1) and 4(a)(1)(A) of the Federal Rules of Appellate Procedure, notice is hereby given that Proposed-Intervenor-Plaintiff The National Rifle Association of America (the "**NRA**"), by and through their attorneys, Brewer, Attorneys & Counselors, appeals to the United States Court of Appeals for the Fifth Circuit from the Memorandum Opinion and Order (Doc. 85), attached hereto as **Exhibit A**, entered by the Court in this action on the 30th day of June 2023.

Dated:  July 3, 2023

Respectfully submitted,

**BREWER, ATTORNEYS & COUNSELORS**

By: */s/ William A. Brewer III*
    William A. Brewer III
     State Bar No. 02967035
     wab@brewerattorneys.com
    Matthew H. Davis
     State Bar No. 24069580
     mhd@brewerattorneys.com
    Noah Peters (*pro hac vice* forthcoming**)**
     nbp@brewerattorneys.com

1717 Main Street, Suite 5900
Dallas, TX 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

**ATTORNEYS FOR PROPOSED-
INTERVENOR-PLAINTIFF
THE NATIONAL RIFLE
ASSOCIATION OF AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the

Court's electronic filing system on this 3rd day of July 2023, upon the following counsel of record:

| | |
|---|---|
| Charles Flores | Brian Walters Stoltz |
| (cflores@cfloreslaw.com) | (brian.stoltz@usdoj.gov) |
| Caleb Rawls | Jody D. Lowenstein |
| (calebrawls@gmail.com) | Jody.d.lowenstein@usdoj.gov) |
| | |
| *Counsel for Plaintiffs* | *Counsel for Defendants* |

*/s/ Matthew H. Davis*
Matthew H. Davis

**TAB 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECOND AMENDMENT FOUNDATION, INC., RAINIER ARMS, LLC, SAMUEL WALLEY, and WILLIAM GREEN, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 3:21-cv-00116-B |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, STEVEN M. DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, UNITED STATES DEPARTMENT OF JUSTICE, and MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, | § § § § § § § § § | |
| Defendants. | | |

---

**Notice of Appeal**

All Plaintiffs appeal to the United States Court of Appeals for the Fifth Circuit from ECF

Document number 109, the "Memorandum Opinion and Order" entered on November 13, 2023.

Respectfully submitted,

/s/ Chad Flores
Chad Flores
cf@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

**TAB 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECOND AMENDMENT FOUNDATION, INC., RAINIER ARMS, LLC, SAMUEL WALLEY, and WILLIAM GREEN, | § § § | Case No. _____ |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | COMPLAINT |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, REGINA LOMBARDO, in her official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, UNITED STATES DEPARTMENT OF JUSTICE, and JEFFREY ROSEN, in his official capacity as Acting ATTORNEY GENERAL, U.S. Department of Justice, | § § § § § § § § § | |
| | § | |
| Defendants. | § | |
| _____ | | |

23-11157.43

**INTRODUCTION**

1.      In a vitally important area of the firearms law, Defendant officials at the Bureau of Alcohol, Tobacco, Firearms and Explosives have committed serious wrongdoings that violate both the Administrative Procedure Act and Second Amendment to the United States Constitution.

2.      Knowing that a full-fledged administrative process would interfere with their anti-gun desires, the Defendants have imposed illegal restrictions on the Second Amendment's right to keep and bear arms by way of rules that violate the most rudimentary commands of due process and the APA.  Their illegal actions harm thousands upon thousands of law-abiding American citizens nationwide, including most particularly persons with disabilities and the firearms industry that supports them, each of whom is being wrongfully faced with the threat of criminal prosecution under Defendants' unlawful rulemaking.

3.      The Defendants' wrongdoing has not ceased.  It is an ongoing effort that will recur under President-elect Biden's Administration, which publicly espouses staunch anti-gun policies.  Plaintiffs therefore seek declaratory and injunctive relief requiring the government Defendants to comply with APA rulemaking requirements, to include applicable notice-and-comment procedures.

**I.      PARTIES**

**A.      Plaintiffs**

4.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of the State of Washington.  SAF's principal place of business is in Bellevue, Washington.  SAF supports education, research, publications, and legal action about the Constitution's right to privately own and possess firearms and the consequences of gun control.  SAF has over 650,000 members and has worked to promote Second Amendment rights throughout the United States since 1974.  SAF has members who are disabled, including Samuel Walley and William Green.  SAF members seek to

purchase and use arm braces sold by Rainier Arms and other firearms suppliers and manufacturers.

5.      Plaintiff Rainier Arms ("Rainier") is a private business corporation that is headquartered and has its principal place of business in the State of Washington.  Rainier Arms is in the business of selling firearms parts and accessories.

6.      Plaintiff Samuel Walley ("Walley") is a natural person and a citizen of the United States and the State of Georgia. Walley is a disabled veteran of the United States Army who suffered a traumatic injury in 2012 outside Helmand Province, Afghanistan from an improvised explosive device that resulted in the partial amputation of his right leg and left arm and a salvaged left leg limb.  Walley uses arm braces to stabilize firearms and increase his accuracy in shooting.  Walley is a SAF member.

7.      Plaintiff William Green ("Green") is a natural person and a citizen of the United States and the State of Texas. Green is a police officer who was seriously injured in the line of duty, which resulted in permanent nerve damage affecting his right hand.  Green uses arm braces to stabilize firearms and increase his accuracy in shooting.  Green is a SAF member.  He resides in Rockwall County, Texas.

8.      SAF brings this action on behalf of itself.  SAF also brings this action on behalf of its members because at least two of its members would have standing to sue in their own right, the interests the suit seeks to vindicate are germane to SAF's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

**B.      Defendants**

9.      Defendant the United States Department of Justice ("Justice Department") is, and was at all relevant times, an executive department of the United States subject to the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 551(1).  The Justice Department is headquartered in Washington DC.

10.     Defendant Jeffrey Rosen is the Acting Attorney General of the United States.  He is sued in his official capacity.  In that capacity, he oversees the Justice Department and its

components.  He is responsible for the federal conduct that is the subject of this action and for the related acts and omissions alleged herein.

11.     Defendant the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is, and was at all relevant times, a component of the Justice Department subject to the APA. *See* 5 U.S.C. § 551(1).  ATF is headquartered in Washington DC.

12.     Defendant Regina Lombardo is the ATF Acting Director.  She is sued in her official capacity.  In that capacity, she is responsible for the federal conduct that is the subject of this action and for the related acts and omissions alleged herein.

## II.     JURISDICTION AND VENUE

13.     28 U.S.C. § 1331 supplies the Court with original federal question jurisdiction over this action because it arises under the Constitution and laws of the United States.

14.     This action seeks declaratory, injunctive, and other relief pursuant to the Constitution of the United States of America, 5 U.S.C. § 702, 5 U.S.C. § 705, 5 U.S.C. § 706, 28 U.S.C. § 1651(a), 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

15.     There exists an active, justiciable controversy amongst the parties about whether the Justice Department complied with the APA, 5 U.S.C. §§ 551-559, and violated Second Amendment rights in promulgating the Open Letter and Notice of Rulemaking attached to this complaint as Exhibits A and B.  Declaratory relief will resolve this controversy and eliminate the burden imposed on Plaintiffs' stemming therefrom.

16.     This Court constitutes a proper venue for this action because this is an action against officers and agencies of the United States, a plaintiff resides in this judicial district, and no real property is involved in the action. *See* 28 U.S.C. § 1391(e)(1)(C).

## III.     DEFENDANTS' ARM BRACE RULE

### A.     The National Firearms Act

17.     Congress passed the National Firearms Act of 1934 ("NFA"), Pub.L. 73–474, 48 Stat. 1236, to impose a tax on the making and transfer of firearms defined by the NFA, as well as a special (occupational) tax on persons and entities engaged in the business of importing,

4

manufacturing, and dealing in NFA firearms. The law also requires the registration of all NFA firearms with the Secretary of the Treasury.

18.     With passage of the Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213, Congress revised the NFA by enacting Title II of the GCA, which regulates machineguns, short-barreled shotguns and rifles, and destructive devices (including grenades, mortars, rocket launchers, and other heavy ordnance). 26 U.S.C. § 5801 et seq.  Rifles and pistols not subject to the NFA are regulated under Title I of the GCA. 18 U.S.C. § 921 et seq.

19.     Both a "rifle" and "shotgun" are defined under the NFA in terms of "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . . ." *Id.* at § 5845(c) and (d).

20.     Short-barreled rifles and shotguns subject to the NFA are defined as rifles "having a barrel or barrels of less than 16 inches in length" and shotguns "having a barrel or barrels of less than 18 inches in length". *Id.* at § 5845(a).

21.     The GCA defines "handgun" to mean, in part, "a firearm which has a short stock and is designed to be held and fired by the use of a single hand . . . ." 18 U.S.C. § 921(a)(29). And the term "pistol" is defined in ATF regulations to mean "[a] weapon originally designed, made, and intended to fire a projectile (bullet) from one or more barrels when held in one hand, and having (a) a chamber(s) as an integral part(s) of, or permanently aligned with, the bore(s); and (b) a short stock designed to be gripped by one hand and at an angle to and extending below the line of the bore(s)." 27 C.F.R. § 479.11 (emphasis added).

**B.     Stabilizing Arm Braces**

22.     Stabilizing arm braces ("arm braces") are accessories installed on pistols and shotguns that allow users to stabilize these firearms against their arms, resulting in more accurate shooting without compromising safety or comfort, and reducing the risk of bruising and other

23-11157.47

injuries when shooting from one hand.  They generally consist of two flaps, a strap, and shroud attached to the end of a firearm.[1]

23.     Originally developed for use by people with disabilities, those with and without disabilities now use arm braces as an additional point of support to ensure firearm safety and accuracy in operation of pistols and shotguns.

24.     Reportedly, over two million arm braces have been sold.

25.     Arm braces are commonly owned throughout the United States.

26.     Arm braces are in common use throughout the United States.

**C.      ATF's Initial Rule on Classification of Arm Braces**

27.     In a November 2012 private classification letter, ATF determined that a pistol equipped with an arm brace was not subject to NFA control.[2]

28.     Thereafter, in a March 2014 private classification letter (the "2014 Letter"), ATF determined that shouldering a pistol with an arm brace does not change the classification of the pistol under federal law:

> For the following reasons, we have determined that firing a pistol from the shoulder would **not** cause the pistol to be reclassified as an SBR:
>
> FTB classifies weapons based on their physical design characteristics. While usage/functionality of the weapon does influence the intended design, it is not the sole criterion for determining the classification of a weapon. Generally speaking, we **do not** classify weapons based on how an individual uses a weapon.
>
> FTB has previously determined (see FTB # 99146) that the firing of a weapon from a particular position, such as placing the receiver extension of an AR-15 type pistol on the user's shoulder, does not change the classification of a weapon. Further, certain firearm accessories such as the SIG Stability Brace have not been classified by FTB as shoulder stocks and, therefore, using the brace improperly does not constitute a design change. Using such an accessory improperly would not change the classification of the weapon per Federal law.

---

[1] *See, e.g.*, www.sb-tactical.com (last accessed Jan. 14, 2021).

[2] ATF Letter to Redacted Recipient, Nov. 26, 2012 ("FTB finds that the submitted forearm brace, when attached to a firearm, does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm."). Exhibit C.

23-11157.48

ATF Letter to Sergeant Joe Bradley of the Greenwood Police Department, Mar. 5, 2014 (emphasis in original). Exhibit D.

**D.     ATF Reverses its Initial Rule on Arm Braces**

29.     Less than a year after the 2014 Classification Letter, in an abrupt about-face, ATF issued two private classification letters[3] and issued its "Open Letter on the Redesign of 'Stabilizing Braces'" on January 16, 2015 (the "2015 Open Letter") completely reversing the position taken in its 2014 Letter. Exhibit A.

30.     In its 2015 Open Letter, ATF stated that the use of stabilizing braces, as designed, would not create a short-barreled rifle when attached to a firearm; and that stabilizing braces are perfectly legal accessories for large pistols. *Id.*  However, the 2015 Open Letter also advised that, because the stabilizing brace was not designed as a shoulder stock, "use" of the device as a shoulder stock would constitute a "redesign" of the firearm to which it was attached, resulting in the classification of the firearm as a short-barreled rifle subject to the NFA:

> The pistol stabilizing brace was neither "designed" nor approved to be used as a shoulder stock, and therefore use as a shoulder stock constitutes a "redesign" of the device because a possessor has changed the very function of the item. **Any individual letters stating otherwise are contrary to the plain language of the NFA, misapply Federal law, and are hereby revoked**.
>
> Any person who intends to use a handgun stabilizing brace as a shoulder stock on a pistol (having a rifled barrel under 16 inches in length or a smooth bore firearm with a barrel under 18 inches in length) must first file an ATF Form 1 and pay the applicable tax **because the resulting firearm will be subject to all provisions of the NFA.**

*Id.* (emphasis added).

31.     The 2015 Open Letter did more than simply interpret existing law.  It made a substantive change to existing law in a complete revocation and reversal of ATF's previous rule, as established in the 2014 Letter.

---

[3] *See* ATF Letter to Eric Lemoine, Oct. 28, 2014 (stating pistol with arm brace is subject to NFA when arm brace is used as a shoulder stock); ATF Letter to Redacted Recipient, Nov. 10, 2014 (same). Letters attached at Exhibit E.

32.     ATF has since issued interpretations of the 2015 Open Letter in private classification letters that limit scope of the rule and create an exception for "incidental, sporadic, or situational 'use'" of an arm-brace on firearms that do not have certain modifications.

33.     Specifically, in a 2017 classification letter to SB Tactical (the "2017 Letter"), ATF acknowledged "that the *Open Letter* may have generated some confusion concerning the analytical framework by which those conclusions were reached." ATF clarified:

> To the extent the January 2015 Open Letter implied or has been construed to hold that incidental, sporadic, or situational "use" of an arm-brace (in its original approved configuration) equipped firearm from a firing position at or near the shoulder was sufficient to constitute "redesign," such interpretations are incorrect and not consistent with ATF's interpretation of the statute or the manner in which it has historically been enforced.

ATF Letter to M. Barnes, Mar. 21, 2017. Exhibit F.

34.     The 2017 Letter also stated:

> If, however, the shooter/possessor takes affirmative steps to configure the device for use as a shoulder-stock—for example, configuring the brace so as to permanently affix it to the end of a buffer tube, (thereby creating a length that has no other purpose than to facilitate its use as a stock), removing the arm-strap, or otherwise undermining its ability to be used as a brace—and then in fact shoots the firearm from the shoulder using the accessory as a shoulder stock, that person has objectively "redesigned" the firearm for purposes of the NFA. This conclusion is not based upon the mere fact that the firearm was fired from the shoulder at some point.

*Id.*

35.     Worsening the confusion caused by its 2015 Open Letter, the 2017 Letter did not define "incidental, sporadic, or situational 'use'", instead leaving it to ATF to decide on a case-by-case basis.

36.     In other private classification letters, which were posted on the Internet by various companies and individuals, ATF determined that the addition of ridges to the end of a brace,[4]

---

[4] *See* ATF Letter to M. Faucette, Dec. 22, 2015. Exhibit G.

8

and/or certain other modifications made to a weapon, when present with a brace that is sporadically shouldered may subject a pistol to NFA requirements.

## IV.   DEFENDANTS' VIOLATION OF APA REQUIREMENTS

### A.   APA Notice-and-Comment Requirements

37.   The APA applies to all executive branch agencies. 5 U.S.C. § 551(1).   It prescribes procedures for agency actions such as rulemaking, as well as standards for judicial review of agency actions.

38.   Rulemaking is the "agency process for formulating, amending, or repealing a rule". 5 U.S.C. § 551(5).

39.   A rule is defined as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

40.   Under the APA, **legislative rules** are rules through which an "agency intends to create new law, rights or duties," *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc).   They also include rules issued by an agency pursuant to statutory authority that implements a statute and where, in the absence of the rule, "there would not be an adequate legislative basis for enforcement action." *Wilson v. Lynch*, 835 F.3d 1083, 1099 (9th Cir. 2016) (citations omitted).   In addition, a rule is legislative if it "repudiates or is irreconcilable with" a prior legislative rule or if it amends a legislative rule.   *Id.*

41.   When an agency promulgates legislative rules, or rules made pursuant to congressionally delegated authority, the exercise of that authority is governed by the APA informal rulemaking procedures outlined in 5 U.S.C. § 553.

42.   These procedures include notice-and-comment provisions in which federal agencies such as ATF must publish proposed rules in the Federal Register[5] and provide the public with adequate notice of a proposed rule followed by a meaningful opportunity to comment

---

[5] The Federal Register is a government publication that lists the official and complete text of federal agency regulations.

23-11157.51

on the rule's content through the submission of written "data, views, or arguments." 5 U.S.C. § 553 (b)–(c); *see also Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1308 (D.C. Cir. 1991) ("[A]n agency can declare its understanding of what a statute requires without providing notice and comment, but an agency cannot go beyond the text of a statute and exercise its delegated powers without first providing adequate notice and comment.").

43.     Unless mandated by statute, there is no minimum period of time for which the agency is required to accept public comments.  However, in reviewing agency rulemaking, courts focus on whether the agency provided an "adequate" opportunity to comment—of which the length of the comment period represents a factor for consideration. *Fla. Power & Light Co. v. U.S.*, 846 F.2d 765, 771 (D.C. Cir. 1988).

44.     Additionally, Executive Order 12866, which provides for presidential review of agency rulemaking via the Office of Management and Budget's Office of Information and Regulatory Affairs, states that the public's opportunity to comment, "in most cases should include a comment period of not less than 60 days." Exec. Order No. 12866, § 6(a), 58 Fed. Reg. 51735, 51740 (Oct. 4, 1993).

45.     After an agency considers public feedback and makes changes where appropriate, it then publishes a final rule in the Federal Register describing and responding to public comments, with a specific date for when the rule will become effective and enforceable.

**B.      The 2015 Open Letter is Subject to APA Requirements**

46.     ATF claims that "Open Letters do not have the force and effect of federal statutes or Department of Justice regulations, and are not final agency actions."[6]  But the 2015 Open Letter was more than a mere interpretative rule and general statement of ATF policy.

47.     The 2015 Open Letter is a legislative rule that instituted a drastic change—a repudiation of the previous ATF rule on arm braces, and that set forth new legal standards and new legal requirements based on "use." *See, e.g.*, *Guedes v. Bureau of Alcohol, Tobacco,*

---

[6] "Open Letters," available at https://www.atf.gov/rules-and-regulations/open-letters (last accessed Jan. 14, 2021).

*Firearms and Explosives*, 920 F.3d 1 (C.A.D.C. 2019) (ATF rule classifying bump-stock devices as "machineguns" under NFA was legislative, rather than interpretive); *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (*citing, e.g.*, *FTC v. Standard Oil Co.*, 449 U.S. 232, 241 (1980) (APA's finality requirement is satisfied when a decision is a "definitive statement of the agency's position and had a direct and immediate effect on the day-to-day business" of the affected parties)).

48.     Moreover, the ATF private classification letters interpreting and applying the 2015 Open Letter are themselves final agency actions subject to the APA. *See, e.g.*, *Sig Sauer*, 826 F.3d at 600 n.1 ("The parties agree that ATF's issuance of a classification letter is a 'final agency action' that is reviewable under the Administrative Procedure Act."); *see also Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014) (finding ATF private classification determination arbitrary and capricious under the APA).

49.     In fact, following Defendants' promulgation of the 2015 Open Letter, the Justice Department enforced ATF's new rule for arm braces in criminal proceedings under the NFA. *See, e.g.*, *USA v. Wright*, Case No. 3:2018-cr-00162 (N.D. Ohio).[7]  Such enforcement provides clear evidence that Defendants intend the 2015 Open Letter to serve as a binding application of its rulemaking authority.

**C.      ATF's 2020 Notice of Rulemaking**

50.     On June 16, 2020, various Members of Congress sent a letter to ATF demanding that ATF clearly state the specific criteria used to determine if and when use of an arm brace somehow converts a non-controlled firearm into an NFA firearm. Exhibit H.

---

[7] *See* Government's publicly available Motion in Limine from case discussing how "the primary issue in dispute at trial will be whether or not Kelland Wright's firearm meets the definition of a 'rifle,' that is a firearm designed to be fired from the shoulder"; and discussing the Government's desire to keep its arm brace private classification letters off the record. A copy of motion is available online at: https://princelaw.files.wordpress.com/2018/10/motion-in-limine-atf-determinations.pdf (last accessed Jan. 14, 2021).

23-11157.53

51.     The letter from Members of Congress described ATF's treatment of arm braces as: "arbitrary Agency action without any solid foundation in law [that] has the potential to create overnight felons of millions of law-abiding gun owners, firearm manufacturers and Federal Firearms Licensees all without ever notifying those individuals that the ATF has — in secret — come up with a novel interpretation of law without proper comment, review or notice." *Id.*

52.     Thereafter, on December 18, 2020, ATF published a notice in the Federal Register seeking to impose NFA controls on braces meeting certain "Objective Factors for Classifying Weapons with 'Stabilizing Braces'" (the "2020 Notice"). 85 Fed. Reg. 82,516 (Dec. 18, 2020). Exhibit B.

53.     Footnote 8 of the 2020 Notice cited the 2015 Open Letter and the 2017 Letter approvingly.

54.     The 2020 Notice explained:

When an accessory and a weapon's objective design features, taken together, are not consistent with use of the accessory as an arm brace, that is, not to stabilize a handgun when being operated with one hand, such weapon, configured with the accessory may fall within the scope of the NFA, particularly where the accessory functions as a shoulder stock for the weapon.

*Id.* at 82,518.

55.     Although the 2020 Notice provided a listing of design features, the listing was open-ended and included *"*peripheral accessories commonly found on rifles or shotguns that may indicate that the firearm is not designed and intended to be held and fired with one hand." *Id.* at 82,518.

56.     ATF provided an extremely short 17-day time period for public comments to the 2020 Notice that began on the last day of Chanukah and ran over Christmas Eve and New Year's Eve.

57.     Following publication of the 2020 Notice, Members of Congress sent ATF another letter on December 22, 2020 stating: "With ambiguous and malleable subjective criteria such as these, it is obvious the ATF has no interest in clarifying the matter but banning

stabilizing braces outright and submitting lawfully purchased firearms and their owners to federal regulation." Exhibit I.

58.     The letter from Members of Congress further stated: "We are disturbed a government agency would issue guidance that would take away a disabled veteran's ability to enjoy his constitutionally protected right." *Id.*

59.     After receiving over 70,000 public comments,[8] ATF withdrew the 2020 Notice. *See* 85 Fed. Reg. 86,948 (Dec. 31, 2020). Exhibit J.

60.     In its Notice of Withdrawal, ATF stated: "The withdrawal of the guidance does not change any law, regulation, or other legally binding requirement." *Id.*  And, to date, ATF has not withdrawn the rule first announced in its 2015 Open Letter.

## V.     ADVERSE IMPACTS ON PLAINTIFFS

61.     Violations of the NFA are felonies punishable by up to 10 years in prison, forfeiture of firearms in violation, and forfeiture of the individual's right to own or possess firearms in the future. *See* 26 U.S.C. § 5871.  The NFA also provides for a penalty of $10,000 for violations. *Id.*

62.     The individual plaintiffs and other SAF members who use arm braces have no intent to shoulder pistols or shotguns equipped with the accessories. Rather, they use arm braces in their only fully functional arm, or to provide support to a damaged limb, in order to stabilize firearms and increase accuracy.

63.     However, the scope of what constitutes "incidental, sporadic, or situational 'use'" of an arm brace is undefined and vague, exposing people with disabilities and other individuals to significant liability under civil and criminal law for the potential actions of friends, family members, and others who may inadvertently and improperly use their firearms.

---

[8] *See* https://beta.regulations.gov/docket/ATF-2020-0001 (last accessed Jan. 14, 2021).

23-11157.55

64.     Similarly, the scope of what cosmetic and other changes to a firearm equipped with an arm brace may subject the firearm to the NFA is seemingly open-ended, unfairly exposing people with disabilities to potential liability under civil and criminal law.

65.     The adverse impact on the individual Plaintiffs harms Rainier by impeding sales of arm braces sold by Rainier by virtue of the shared fear among would-be purchasers.  Rainier may also be forced to halt sales and recall products from customers based on reports from recipients of ATF positions taken in private classification letters.

66.     Plaintiffs reasonably expect that the threat of arbitrary enforcement of gun control laws will dramatically increase in the next four years under President-elect Biden's Administration, which publicly espouses a staunch anti-gun rhetoric.[9]

67.     To address the threat of Defendants' enforcement of the 2015 Open Rule, the individual plaintiffs and other SAF members who use arm braces are forced to choose between taking calculated risks, requesting private classification determinations[10] from Defendant ATF, or registering their firearms.

68.     The NFA private classification letter request and the NFA application and registration processes are more than *de minimis* burdens on Second Amendment rights because they involve significant wait periods.  For instance, the NFA registration requirement, which is required for short-barreled rifles, involves wait times of several months to a year or more.[11]

---

[9] *See* https://joebiden.com/gunsafety/ (last accessed Jan. 14, 2021).

[10] "Even though firearms may appear to have similar features, an ATF classification pertains only to the particular sample submitted, because variations in submissions, applicable statutes, judicial interpretations of these statutes, the manufacturer's or maker's intent, and the objective design features supporting that intent, make the general applicability of any particular classification exceedingly rare." 85 Fed. Reg. at 82517.

[11] *See Transfer Tracking*, NFA TRACKER, available at https://www.nfatracker.com/nfa-transfer-time-tracking/ (last accessed Jan. 14, 2021).

23-11157.56

69.     Moreover, Defendants' restrictions on arm braces, accessories necessary for disabled persons to safely exercise rights protected by the Second Amendment, violate the Rehabilitation Act of 1973, which applies to actions by federal executive branch agencies.[12]

70.     Requiring Defendants to provide Plaintiffs and other members of the public with an adequate opportunity to submit comments, and proper agency consideration and response to those comments, will alert Defendants to the many legal and practical deficiencies of the 2015 Open Letter, which, in turn, should reduce the unwarranted risk of criminal or civil penalties and the potential for costly product recalls and other corrective actions.

## VI.     CAUSES OF ACTION

### A.     Count One: Violation of the Administrative Procedures Act

71.     Plaintiffs incorporate the preceding paragraphs as if separately stated herein.

72.     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

73.     The Open Letter is a legislative rule because, among other things, it establishes new legal requirements, reverses the prior rule on arm braces, substantially impacts Plaintiffs and other members of the public, and forms the basis of criminal enforcement actions.

74.     Defendants therefore committed a final agency action that was not in accordance with procedural law by failing to publish the 2015 Open Letter on the Federal Register and failing to adequately open the rule to public comment.  Plaintiffs are therefore entitled to a judgment holding this conduct unlawful and awarding damages.

75.     Defendants committed and/or attempted to commit a final agency action that was not in accordance with procedural law by publishing the 2020 Notice with a 17-day public

---

[12] *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination…under any program or activity conducted by any Executive agency . . . .").

23-11157.57

comment period over the 2020 holiday season.  Plaintiffs are therefore entitled to a judgment holding this conduct unlawful and awarding damages.

76.     Defendants committed and/or attempted to commit a final agency action that was not in accordance with procedural law by withdrawing the 2020 Notice in an apparent attempt to sidestep over 70,000 public comments.  Plaintiffs are therefore entitled to judgment holding this conduct unlawful and awarding damages.

### B.     Count Two: Violation of the Second Amendment

77.     Plaintiffs incorporate the preceding paragraphs as is separately stated herein.

78.     The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

79.     The Supreme Court has held that the Second Amendment secures an individual right to possess firearms. *See District of Columbia v. Heller*, 554 U.S. 570 (2008).

80.     Arm braces are commonly owned firearms accessories.

81.     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

82.     Defendants violated and/or attempted to violate the Second Amendment by subjecting Plaintiffs to an unconstitutional abridgement of Second Amendment rights.  By unlawfully imposing NFA registration requirements on firearms outside the APA rulemaking process, Defendants have created new application and registration requirements that unlawfully infringe on Second Amendment rights of customers of Rainier Arms, of Green and Walley, and SAF members.

## VII.   REQUESTED RELIEF

83.     Plaintiffs request a judgment in their favor as to all claims against Defendants awarding them all relief they are entitled to;

23-11157.58

84.     Plaintiffs request a declaration that Defendants' conduct violates applicable APA procedural requirements;

85.     Plaintiffs request a declaration that Defendants' conduct violates the Second Amendment;

86.     Plaintiffs request an injunction, on a preliminary and permanent basis, enjoining Defendants from further failures to comply with APA rulemaking requirements;

87.     Plaintiffs request an order requiring that Defendant ATF publish the public comments it received in response to the 2020 Notice;

88.     Plaintiffs request an order requiring that, in any subsequent final agency action regarding arm braces, Defendant ATF provide at least 60 days for public comment;

89.     Plaintiffs request an order requiring that, in any subsequent final agency action regarding arm braces, Defendant ATF describe and respond to the public comments it received in response to the 2020 Notice;

90.     Plaintiffs request an award of actual damages;

91.     Plaintiffs request an award of nominal damages;

92.     Plaintiffs request an award against Defendants of reasonable attorney fees and costs pursuant to 5 U.S.C. § 504(a)(1) and 28 U.S.C. § 2412; and

93.     Plaintiffs request any other relief against Defendants to which Plaintiffs are entitled.


Respectfully submitted,

BECK REDDEN LLP
By /s/ *Chad Flores*
Chad Flores
cflores@beckredden.com
State Bar No. 24059759

23-11157.59

Hannah Roblyer
hroblyer@beckredden.com
State Bar No. 24106356
1221 McKinney St., Suite 4500
Houston, TX 77010
(713) 951-3700 | (713) 952-3720 (fax)

FARHANG & MEDCOFF
Matthew Goldstein *
mgoldstein@farhangmedcoff.com
D.C. Bar No. 975000
4801 E. Broadway Blvd., Suite 311
Tucson, AZ 85711
(202) 550-0040 | (520) 790-5433 (fax)

Attorneys for Plaintiffs

*Pro Hac Vice application forthcoming*

23-11157.60

**TAB 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECOND AMENDMENT FOUNDATION, INC., RAINIER ARMS, LLC, SAMUEL WALLEY, and WILLIAM GREEN, | § § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00116-B |
| | § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, STEVEN M. DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, UNITED STATES DEPARTMENT OF JUSTICE, and MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, | § § § § § § § § § | |
| | § | |
| Defendants. | | |

---

**Plaintiffs' Additional Declarations in Support of
Plaintiffs' Motion for a Preliminary Injunction**

Plaintiffs submit these additional declarations in support of their motion for a preliminary injunction.  Defendants do not oppose this submission.

Respectfully submitted,

/s/ Chad Flores
Chad Flores
cf@chadfloreslaw.com
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440



**TAB 6**

DocuSign Envelope ID: A513AD84-A332-44CB-989B-EDE484046D71

**Declaration of John Hwang**

I, John Hwang, declare under penalty of perjury that the following statements are true and correct:

1.  My March 2023 declaration remains true and correct in all respects and is attached here. I remain familiar with the federal regulation entitled *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023) (the "Rule").

2.  Because of the Rule, Rainier continues to lose substantial profits that it would otherwise be making from the sale of brace-equipped AR-style pistols and components thereof. Customer demand dropped precipitously for predictable reasons that everyone in this industry knows to be true—because the Rule's resulting requirements of NFA compliance are both practically burdensome and constitutionally intolerable. The amount of these lost revenues for Rainier is substantial, easily exceeding tens of thousands of dollars per month.

3.  Because of the Rule, Rainier continues to lose substantial customer good will that it would otherwise be sustaining and growing. Since its founding in 2005, Rainier has successfully built an exemplary nationwide reputation for delivering high-end tactical firearms, parts, and accessories—always in full compliance with the law. Rainier's exceptional reputation extends to the many Americans that rely upon brace-equipped AR-style pistols for safe and effective self-defense, especially veterans with disabilities. Even though Rainier's offerings have always fully complied with the law, the Rule nonetheless casts a chilling legal cloud that injures customer good will.

4.  Judicial relief stopping ATF's enforcement of the Rule vis-à-vis Rainier would work to substantially lessen and/or totally halt these harms. Customer demand for the products at issue could return to near-normal levels, and Rainer could go back to providing all of its customers' most desired products free from the Rule's chilling legal cloud.

5.  I executed this declaration on October 14, 2023.

DocuSigned by:

*John Hwang*

5C852AB772DC47C...

John Hwang

October 14, 2023

DocuSign Envelope ID: A513AD84-A332-44CB-989B-EDE484046D71

**Declaration of John Hwang**
**March 3, 2023**

I, John Hwang, declare under penalty of perjury that the following statements are true and correct:

1.      I founded Rainier Arms and am its current CEO.

2.      Rainier Arms, LLC ("Rainier") is a private corporation headquartered and with principal place of business in the State of Washington.  Rainier is in the business of selling a wide variety of firearms and firearm parts and accessories to customers nationwide, including customers in this District. Most of Rainier's business is conducted via the internet.

3.      Rainier sells arm braces and brace-equipped firearms ("arm brace products").  This aspect of Rainier's business is longstanding, substantial in economic magnitude, a significant driver of customer good will, and critical to the company's overall financial health.

4.      Rainier's arm brace products are designed and manufactured by well-established third-party firms such as A3 Tactical and SB Tactical, whose current arm brace offerings are generally representative of Rainier's arm brace products.  Specific representative examples of Rainier's arm brace products include the "SB TACTICAL SOB BRACE BLACK," the "SB TACTICAL SBA3 PISTOL STABILIZING BRACE," the "SB TACTICAL SBM47 AK47/74 BRACE," the "A3 TACTICAL ALUMINUM OFFSET MODULAR SIDE FOLDING STEADY ARM BRACE," and the "SIG SAUER MCX / MPX PIVOTING CONTOUR BRACE."

5.      The Arm Brace Rule injures Rainier concretely and substantially.  In particular, the Arm Brace Rule injures Rainier by imposing substantial economic losses.  Immediately upon issuance, the Arm Brace Rule deprived Rainier of substantial profits by causing customers to cancel then-pending orders; and ever since its issuance, the Arm Brace Rule has deprived Rainier of substantial profits by making otherwise willing customers either legally ineligible or practical incapable of using Rainier's arm brace products.  The Arm Brace Rule also injures Rainier by depriving it of customer good will, as its products have now arguably triggered onerous federal firearms regulations.  The Arm Brace Rule also injured and continues to injure Rainier by forcing it to incur substantial unrecoverable compliance costs.

6.      I executed this declaration on March 3, 2023.

_John Hwang_
John Hwang

23-11157.1132

**TAB 7**

### Declaration of Alan M. Gottlieb

I, Alan M. Gottlieb, declare under penalty of perjury that the following statements are true and correct:

1.　　My March 2023 declaration remains true and correct in all respects and is attached here.  I remain familiar with the federal regulation entitled *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023) (the "Rule").

2.　　One of SAF's core functions is to vindicate the Second Amendment's right to keep and bear arms, including brace-equipped AR-style pistols that the Rule illegally regulates.  The SAF members that serve as named plaintiffs in this action—Rainier Arms, Samuel Walley, and William Green—fairly represent a large swath of SAF's overall membership that is similarly burdened by and similarly in need of immediate judicial relief from the Rule.

3.　　If not for the Rule's chilling legal effects, many of these SAF members would purchase a brace-equipped AR-style pistol within the next year, and would keep and bear it only for traditionally lawful purposes such as self-defense within the home.  For many of these SAF members, Rule compliance via ATF's registration system would entail extraordinary outlays of personal effort, time, and risk because the complex application requires specialized legal knowledge and is backed by extremely stiff penalties. And for the many SAF members whose incomes are near or below the American household average, rule compliance via payment of ATF's $200 tax is financially onerous, not *de minimis*.

4.　　I executed this declaration on <u>October 14, 2023</u>.

DocuSigned by:

*Alan Gottlieb*

432E1FBC053342E...

Alan Gottlieb

DocuSign Envelope ID: 2F2759A0-5AF2-4B17-9D62-936D6B7D8227

**Declaration of Alan Gottlieb**
**March 3, 2023**

I, Alan M. Gottlieb, declare under penalty of perjury that the following statements are true and correct:

1.  I founded the Second Amendment Foundation, Inc. ("SAF") in 1974 and have overseen its operations almost continuously since then. I am familiar with all significant aspects of SAF operations.

2.  SAF is a non-profit membership organization incorporated under the laws of the State of Washington. SAF's principal place of business is in Bellevue, Washington. It is governed by a board of trustees and has members nationwide and in this district. SAF's members voluntarily associate themselves with SAF and pay membership dues to finance SAF's activities.

3.  SAF promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control. SAF has over 720,000 members and supporters, and has worked to promote Second Amendment rights throughout the United States since 1974.

4.  SAF brings this action on behalf of itself. SAF also brings this action on behalf of its members because at least one of its members would have standing to sue in his own right, the interests the suit seeks to vindicate are germane to SAF's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

5.  A substantial number of SAF members have a concrete and particularized interest in the Arm Brace Rule's treatment of brace-equipped pistols. Some these SAF members use such a firearm's arm brace only as an arm brace because of limb-related physical disabilities that inhibit the safe and effective firearm use otherwise. Other of these SAF members do not have limb-related disabilities and use such a firearm's arm brace only as an arm brace to facilitate safe and effective firearm use that cannot be achieved otherwise. All of these SAF members have in the past and/or would in the immediate future legally acquire from sellers such as Rainier Arms, LLC either an arm brace or a brace-equipped pistol of the kind that is currently offered. All of these SAF members are fully eligible to possess firearms under federal and state law. All of these SAF members use firearms for only traditionally lawful purposes, such as self-defense within the home.

6.  For these SAF members, compliance with the Arm Brace Rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023), causes serious and irreparable injuries no matter what compliance method occurs. For these SAF members, the NFA registration process costs are substantially injurious and irrecoverable; altering their firearms would significantly lessen their safety and/or efficacy; and worst of all, a requirement of firearm destruction or turnover would abridge their Second Amendment right to keep and bear arms.

7.  I executed this declaration on March 2, 2023.

_Alan M. Gottlieb_
_____

Alan M. Gottlieb

**TAB 8**

**Declaration of Samuel Walley**

I, Samuel Walley, declare under penalty of perjury that the following statements are true and correct:

1.    My March 2023 declaration remains true and correct in all respects and is appended here.

2.    I remain familiar with the federal regulation entitled *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023) (the "Rule"). I still cannot understand or otherwise decipher through other efforts, with a comfortable degree of certainty, exactly what the Rule does and does not deem a "short-barreled rifle."

3.    If not for the Rule's chilling legal effects, I would purchase another brace-equipped AR-style pistol within the next year. As with the brace-equipped AR-style pistols that I acquired in the past, I would keep and bear this brace-equipped AR-style pistol only for traditionally lawful purposes, such as self-defense within the home.

4.    For the brace-equipped AR-style pistols that I have and intend to acquire, the burdens of Rule compliance entail extraordinary outlays of personal effort, time, and money. The registration application requires mastery of complex legal terms that cannot be accurately answered without either extensive personal research or the engagement of a lawyer, and processing times cause meaningful acquisition delays. The $200 tax is financially onerous. Expenses of that amount impact my financial well-being significantly and materially. And last but not least, forced compliance with this illegal Rule violates my Second Amendment right to keep and bear arms.

5.    I executed this declaration on October 15, 2023 _____

DocuSigned by:

Samuel Walley
190FB08A35B0462...
Samuel Walley

DocuSign Envelope ID: 86837AE0-8BB1-4663-BA2C-BADE8C0E4984

## Declaration of Samuel Walley
### March 3, 2023

I, Samuel Walley, declare under penalty of perjury that the following statements are true

and correct:

1. I am a citizen of the United States the State of Georgia. I am a Second Amendment Foundation member. I am eligible to possess firearms under state and federal law.

2. I am a United States Army veteran with disabilities incurred during active duty. While serving in 2012 in Afghanistan, an improvised explosive device inflicted traumatic injuries that resulted in the partial amputation of my leg and left arm.

3. Because of my physical disabilities, I possess multiple brace-equipped pistols. Each has a common "AR pistol" configuration and includes the kind of arm brace that is commonly available. Without an arm brace, my disability prevents the operation of these firearms with sufficient safety and efficacy. With an arm brace, I am able to safely and effectively operate these firearms despite my disability.

4. I keep and bear these brace-equipped pistols only for traditionally lawful purposes, such as self-defense within the home. I operate them regularly to maintain a fully responsible, safe, and effective level of preparedness.

5. The Arm Brace Rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023), injures me directly, concretely, and substantially no matter which compliance path is forced. Complying via the NFA registration process would inflict substantial financial injuries that would never be recovered. Complying by altering my firearms would inflict the substantial practical injury of significantly lessened firearm safety and/or efficacy. Worst of all, compliance by way of firearm destruction or surrender inflicts the irreparable harm of abridging my Second Amendment right to keep and bear arms.

6. I executed this declaration on March 3, 2023.

_____

**Samuel Walley**

23-11157.1136

**TAB 9**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECOND AMENDMENT FOUNDATION, INC., RAINIER ARMS, LLC, SAMUEL WALLEY, and WILLIAM GREEN<br><br>    Plaintiffs,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, STEVEN M. DETTELBACH, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, UNITED STATES DEPARTMENT OF JUSTICE, and MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,<br><br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:21-CV-0116-B |

## MEMORANDUM OPINION AND ORDER

Before the Court is Second Amendment Foundation, Inc. ("SAF"), Rainier Arms, LLC ("Rainier Arms"), Samuel Walley, and William Green ("Plaintiffs")'s Motion for a Preliminary Injunction (Docs. 51, 52, 55, 59, 95, 97).

Plaintiffs in this case challenge an administrative rule (the "Final Rule") regulating firearms equipped with a stabilizing brace ("brace-equipped firearms"). The Final Rule was published by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") on January 31, 2023. Plaintiffs contend the Final Rule is invalid because it: (i) is not a logical outgrowth of the Proposed Rule, (ii) is promulgated in excess of agency authority and contradicts the statute the ATF seeks to interpret, (iii) has an unlawful effective date, (iv) is unconstitutionally vague, (v) is arbitrary and capricious

- 1 -

for failure to consider the Second Amendment inquiry under *Bruen*, and (vi) is unconstitutional under the Second Amendment. Doc. 52, Pls' Br., 14–17 (citing *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S. Ct. 2111 (2022)); Doc. 95, Pls' Supp. Br., 2–3. The Final Rule, in its simplest terms, sets out a multi-factor test to define when statutory registration and taxation would apply to a brace-equipped firearm. Plaintiffs seek to enjoin the Final Rule's enforcement nationwide[1] and specifically against them until this case's resolution. Having considered the parties' briefing and oral arguments under the applicable law, the Court **DENIES** Plaintiffs' Motion for a Preliminary Injunction.

## I.

## BACKGROUND

A.  *The Final Rule and its Statutory Background*

The National Firearms Act of 1934 ("NFA") was enacted by Congress to deter the use of dangerous, concealable firearms associated with emerging organized criminal activity. 26 U.S.C §§ 5801–5872; *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002); *see also United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.). One category of firearms regulated by the NFA is a short-barreled rifle ("SBR"). 26 U.S.C. § 5845(a). Over thirty years following its enactment of the NFA, Congress enacted the Gun Control Act of 1968 ("GCA"), expanding federal firearms regulation. 18 U.S.C. §§ 921–31.

The NFA defines a rifle as:

> [A] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of

---

[1] During the evidentiary hearing Plaintiffs' counsel represented that at this stage, Plaintiffs seek an "injunction, personalized that binds these plaintiffs and defendants." Doc. 106, Hearing Transcript, 5. However a "universal vacatur . . . . is pleaded for . . . ultimately. *Id.*

23-11157.1153

the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

*Id.* § 5845(c).

The NFA and GCA define "rifle" almost identically. *Compare* 26. U.S.C. § 5845(c) *with* 18 U.S.C. § 921(a)(7). The statutory definitions of a "rifle" implicate the definitions of an SBR under the GCA and NFA. The GCA defines an SBR as "a rifle having one or more barrels less than 16 inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than 26 inches." 18 U.S.C. § 921(a)(8). The NFA has a similar definition for SBRs. 26 U.S.C. §§ 5845(a)(3), (4).

The NFA imposes registration, taxation, and use requirements over SBRs. 26 U.S.C. §§ 5801–02, 5811–12, 5821–22, 5841, 5845(a).  Specifically, SBRs "must be registered in the National Firearms Registration and Transfer Record ('NFRTR') to a person entitled to possess the firearm," they "require approval by the Attorney General before their transfer or making," and they "are subject to transfer and making taxes." Final Rule at 6,479 (citing 26 U.S.C. §§ 5811–12, 5821–22, 5841). Importers, manufacturers, and dealers of SBRs must register certain identifying information with the Attorney General and pay a special occupation tax for each place of business. 26 U.S.C. §§ 5801–02. SBRs are regulated by the NFA in part because they have firepower similar to an ordinary rifle but are more concealable than ordinary rifles. *See Thompson/Center Arms Co.*, 504 U.S. at 517 ("It is of course clear from the face of the [NFA] that the NFA's object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used."). Violations of both the NFA and GCA carry criminal penalties. Violations under the NFA are punishable by up to ten

23-11157.1154

years in prison and a fine of up to $10,000. 26 U.S.C. § 5871. Non-compliance with the GCA is punishable by up to five years in prison and a fine of up to $250,000. 18 U.S.C. §§ 924(a)(1), 3571.

Recently, confusion has arisen about whether brace-equipped firearms constitute SBRs under the NFA and GCA. Doc. 55, ATF Resp., 5–7. In response to this confusion, the ATF engaged in rulemaking to creates framework to determine whether attaching a brace to a firearm renders that brace-equipped firearm an SBR under the NFA. Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("the Final Rule"). The Final Rule comes years after informal ATF classifications of various types of brace-equipped firearms. *Id.*

Stabilizing braces were originally designed to assist people with disabilities or limited strength or mobility to safely and single-handedly fire heavy pistols. *Id.* at 5. In 2012, the ATF received its first request to classify a brace prototype designed to attach onto one's forearm and a receiving AR-15 type pistol, which the ATF concluded did not change the resulting device's classification "into a weapon designed or intended to be fired from the shoulder" *Id.*

In the following years, the "ATF received an increasing number of classification requests" for braced firearms that the ATF admits it did not resolve with "a standard set of criteria . . . resulting in inconsistent (and occasionally incorrect) guidance." Doc. 55, ATF Resp., at 5–7 (discussing select classification responses between 2012-2020). In some instances, the ATF concluded the brace-equipped firearm was not an SBR under the NFA. *Id.* In 2014, the ATF started classifying certain brace-equipped firearms as SBRs. *Id.* But later classifications by the ATF included limitations to when brace-equipped firearms could be considered SBRs. At the same time brace-equipped firearms continued to evolve and many emerged that included characteristics resembling shoulder stocks. *Id.*; Defs' Evidentiary Hearing Slides, 35–42. The ATF also learned that manufacturers were widely marketing these "braces" to consumers as a means of creating

functional SBRs that avoided NFA requirements for SBRs, thereby allowing consumers to fire the brace-equipped firearms from the shoulder. Final Rule at 6,503, 6,527, 6,545–48.



Figure 1. The "forearm brace" prototype of 2012, which the ATF did not classify as a short-barreled rifle. Final Rule at 6,483.



Figure 2. Contemporaneously marketed heavy pistols equipped with a "stabilizing brace" (top) compared with contemporaneously marketed rifle by same company (bottom). Final Rule at 6,494.

To respond to this trend in manufacturing and consumer use, as well as its varied classifications, the ATF published a notice of proposed rulemaking ("Proposed Rule") in June 2021. 86 Fed. Reg. 30,826. The Final Rule was published on January 31, 2023. 88 Fed. Reg. 6,478. The Final Rule amends the definition of "rifle" under ATF regulations, which address the ATF's meaning for the term "rifle" in the NFA and GCA. 27 CFR §§ 478.11, 479.11. The Final Rule sets up a multi-factor criterion by which the ATF determines whether a brace-equipped firearm is

23-11157.1156

"designed or redesigned, made or remade, and intended to be fired from the shoulder" under the NFA and GCA's definition of "rifle." Final Rule at 6,574–75.

According to the Final Rule, "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder," is interpreted by the ATF to include any weapon "that is equipped with an accessory, component, or other rearward attachment," such as a stabilizing brace, "that provides surface area that allows the weapon to be fired from the shoulder, provided other factors . . . indicate that the weapon is designed, made, and intended to be fired from the shoulder." *Id.* The "other" factors used in this determination are:

> (1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
> (2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;
> (3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;
> (4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;
> (5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and
> (6) Information demonstrating the likely use of the weapon in the general community.

*Id.*

After the Final Rule's publication, anyone who newly acquired or transferred a brace-equipped firearm deemed an SBR under the Final Rule's criteria was required to follow the NFA's requirements over SBRs, namely, to register the device and pay a $200 tax. Final Rule at 6,481; 26 U.S.C. §§ 5801–02. While the Final Rule was "immediately effective," the Final Rule simultaneously states the ATF would not initiate any enforcement action over new acquisitions or transfers for at least 60 days from the date of publication. Final Rule at 6,481. The Final Rule also

23-11157.1157

states that, as of the publication date, individuals or Federal Firearms Licensees[2] who already possessed qualifying brace-equipped firearms had a 120-day registration period to comply with the NFA without paying the $200 tax.[3] Final Rule at 6,481, 6,570, 6,498. Importers, manufacturers, and dealers of qualifying brace-equipped pistols did not need to pay the $200 tax upon registration if they already paid the special occupation tax under the NFA. *Id.*; 26 U.S.C. §§ 5801–02. The ATF estimates the Final Rule applies to 99% of brace-equipped firearms, meaning the ATF considers those devices SBRs subject to the NFA. *Mock v. Garland*, 75 F.4th 563, 574 (5th Cir. 2023) (citing ATF FINAL REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS at 21).

The ATF provides two justifications for its exercise of its rulemaking authority: regulatory clarity and public safety. First, the ATF asserts that the Final Rule provides regulatory clarity by rescinding the ATF's prior differing classifications—informal agency actions that the ATF admits did not rely on a standard criterion—and creates a publicly known framework for determining when a brace-equipped firearm is an SBR. Doc. 55, ATF Resp., 5–7, 10; *see also* Final Rule at 6,495 (referencing "criticism from various parties that [the] ATF had not widely published a definitive approach"). Second, the ATF justifies the Final Rule as protecting the public by attempting to remove from widespread circulation brace-equipped firearms that effectively function as SBRs, especially given their use in recent mass shootings. The ATF emphasizes recent mass shootings in Colorado, Ohio, and Tennessee involved gunmen using stabilizing braces with their firearms. Doc.

---

[2] This is a term used in the Final Rule to refer to licensed importers, manufacturers, dealers, or collectors, who are statutorily obligated to obtain authorization from the Attorney General to transport SBRs for interstate or foreign commerce. 18 U.S.C. §§ 922(a)(4), (b)(4).

[3] Brace-equipped firearms qualifying under the framework of the Final Rule are deemed SBRs, and thus subject to the NFA's existing taxation and registration requirements over SBRs. *See* 26 U.S.C. §§ 5801-5802, 5811-5812, 5821-5822, 5841, 5845(a)(3), 5845(c).

23-11157.1158

55, ATF Response, 20; Doc. 97, ATF Supp., 8 ("[B]race-equipped AR-type pistol killed nine people and injured at least fourteen others."). Some commenters to the Proposed Rule are former law enforcement officers echoing the concern that brace-equipped firearms "are unusually dangerous" due to their ability to "be easily concealed like a handgun but have the firepower and accuracy of a rifle." Final Rule at 6,498.

The ATF emphasizes the Final Rule does not ban brace-equipped firearms. Doc. 55, ATF Resp., 22–23, 25–26. Persons affected by the Final Rule have five options: (1) remove the short barrel of the firearm and attach a 16-inch or longer rifled barrel, (2) register the firearm with the ATF as an SBR, (3) permanently remove and destroy, or alter the "stabilizing brace" such that it cannot be reattached to a firearm, (4) forfeit the braced firearm to a local ATF office, or (5) destroy the entire braced firearm. Final Rule at 6,570.

B.  *Factual and Procedural Background*

This lawsuit commenced on January 15, 2021. There are four Plaintiffs in the instant case: (1) Rainier Arms is a Washington company selling firearms and accessories nationwide, (2) Second Amendment Foundation, Inc. ("SAF") is a Washington organization that promotes Second Amendment rights and has over 720,000 members and supporters, (3) Samuel Walley is a Georgia resident, a member of SAF, and a disabled veteran who owns multiple brace-armed pistols, and (4) William Green is a Texas resident, a member of SAF, and a disabled police officer who owns multiple brace-armed pistols. Doc. 50, Am. Compl., ¶¶ 6–7, 11, 20–21. In their initial complaint, Plaintiffs challenged the ATF's 2015 "Open Letter on the Redesign of 'Stabilizing Braces" as an invalid exercise of legislative power. Doc. 3, Compl. ¶ 47. Four months later, the Government requested the Court stay all proceedings as the ATF was initiating a notice and comment period

for the Proposed Rule. Doc. 24, Mot., 1. Through a series of orders, the Court stayed this case until the ATF promulgated the Final Rule over a year and a half later.

Shortly after the ATF published the Final Rule, Plaintiffs filed an Amended Complaint (Doc. 50) and preliminary injunction motion (Docs. 51–52) seeking to enjoin the Final Rule. A parallel case, *Mock v. Garland*, No. 4:23-cv-95 (N.D. Tex.), made its way up to the Fifth Circuit during the parties' preliminary injunction briefing. The Fifth Circuit granted the *Mock* plaintiffs an injunction pending appeal. Order, Mock v. Garland, No. 23-cv-10319, ECF No. 52. Pending the resolution of the appeal in *Mock*, this Court administratively stayed this case and administratively issued a preliminary injunction. Docs. 62, 65, 82, 93.

C.  *The Fifth Circuit's Ruling in Mock v. Garland*

The *Mock* appellate decision addressed only the plaintiffs' logical outgrowth claim. In the Fifth Circuit, the logical-outgrowth rule requires a proposed administrative rule to provide "fair notice" of the eventual Final Rule. *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021). Failing to do so constitutes a procedural error. *Mock*, 75 F.4th at 586.  If a procedural error is found, a party must "demonstrate prejudice" to its own notice interests. *Id.* (citing *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 243 (5th Cir. 2012) ("The harmless error rule requires the party asserting error to demonstrate prejudice from the error."), *aff'd*, 569 U.S. 290 (2013)); *State of Tex. v. Lyng*, 868 F.2d 795, 799 (5th Cir. 1989) (addressing the "specific prejudice alleged by appellants in the procedure followed" by the agency).

In bringing their logical outgrowth claim, the *Mock* plaintiffs addressed certain differences between the Proposed Rule and the Final Rule. The ATF's Proposed and Final Rules laid out methodologies for determining if a brace-equipped firearm falls within the statutory definition of SBRs. The Proposed Rule's methodology was based on a total points system, which assigned points

to various design criteria to judge whether a brace-equipped firearm constituted an SBR under the NFA. Proposed Rule at 30,830–31. The Final Rule replaced the points system with a multi-factor test. Final Rule 6,574–75; *see also Mock*, 75 F.4th at 584.

A divided Fifth Circuit panel ultimately reversed the district court's denial of a preliminary injunction. *Mock*, 75 F.4th at 588. The Fifth Circuit found that the methodologies of the Proposed Rule and the Final Rule were "vastly different," such that the Final Rule should have been subject to a second notice and comment process. *Id.* 585–86 (finding the Final Rule to be legislative, not interpretive). The ATF's failure to "start the notice-and-comment process again and receive public comments on the new test" therefore constituted a procedural error. *Id.* at 584. Next, the majority found that the *Mock* plaintiffs "easily" illustrated prejudice from the procedural error by showing "through [their] briefing" several comments they would have made, but were not able to make, to the Final Rule. 75 F.4th at 586, n.58. Therefore, the Fifth Circuit found that the plaintiffs adequately demonstrated they were likely to succeed on their claim that the Final Rule was not a "logical outgrowth" of the Proposed Rule, in violation of the APA. *Id.* at 578–86.

Rather than holding the Final Rule unlawful and enjoining its enforcement, the Fifth Circuit remanded the case back to the district court for further findings as to the remaining preliminary injunction factors. *Id.* at 587 ("The Final Rule therefore must be set aside as unlawful *or* otherwise remanded for appropriate remediation. . . . [We] remand for a ruling on a preliminary injunction (emphasis added)). On remand, the district court issued a preliminary injunction to the *Mock* plaintiffs, their members, customers, and family members. 2023 WL 6457920, at *17 (N.D. Tex. Oct. 2, 2023) (O'Connor, J.).

Following the Fifth Circuit's ruling in *Mock*, this Court ordered the parties to submit supplemental briefing. Doc. 93, Order. Plaintiffs had not asserted their logical outgrowth claim in

their initial preliminary injunction briefing. *Compare* Doc. 52, Pls' Br. and Doc. 59, Reply *with* Doc. 50, Am. Compl. Therefore, in their supplemental brief, Plaintiffs raised their logical outgrowth claim to support an award of preliminary injunctive relief. Doc. 95, Pls' Supp. Br. However, without any substantive analysis, or showing of prejudice, Plaintiffs' four-page supplemental brief simply asserts that *Mock* "assured" success on their logical outgrowth claim. Doc. 95, Pls' Supp. Br., 2. The ATF emphasized in its supplemental brief factual and legal deficiencies in Plaintiffs' irreparable harm argument even if the logical outgrowth claim is likely to succeed. Doc. 97, ATF Supp. Br., 2–9. The Court held an evidentiary hearing on October 18, 2023, to ascertain whether Plaintiffs' logical outgrowth claim and asserted irreparable harm have sufficient factual support. The administrative stay and preliminary injunction in this case expired on October 13, 2023.

Multiple cases like the one currently before this Court continue to circulate through federal courts nationwide with varying outcomes.[4]

## II.

## LEGAL STANDARD

"Injunctive relief is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360

---

[4] *Mock v. Garland*, No. No. 4:23-CV-00095-O, 2023 WL 6457920, at *18 (N.D. Tex. Oct. 2, 2023) (J. O'Connor) (granting preliminary injunction motion); *Britto v. ATF*, No. 2:23-cv-00019 (N.D. Tex.) (Kacsmaryk, J.); *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, No. 3:23-cv-01471 (N.D. Tex.) (Lindsey, J.); *Texas v. ATF*, No. 6:23-cv-00013, 2023 WL 7116844 (S.D. Tex. Oct. 27, 2023) (granting preliminary injunction motion); *Miller v. Garland*, 2023 WL 3692841 (E.D. Va., May 26, 2023) (denying preliminary injunction motion), *appeal filed*, (4th Cir. 2023); *Firearms Regul. Accountability Coal., Inc. v. Garland*, No. 1:23-CV-024, 2023 WL 5942365, at *5 (D.N.D. Sept. 12, 2023) (denying preliminary injunction motion), *appeal filed*, (8th Cir. 2023); *Colon v. ATF*, No. 8:23-cv-00223 (M.D. Fla.); *Watterson v. ATF*, No. 4:23-cv-00080 (E.D. Tex.) (Mazzant, J.).

23-11157.1162

(5th Cir. 2009) (internal quotation omitted). A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth requirements "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction should only be granted if the party seeking the injunction has clearly carried the burden of persuasion on all factors. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## III.

## ANALYSIS

As of October 18, 2023, none of the Plaintiffs are protected by the preliminary injunction issued in *Mock* on October 2, 2023. 2023 WL 6457920; Doc. 106, Hearing Transcript, 14–15. Therefore, the instant Motion is not mooted as to any Plaintiff.

The Court first addresses whether Plaintiffs are entitled to a preliminary injunction based on their logical outgrowth claim, given the Fifth Circuit's directive in *Mock*. Finding Plaintiffs are not likely to succeed on their logical outgrowth claim, the Court next addresses the likelihood of success on the merits of Plaintiffs' other claims in support of their preliminary injunction motion. The Court concludes Plaintiffs are not likely to succeed on the other claims. Finally, even assuming that Plaintiffs are likely to succeed on at least one of their claims, the Court addresses the irreparable harm and balance of the equities factors.

A.   *Likelihood of Success as to Logical Outgrowth Claim*

The Court adheres to the Fifth Circuit's directive in *Mock*, and finds that the Final Rule is not a logical outgrowth of the Proposed Rule. *Mock*, 75 F.4th at 584–86. However, as the Fifth

Circuit recognized, procedural error alone is not sufficient to support a finding of likelihood of success on the merits. *Id.* at 586. The plaintiffs in *Mock*, like the Plaintiffs here, still needed to show that they were prejudiced by the procedural error in order to demonstrate likelihood of success as to their logical outgrowth claim. *Id.*

Plaintiffs have not met their burden of showing they were prejudiced by the procedural error raised in *Mock*. "The harmless error rule requires the party asserting error to demonstrate prejudice from the error." *City of Arlington, Tex.*, 668 F.3d at 243; *see also Shinseki v. Sanders*, 556 U.S. 396 (2009)). Moreover, that prejudice must be specific to the asserting party by a showing of some "new information they would have submitted to the agency if given the opportunity." *State of Tex. v. Lyng*, 868 F.2d at 800; *see City of Arlington, Tex.*, 668 F.3d at 244 (comparing party's asserted concerns with comments submitted during notice and comment period). The Fifth Circuit has recognized, however, that adequate notice from an agency's notice and comment period "may be achieved in cases where the agency's decision-making process centered on the identical substantive claims as those proposed by the party asserting error, even if there were APA deficiencies." *Id.* at 245 (discussing *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011)).

Despite having the chance to submit a supplemental brief and present oral argument to raise and fully argue their logical outgrowth claim in support of a preliminary injunction, Plaintiffs merely concluded their claim "matches" the one raised in *Mock*, without delineating any reasons why their notice interests were harmed when the ATF did not conduct a second notice and comment process. Doc. 95, Pls' Supp., 2–4; Doc. 106, Hearing Transcript. Plaintiffs' counsel incorrectly asserted "*Mock* has already decided" prejudice as to Plaintiffs in this case. Doc. 106, Hearing Transcript, 64.

In *Mock*, the plaintiffs "suggested, through briefing, a number of comments they would have liked to have made against the Final Rule" if given the opportunity. 75 F.4th at 586 n.58. When pressed at the evidentiary hearing to explain the prejudice as to Plaintiffs, counsel made the broad assertion "we would have made due process comments." Doc. 106, Hearing Transcript, 16. But without more information, it is possible the Final Rule's "decision-making process centered on the identical substantive [due process] claims" as those broadly raised by Plaintiffs. *City of Arlington, Tex.*, 668 F.3d at 245; Final Rule at 6,549–52 (summarizing and addressing public comments regarding due process). Plaintiffs have not provided the Court with any examples or particular due process concerns Plaintiffs have between the Proposed Rule and the Final Rule, or any "new information they would have submitted to the agency" in another notice and comment period.[5] *Lyng*, 868 F.2d at 800; Doc. 97, Pls' Supp. Br., at 15-17. Although Plaintiffs need not have made comments to the Proposed Rule to show prejudice, they need to "explain what they would have said in response" to an agency's procedural error. *Lyng*, 868 F.2d at 799; *Mock*, 75 F.4th at 586.

The Court fully applies the Fifth Circuit's directive in *Mock*, but this case presents a different record than the one presented by the *Mock* plaintiffs. Based on the record here, the Court finds Plaintiffs have not shown prejudice. Therefore, Plaintiffs are not likely to succeed on the merits of their logical outgrowth claim.

The Court thus proceeds to assess the likelihood of success of Plaintiffs' remaining claims— none of which were analyzed by the Fifth Circuit in *Mock*.

---

[5] Plaintiffs' counsel "do[es]n't think" any Plaintiffs submitted comments during the notice and comment process. Doc. 106, Hearing Transcript, 15. Counsel attested SAF monitored the comment process and determined the organization did not need to submit comments because the comments submitted by others addressed SAF's concerns. *Id.* at 15–16. Counsel attested Rainier Arms, Green, and Walley "observed" comments submitted as well. *Id.*

B. *Likelihood of Success as to Other Procedural Claims Arising Out of APA § 706(2)(A) and (C)*

Plaintiffs contend the Final Rule exceeds the ATF's rulemaking authority and contradicts the statutes it was delegated to enforce in violation of APA § 706(2)(A) and (C). Doc. 52, Pls' Br., 9–10. According to Plaintiffs, the Final Rule is also unlawful because it impermissibly went into immediate effect without fitting a statutory exception. *Id.* at 17. Addressing each argument in turn, the Court concludes Plaintiffs are not likely to succeed on the merits of these claims.

The Court first addresses the claim that the ATF has acted in excess of its authority. The APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). In this case, authority to administer and enforce the NFA and GCA through "all needful rules and regulations" is vested in the Attorney General, who properly delegated this responsibility to the ATF Director. 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 18 U.S.C. § 926(a); 28 C.F.R. § 0.130; *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret" the NFA's definitions), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019). When agencies are given the authority to administer and enforce a statute, they often must interpret relevant provisions to ensure efficient and accurate implementation. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006).

The ATF has accordingly promulgated rules and regulations enforcing the NFA, including by classifying particular weapons and devices as subject to or exempt from federal regulation. *E.g.*, Definition of "Frame or Receiver" and Identification of Firearms, 87 FR 24652 (Apr. 26, 2022) (revising and clarifying the definition of "frame or receiver"). The Court does not find the ATF's promulgation of the Final Rule departs from the ATF's delegated authority to enforce the NFA and GCA through "all needful rules and regulations." After careful review of the full administrative

and factual record, the Court does not find the Final Rule to be impermissibly exceeding its authority to enforce the statutory definition of "rifle" because, in the absence of Congressional guidance, the Final Rule appears "needful" to enforce the NFA and GCA definitional phrase "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 18 U.S.C. § 926(a); 28 C.F.R. § 0.130. In light of the evolution of manufactured braces, *see* Final Rule at 6,482–83, 6,493-94, 6,529, 6,543, the Final Rule provides, at the very least, some comprehensible standard for enforcement by placing brace-equipped devices that act like SBRs and are being marketed as SBRs into the statutory definition of SBRs. Final Rule 6,575; 26. U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Therefore, Plaintiffs are not likely to succeed on the merits of their excess of authority claim. *See Gonzales*, 546 U.S. at 255.

Next, the Court turns to the statutory contradiction argument. Even when acting within its authority, an agency is constrained by the language of the statute it must administer and may not rewrite or redefine terms in a way that contradicts the original statute.[6] *Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (*citing Massachusetts v. EPA*, 549 U.S. 497 (2007)). According to Plaintiffs, the ATF improperly "expands" the definition of a "rifle" under the NFA by adding "elements to the definition that Congress never made part of the law." Doc. 52, Pls' Br., 9. But this legislative rule appears to pose an inquiry identical to the one posed by the NFA's definitional phrase "designed or redesigned, made or remade, and intended to be fired from the shoulder." 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c). For example, the Final Rule's third factor asks whether a brace-equipped firearm "is equipped with sights or a scope with eye relief that

---

[6] *Chevron* deference does not apply both because the ATF has not raised it and because the Final Rule interprets the NFA, which imposes criminal liabilities. *Cargill v. Garland*, 57 F.4th 447, 466 (5th Cir. 2023) (holding *Chevron* does not apply to regulations imposing criminal liability).

*requires the weapon to be fired from the shoulder* in order to be used as designed." This factor necessarily means one is looking to the brace-equipped firearm's intended use from the shoulder, just like the NFA's definitional phrase. And the first and second factors similarly pose an inquiry to identify a brace-equipped firearm whose use and design is akin to that of a rifle. Final Rule 6,757 (assessing whether design criteria are akin to "similarly designed rifles"). Indeed, all of the factors are textually grounded in the inquiry posed by the definitional phrase in "rifle" under the NFA. *E.g.*, Final Rule 6,757 ("provided other factors . . . indicate the weapon is *designed, made, and intended to be fired from the shoulder*." (emphasis added)).

Plaintiffs contend that the Final Rule's term "equipped" is a term that "must be different than 'made'" under the NFA, Doc. 52, Pls' Br., 9, without explaining why an "equipped" brace cannot be synonymous with the inquiries raised by the other statutory terms "remade," "redesigned," or "intended to be fired from the shoulder." The Government, on the other hand, illustrates reasonable decision-making behind the factors, however imperfect. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016), as revised (Jan. 28, 2016) ("A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives."). Multiple demonstratives, pulled from the Final Rule, and the Government's briefing show a rational connection between the Final Rule's factors and the underlying factual record. Doc. 55, ATF Resp., 17–19; Doc. 106, Hearing Transcript, 53–54 (explaining marketing factor); *see also* Defs' Evidentiary Hearing Slides at 17-19 (images and videos from Final Rule at 6,494, 6,546, and 6,506 n.94)).

Relatedly, Plaintiffs argue that the Final Rule should be set aside as invalid under the rule of lenity. *See* Doc. 52, Pl's Br., 10. The rule of lenity is a principle of statutory construction that applies to laws imposing criminal penalties. *See Albernaz v. United States*, 450 U.S. 333, 342 (1981).

The "touchstone" of the rule of lenity "is statutory ambiguity." *Id.* However, the rule of lenity only applies in cases of genuine ambiguity. *Voisine v. United States*, 579 U.S. 686, 698 (2016). The Court does not find the rule of lenity applicable because Plaintiffs do not adequately explain how the Final Rule creates genuine ambiguity[7] nor does the Court find a grievous ambiguity or uncertainty regarding Congress's intent behind the meaning of the NFA's definitional phrase "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); *United States v. Palomares*, 52 F.4th 640, 647 (5th Cir. 2022) ("Because we need not 'guess' at the statute's meaning, the rule of lenity does not apply."). The Court finds Plaintiffs unlikely to succeed on their claim arising out of APA § 706(2)(A).

Finally, the Court addresses Plaintiffs' argument that the Final Rule is unlawful under 5 U.S.C. § 553(d) because it expressly took effect "immediately." Doc. 52, Pls' Br., 17; Final Rule at 6,480. A substantive rule cannot be effective for at least thirty days following the rule's publication unless one of the following three exceptions applies: (i) the substantive rule "grants or recognizes an exemption or relieves a restriction;" (ii) the rule is an "interpretative rule[] or statement[] of policy;" or (iii) "as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C.A. §§ 553(d)(1)–(3). Section 533(d) "protects those who are affected by agency action taken during the 30-day waiting period without disturbing later action that is not the product" of a substantive rule's improper immediate effect. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 5:21-CV-071-H, 2023 WL 2753978, at *7 (N.D. Tex. Mar. 31, 2023) (Hendrix, J.) (quoting *Prows v. Dep't of Justice*, 938 F.2d 274, 276 (D.C. Cir. 1991)). "[T]he purpose of the

---

[7] In their Reply, Plaintiffs argue the statutory phrase "intended to be fired from the shoulder" is "best read" to mean both the intent of the manufacturer and end user. Doc. 59, Reply, 7. There is not textual basis for limiting the statutory intent to that of a manufacturer and end user. The Final Rule also takes both sources of intent into account through the fifth and sixth factors. Final Rule at 6,574–75.

thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *City of Arlington, Tex.*, 668 F.3d at 245.

Neither party's briefing addresses the first exception. The second exception does not apply because the Fifth Circuit has held the Final Rule to be legislative. *Mock*, 75 F.4th at 578; *cf.* Doc. 55, ATF Resp., 33. Because the Government has not addressed whether the third exception applies, there is procedural error in violation of § 553(d). *See Black*, No. 5:21-CV-071-H, 2023 WL 2753978, at *5 (N.D. Tex. Mar. 31, 2023) ("The burden of establishing good cause is on the agency, and the exception is applicable in emergency situations, or where delay could result in serious harm.")

Such error is ultimately harmless because the Plaintiffs fail to explain how they would be "affected by agency action" during the 30-day period following the Final Rule's promulgation. *Black*, 2023 WL 2753978, at *7; *City of Arlington, Tex.*, 668 F.3d at 243 ("The harmless error rule requires the party asserting error to demonstrate prejudice from the error."). Although Final Rule was "immediately effective," it imposed a 120-day registration period for existing possessors of brace-equipped firearms—including Rainier Arms, Walley, Green, and certain SAF members—to comply with the Final Rule without facing any agency enforcement action. Final Rule at 6,481; Doc. 52-2, Gottlieb Decl., 1; Doc. 52-3, Green Decl., 1; Doc. 52-4, Walley Decl., 1. The certain SAF members who "would in the immediate future" following the Final Rule's publication acquire a stabilizing brace or brace-equipped firearm also were not "affected by agency action" because of an express 60-day waiting period before the initiation of any agency enforcement as to newly acquired or transferred devices. *Black*, 2023 WL 2753978, at *7; Final Rule at 6,481; Doc. 52-2, Gottlieb Decl., 1. Moreover, these members' alleged harm of wanting to purchase new brace-equipped firearms without agency interference does "not flow 'from the immediate effective date'"

but rather from choosing to purchase but not register a qualifying device under the Final Rule. *See Ctr. for Biological Diversity v. Regan*, No. CV 21-119, 2023 WL 5437496, at *3 (D.D.C. Aug. 23, 2023) (addressing source of alleged loss).

In any event, this Court issued an administrative stay and preliminary injunction for almost five months of the litigation, curing any potential prejudice arising from the procedural defect. Docs. 62, 65, 82, 93; *Black*, 2023 WL 2753978, at *7 (enjoining agency rule for thirty days as remedy for § 553(d) violation); *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1121 (D.C.Cir.2010) ("The harmless error rule applies to agency action because '[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.'"). Therefore, Plaintiffs have not shown they are likely to succeed on the merits of their unlawful effective date claim.

C.  *Likelihood of Success as to Void for Vagueness Claim Under Constitution and APA § 706(2)(B)*

The Court next addresses Plaintiffs' facial vagueness challenge to the Final Rule. Plaintiffs argue the Final Rule uses "inherently amorphous terms" and "is so inherently subjective that it invites arbitrary enforcement." Doc. 52, Pls' Br., 14. A law is unconstitutionally vague if it does not "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A facial challenge to a law considers only the text of the statute itself, not its application to the particular circumstances of an individual. *See Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019). A plaintiff can only succeed on a facial challenge by establishing "that no set of circumstances exists under which the Act would be valid." *Wash. St. Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotations omitted). Plaintiffs have not met their burden. Conversely, Defendants have shown that the Final Rule is likely valid because in at least

some circumstances the multi-factor framework allows a person of ordinary intelligence to assess whether his brace-equipped firearm is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The first focus of dispute is the Final Rule's phrase "provides surface area that allows the weapon to be fired from the shoulder," which Plaintiffs find vague because "surface area" does not have a quantifiable measurement. Doc. 52, Pl's Br., 15. But a test without "numeric thresholds" is not dispositively vague. *Cf. Texas v. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (upholding an agency's use of "a multi-factor balancing test" that included no "numeric thresholds"). Moreover, the language identifies a straightforward goal: identifying whether there is *a* surface area permitting a user to fire a firearm from the shoulder. And this goal appears to derive directly from the statutory definition of "rifle" as being "fired from the shoulder." 26. U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Final Rule provides a pictorial example supporting that the language means the brace-equipped firearm has some surface area that one would use to fire from the shoulder like a rifle. Final Rule at 6,529. Defendants also provide examples supporting this interpretation. *See* Defs' Evidentiary Hearing Slides, 40. The record also suggests that it would be impractical, given the evolving variety of braces, to lay out a precise surface area in the Final Rule. *See generally* Non-Exhaustive List (illustrating braces); *see supra* Part I.A.

Plaintiffs argue the factor regarding the "weight or length consistent with the weight or length of similarly designed rifles" is also vague without "[s]pecific measurements." Doc. 52 Pls' Br., 15. Neither their cited cases nor the record supports Plaintiffs' argument. [8] The evolution of

---

[8] The Court declines to apply *Johnson v. United States*, 576 U.S. 591 (2015) because Plaintiffs fail to sufficiently explain how the case matters here. In *Johnson*, the Supreme Court invalidated a statutory clause for vagueness because it required court-derived interpretations of "conduct that presents a serious potential risk of physical injury to another" form prior cases to define a "violent felony." Plaintiffs are not challenging

braces supports the interpretation of this factor as covering modern-day braces that are long or heavy enough to be used as shoulder stocks, unlike initial brace prototypes that locked closer to the forearm. *Compare* Final Rule at 6,483 (2012 brace prototype) *with id.* at 6,494. While the Court agrees that this factor certainly could have been phrased with more precise language, the law does not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

Plaintiffs further argue that no reasonable person can reliably infer the meaning of the "manufacturer's direct and indirect marketing" factor and the "general community" use factor. Doc. 52, Pls' Br., 15–16. The record suggests a contrary conclusion. During the evidentiary hearing, Defendants presented sample materials demonstrating applications of the marketing and community use factors. Doc. 106, Hearing Transcript, 53; Defs' Evidentiary Hearing Slides, 17–19 (citing materials published in Final Rule). Such examples illustrate that there are at least some circumstances in which these factors have meaning and are valid. Figure 3, below, is a sample marketing photo that illustrates the meaning of the marketing factor. Final Rule at 6,546. The Government explained that the brace-equipped firearm pictured was "marketed as a pistol even though it is so heavy [that] it is set up on a tripod, . . . [and], even though this individual has shouldered what is, for all intents and purposes, a buttstock into their shoulder." Doc. 106, Hearing Transcript, 53.

---

the terms of the NFA that impose criminal liability nor does this Court find the language at issue in *Johnson* relevant to the instant analysis. Plaintiffs' other supporting cases are likewise incongruent.

23-11157.1173



Figure 3. Marketing photo of Reece 11 MCMR 5.56 NATO caliber pistol with SBA3 stabilizing brace. Defs' Hearing Slide 18 (depicting picture in Final Rule at 6,546).

The example of the community use factor featured at the evidentiary hearing also shows there are at least some circumstances in which this factor has an understandable meaning. Doc. 106, Hearing Transcript, 54. The example, a YouTube video with 159,654 views and 235 comments, captures two firearm enthusiasts discussing brace-equipped firearms and demonstrating how a brace-equipped pistol can be fired from the shoulder. Defs' Evidentiary Hearing Slides at 19 (embedding link to video cited in Final Rule at 6,509 n.94); Doc. 106, Hearing Transcript, 54 (explaining community use factor goes to the same inquiry of whether a weapon is fired from the shoulder).

There are at least some instances in which a reasonable person can infer meaning from the Final Rule to determine whether a brace-equipped pistol is "designed, made, and intended to be fired from the shoulder" under the NFA. Final Rule at 6,574–75; 26. U.S.C. § 5845(c); *see Wash. State Grange*, 552 U.S. at 449. Therefore, the Court concludes that Plaintiffs are not likely to succeed on the merits of their vagueness claim.

23-11157.1174

*D.  Likelihood of Success as to Second Amendment Claims*

Plaintiffs contend the Final Rule is unlawful due to procedural and substantive Second Amendment violations. The Court reviews each argument and concludes Plaintiffs are not likely to succeed on the merits of their claims.

1.  Procedural Failure to Consider Claim (APA § 706(2)(A))

SAF brings a second "arbitrary and capricious" challenge under the APA, arguing the ATF failed to conduct a full Second Amendment inquiry under *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Doc. 52, Pls' Br., 11. *Bruen* sets forth a two-step test for evaluating Second Amendment claims. 142 S. Ct. at 2126–34. First, a court must determine whether the regulated activity falls within the scope of the Second Amendment. *Id.* at 2126–27. If the activity implicates the Second Amendment, a court moves onto the second step, which asks "whether [the Final Rule] 'is consistent with this Nation's historical tradition of firearm regulation.'" *Id.* at 2126. "The APA's arbitrary-and-capricious standard requires that an agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Here, Court finds that Plaintiff has not shown that the Final Rule inadequately addresses *Bruen*.

SAF argues the ATF did not conduct the second step of the *Bruen* analysis. In the Final Rule, the ATF describes the comments to the Proposed Rule that invoked the Second Amendment. Final Rule at 6,548. Certain commenters, for example, voiced their view that the Proposed Rule "attacked" and "infringed" on citizens' Second Amendment rights. *Id.* Many others specifically cited to the Supreme Court's *Heller* opinion to argue the Final Rule was unlawful. *Id.* (referencing *District of Columbia v. Heller*, 554 U.S. 570 (2008)). In response, the ATF discussed *Heller*'s holding and its application to SBRs—the weapon equivalent to brace-equipped firearms subject to the Final Rule. *Id.* The ATF also responded to these comments by addressing

implications from *Bruen*. First, the ATF explained that *Heller* confirms that Second Amendment rights are not absolute. *Id.* (citing 554 U.S. at 627). In *Heller*, the ATF explained, the Supreme Court recognized that Second Amendment rights are not absolute partly because of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (citing 554 U.S. at 627). The ATF interpreted that under *Heller*, "dangerous and unusual weapons" are unprotected by the Second Amendment. *Id.* Next, the ATF catalogued a number of post-*Heller* federal cases concluding that SBRs are "dangerous and unusual" weapons falling outside of the Second Amendment's protection. *Id.* The ATF concluded, based on *Heller* and its progeny, that weapons "regulated by the NFA, such as short-barrel rifles, were not historically protected by the Second Amendment and thus fall outside of the scope of the Second Amendment." *Id.* The ATF also concluded that "[n]othing in the Supreme Court's recent decision in . . . *Bruen* . . . changes this analysis." *Id.* Finally, the ATF summarized and applied *Bruen*'s legal test to the Final Rule. *Id.* n. 145. Based on its conclusion that brace-equipped firearms subject to the Final Rule are SBRs— "dangerous and unusual weapons" unprotected by Second Amendment—the ATF ended its analysis at *Bruen*'s first step.

Plaintiffs argue that "the record shows no *Bruen*-compliant considerations." Doc. 52, Pls' Br., 12. But their qualm is with the fact that the ATF did not reach the second step of *Bruen*, conducting an analysis of a firearm's historical tradition. Plaintiffs' argument poses a disagreement with the *outcome* of the ATF's consideration of *Bruen*, not a disagreement with an actual failure to consider *Bruen*. *See id.* (contending ATF's "premise" that SBRs are dangerous and unusual "is wrong"). The APA requires that agency action is "reasonably explained," which ATF has done here. 5 U.S.C. § 706(2)(A). The agency raised the operative law and applied it reasonably. Nothing in *Bruen* requires one to unconditionally proceed to the second step of the inquiry where the first

step is not met. Therefore, Plaintiffs are not likely to prevail on their claim that the Final Rule is arbitrary and capricious for failure to consider *Bruen*.

### 2.  Violation of Second Amendment Right

Plaintiffs also contend that the Final Rule is invalid because it violates the Second Amendment right to keep and bear arms. The Court concludes Plaintiffs are unlikely to succeed on their claim because the Final Rule does not implicate the Second Amendment.

The Fifth Circuit has at least tacitly recognized that, in the context of a facial challenge under the Second Amendment, the standard recognized in *Washington State Grange* and *United States v. Salerno* is superseded by the two-step process laid out in *Bruen*. *See United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) ("[I]f a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances."). The Court therefore looks to *Bruen* to assess Plaintiff's facial challenge. [9]

Under the first step, a rule implicates the Second Amendment when the instrument at issue "constitute[s] [a] bearable arm." *Heller*, 554 U.S. at 582; *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). Courts have held that "arm" typically covers "[w]eapons of offence or armour of defence." *Heller* 554 U.S. at 581. If a regulated device is not encompassed by "arms," it falls outside the protection of the Second Amendment. The Supreme Court has additionally noted that the Second Amendment does not protect "dangerous and unusual weapons." *Id. at* 625 (explaining "historical tradition in prohibiting dangerous and unusual weapons" justified limiting Second

---

[9]  Individual Plaintiffs assert constitutional injury in their declarations based on their individual constitutional rights being violated by the Final Rule if they were to destroy or surrender their brace-equipped weapons. Doc. 52-3, Green Decl.; Doc. 52-4, Walley Decl. The Court does not have a record of them intending to do so or having done so. Therefore, such harm is speculative, *supra* Part B.3, and the Court does not construe a viable as-applied challenge.

Amendment's protection); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Where a rule does implicate a bearable arm, the Government must show that the rule "is consistent with the Nation's historical tradition of firearm regulation," by showing there is a "well-established and representative historical analogue." *Bruen*, 142 S. Ct. at 2130, 2133.

Plaintiffs contend that under *Bruen*, the Final Rule infringes on the Second Amendment right to keep and bear arms. Doc. 52, Pls' Br., 12. The parties' arguments require the Court to first determine Final Rule's scope, and whether that scope of regulation implicates the Second Amendment. Only after making these determinations can the Court proceed to assess whether a Second Amendment right is actually infringed upon.

### a. The Final Rule's Scope of Regulation

Plaintiffs argue the first step of *Bruen* is satisfied because the ATF "acted directly on the Second Amendment subject of a 'rifle,' [by] changing that term's definition." Doc. 59, Reply, 9. The Court has already ruled that Plaintiffs are unlikely to succeed on their claim that the Final Rule contradicts the NFA, and specifically the NFA's definition of a rifle. *Supra* Part III.B. By its plain function and text, the Final Rule acts on an "*accessory…(e.g., a 'stabilizing brace')*" and how an accessory can render a firearm an SBR. Final Rule at 6,480. No firearm on its own is suddenly being pulled under the ambit of the NFA. *See generally supra* Part I.A.

The Final Rule operates in two-tiers. The first tier indicates that accessories, namely stabilizing braces, are the focus. The Final Rule states that the NFA's definitional phrase "'designed or redesigned, made or remade, and intended to be fired from the shoulder" includes "a weapon *that is equipped* with an accessory, component, or other rearward attachment" providing surface area for the user to fire from the shoulder. Final Rule at 6,574–75 (emphasis added). The second tier of the Final Rule lays out six non-dispositive factors focusing on whether the resulting device—

the firearm *equipped with an accessory*—"is designed, made and intended to be fired from the shoulder." *Id.* Therefore, it is the addition of an accessory to a firearm that renders that firearm to be construed as a different device.

### b. Stabilizing Braces Do Not Implicate the Second Amendment

Laws that regulate the use of firearm accessories or attachments do not generally implicate the Second Amendment. *See, e.g., United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (A silencer is a firearm accessory . . . . Accordingly, it can't be a 'bearable arm' protected by the Second Amendment."); *United States v. Saleem*, No. 3:21-cr-00086-FDW-DSC, 2023 WL 2334417, at *11 n. 9 (W.D.N.C. Mar. 2, 2023). The most salient example of an accessory not implicating the Second Amendment is a silencer. *See Cox*, 906 F.3d at 1186. Courts have routinely held that a silencer is not a bearable arm as defined in *Heller* because a silencer cannot cause harm on its own, nor is it of any use "independent of its attachment to a firearm." *United States v. Peterson*, No. CR 22-231, 2023 WL 5383664, at *2 (E.D. La. Aug. 21, 2023) (quotations omitted); *United States v. Al-Azhari*, No. 8:20-CR-206-T-60AEP, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022) (collecting cases). Additionally, an "accessory" like a silencer does not implicate the Second Amendment because "a firearm remains an effective weapon without a silencer." *Hasson*, WL 4573424, at *4–5.

Applying the same logic, a stabilizing brace cannot cause harm on its own and is not useful independent of its attachment to a firearm. Nothing in record evidence indicates that braces are necessary for the actual use of a firearm. Indeed, both parties recognize only that stabilizing braces improve the "accuracy" or "efficacy" of one's firearm use. Final Rule 6,499, 6,557; Doc. 52, Pls' Br., 21; Doc. 52-4, Walley Decl., 1; Doc. 106, Hearing Transcript, 27–30. In the absence of additional

facts, the Court sees no other reason to believe that stabilizing braces are necessary to actually fire or operate a firearm. *Hasson*, WL 4573424, at *4-5. The Court concludes that, like silencers, stabilizing braces are not "bearable arms" under the Second Amendment. *See Heller*, 554 U.S. at 582; *Cox*, 906 F.3d at 1186. Under *Bruen*, the analysis ends at the first step because the regulated activity does not fall within the scope of the Second Amendment. 142 S. Ct. at 2129–30.

### c. "Brace-Equipped Pistols" Do Not Implicate the Second Amendment

Plaintiffs assert the regulation of pistols as part of a brace-equipped firearm violates the Second Amendment. Doc. 52, Pls' Br., 12–14. No matter how the Court conceptualizes the scope of the regulation, however, the result is the same. The Final Rule does not implicate the Second Amendment. Plaintiffs' argument goes that when considering the Final Rule as covering the entire brace-equipped pistol, the Court should move to the second step of *Bruen* because brace-equipped pistols are within the Second Amendment's orbit. Doc. 52, Pls' Br., 13–14. But brace-equipped pistols subject to the Final Rule are equivalent to SBRs,[10] which are "dangerous and unusual weapons" outside of the protection of the Second Amendment.

The Fifth Circuit has established a two-step approach for determining when a device is "dangerous and unusual." *Hollis*, 827 F.3d at 446. First, a "dangerous and unusual" weapon is one that is "not in common use" at the time of founding. *Id.*; *United States v. Miller*, 307 U.S. 174, 178 (1939) (holding short-barreled shotguns fall outside the protection of the Second Amendment). Invoking *Jennings*, *Heller*, *Thompson/CTranscript Arms Co.*, and *Bruen*, at least one court within this District has concluded that short-barreled rifles are "dangerous and unusual." *United States v.*

---

[10] The parties do not dispute that the Final Rule addresses the definition of a "rifle" and SBRs under the NFA. *See* Part I.A, III.B (the inquiries are the same); Final Rule at 6,478–80, 6,494–95.

23-11157.1180

*Miller*, No. 3:23-CR-0041-S, 2023 WL 6300581, at *3 (N.D. Tex. Sept. 27, 2023) (Scholer, J.). Other circuit courts have held there are sufficient similarities between SBRs and other weapons deemed "dangerous and unusual," such that "possession of SBRs falls outside the Second Amendment's guarantee." *Cox*, 906 F.3d 1170, 1185–86 (comparing to short-barreled shotgun and sawed-off shotgun). Although the Fifth Circuit has not addressed whether SBRs are "dangerous and unusual" weapons, the Circuit has noted the NFA, which regulates SBRs, was "designed to target" weapons that are "dangerous and unusual." *Mock*, 75 F.4th at 567–68. The Fifth Circuit has also recognized Congress's "specific declaration and finding [when expanding the scope of the NFA] that ... short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection." *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (citing S. REP. No. 90–1501, at 28 (1968)). The Supreme Court has also recognized that Congress's object with passing the NFA was to regulate SBRs as "concealable weapon[s] likely to be" used "for criminal purposes." *Thompson/CTranscript Arms Co.*, 504 U.S. at 517.

Plaintiffs do not contend that the NFA or its definition of SBRs is unconstitutional. And no court has held that SBRs are no longer unusually dangerous, associated with criminal activity, or otherwise contrary to Congress's stated position during the passing of the NFA. Therefore, this Court does not take the tremendous step of finding otherwise as to traditional SBRs and brace-equipped firearms equivalent to SBRs.

The Court's conclusion is also unchanged by Plaintiffs' assertion that brace-equipped pistols are "in common use now." As the regulatory history reveals, the very point of promulgating the Final Rule was the agency's discovery that there was an emerging evasion of the NFA through evolving models of braces and brace-equipped pistols. *See supra* Part I.A. The fact that over this same period, brace-equipped pistols that effectively operated as SBRs have been used by criminal

gunmen to successfully execute mass shootings of innocent people lends additional support to the conclusion that brace-equipped firearms deemed SBRs under the Final Rule are "dangerous and unusual." *See* Doc. 55, ATF Resp. 8–9, 26; Doc. 97, ATF Supp. Br., 8; Final Rule at 6,495–99, 6,508 ("[T]here have been at least two mass shooting incidents where the shooters reportedly shouldered their weapons by using purported 'stabilizing braces' as stocks, killing a total of 19 people."), 6,566. For the forgoing reasons, SAF is unlikely to succeed on the merits of the facial Second Amendment challenge.

### E.  *Irreparable Harm*

In the event Plaintiffs are likely to succeed on any of their claims, Plaintiffs must still show they are likely to face irreparable harm. *Winter*, 555 U.S. at 20. Assuming Plaintiffs have shown prejudice through their assertion that their logical outgrowth claim entirely "matches" the logical outgrowth claim in *Mock*, the Court must still conduct an analysis of the remaining factors. Doc. 95, Pls' Supp. Br., 2; *see* 75 F.4th 563. Despite ample time and opportunity to evidence their asserted harm through briefing, supplemental briefing, declarations, and an evidentiary hearing,[11] Plaintiffs have failed to sufficiently establish they likely will face irreparable harm in the absence of a preliminary injunction. The Court first addresses the asserted compliance costs and business injuries, and next the asserted constitutional harm.

"To be considered irreparable, the injury in question must be imminent and cannot be speculative." *Terex Corp. v. Cubex Ltd.*, No. 3:06–CV–1639–G, 2006 WL 3542706, at *9 (N.D. Tex. Dec. 7, 2006) (Fish, J.). Costs arising from compliance with a regulation can also constitute irreparable harm, but they must also "be based on more than speculation." *Rest. L. C Transcript v.*

---

[11] No Plaintiff attended or participated in the evidentiary hearing to testify about the injuries they will or have suffered such that the injury is irreparable.

*United States Dep't of Lab.*, 66 F.4th 593 (5th Cir. 2023) (citing *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022)). A party must show that its non-speculative compliance costs are more than *de minimis* and cannot be recovered in the ordinary course of litigation. *Id.* at 597–600. While a business injury, such as lost profits, may be sufficient to show irreparable harm, a party must meet a heavy burden showing such injury is "substantial," beyond the realm of everyday losses. *Cf. Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016). Finally, "[w]hile courts are willing to entertain a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable by showing that the loss cannot be measured in money damages." *Brink's Inc. v. Patrick*, No. 3:14-CV-775-B, 2014 WL 2931824, at *6 (N.D. Tex. June 27, 2014) (Boyle, J.) (citation omitted).

    1.  <u>Harm as to Rainier Arms</u>

        Rainier Arms asserts four types of injuries: (i) "substantial" lost profits from pending orders that were canceled "[i]mmediately" upon the Final Rule's issuance, (ii) "substantial" lost profits from fallen demand for "brace-equipped AR-style pistols and components thereof," (iii) "substantial" loss in customer goodwill caused by "a chilling legal cloud," and (iv) "substantial" unrecoverable compliance costs." *See* Doc. 52-1, Hwang Decl. ¶ 5; Doc. 103-1, Hwang Add'l Decl., 1. The declarant for Rainier Arms, John Hwang, is the company's founder and CEO.

        As a preliminary matter, the lost profits from past, pending orders are never defined but even if they were, they cannot justify a forward-looking preliminary injunction. *See* Doc. 52-1, Hwang Decl.; *Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 534 (N.D. Tex. 2020) (Kacsmaryk, J.) ("Plaintiff's reference to *past* injuries . . . do not constitute the type of ongoing or probable future injuries requiring [a] preliminary injunction.").

Next, the nature of the asserted ongoing lost profits is unclear. Hwang's March 2023 declaration asserted the Final Rule "deprive[d] Rainier of substantial profits by making otherwise willing customers either legally ineligible or practical[ly] incapable of using Rainier's arm brace products." Doc. 52-1, Hwang Decl. ¶ 5. Rainier Arms does not provide any further context or supporting facts. Hwang's October 2023 declaration asserts for the first time that Rainier Arms that the continuing "lost revenue . . . easily exceed[s] tens of thousands of dollars per month." Doc. 103-1, Hwang Add'l Decl., 1. While Hwang's second declaration does provide the Court with a number, Rainier Arms fails to provide other contextual facts such as when this loss began, how the figure is calculated, or whether the figure represents total or product-specific lost revenue. Doc. 103-1, Hwang Add'l Decl., 1; *cf. Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142 (finding irreparable harm where party responding to agency order stopped all production of a product line representing 90% of its annual revenue). The Court cannot simply assume Rainier Arm's financial losses are "substantial" and support a finding of irreparable harm based only on the company's own conclusion. *Cf. Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142; *Texas v. EPA*, 829 F.3d at 433; Doc. 106, Hearing Transcript, 17.

The Court tried to ascertain whether the asserted monthly loss constituted irreparable harm or likely irreparable harm. During the evidentiary hearing, the Court asked for context from "Rainier Arms' total monthly sales revenue" or what percentage of Rainier Arms' "average monthly income derived from the sales of brace-equipped pistols" both before and after the Final Rule went into effect. Doc. 106, Hearing Transcript, 17–18. But Plaintiffs' counsel had no further information to share. Counsel effectively asks the Court to take Hwang's word that such asserted monthly losses are "substantial." Doc. 106, Hearing Transcript, 17–20.

In contrast, the manufacturer in *Mock*, Maxim Defense, showed irreparable harm by not only asserting drastic figures but by showing why those figures mattered. Maxim Defense had an estimated to-date loss of over $7 million attributed to braced pistol and stabilizing brace sales. *Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 6457920, at *15 (N.D. Tex. Oct. 2, 2023) (O'Connor, J.). Further, Maxim Defense projected losing over $9 million in sales in 2023 due to the Final Rule, which represented more than half of the prior year's gross revenues. *Id.* Here, Rainier Arms' loss does not threaten the existence of its business and the company provides no other context for the asserted the monthly loss. Doc. 106, Hearing Transcript, at 18; *cf. Mock*, 2023 WL 6457920 at *15 (finding Maxim Defense would "not be able to sustain its business for any longer" absent an injunction); *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142 (finding irreparable harm from ongoing losses "representing 90 percent of [party's] annual revenue, thereby requiring the company to make plans to lay off its employees [in] two weeks").

Rainier Arms' other asserted business harm lacks sufficient support. The company's asserted goodwill injury is speculative both as to actual loss of goodwill and its nexus to the Final Rule. *See Terex Corp.*, 2006 WL 3542706, at *9. Rainier Arms says it cannot measure goodwill nor a change in goodwill. Doc. 106, Hearing Transcript, 20. The Court cannot divine irreparable harm from Hwang's mere "inference" of lost goodwill. *Id.* Thus, Rainier Arms has not sufficiently established likely irreparable harm from unclear business losses.

Finally, Rainier Arms alleges it has hefty monetary or time compliance costs. *Id.* 20–21. Its asserted monetary compliance cost of "legal fees" is asserted without any estimated value or supporting caselaw that legal fees constitute compliance costs. *Id.*at 20; *but see United States v. Vineland Chem. Co.*, Civ. No. 86-1936, 1990 WL 157509, at *11 (D.N.J. Apr. 30, 1990) (suggesting legal fees and compliance costs are distinct), *aff'd*, 931 F.2d 52 (3d Cir. 1991). Plaintiffs are also

silent as to whether Rainier Arms has paid a special occupation tax, *supra* Part I.A., which would negate compliance costs in terms of taxes.[12] The amount of time Rainier Arms has or will expend to comply with the Final Rule is also unknown. Doc. 106, Hearing Transcript, 21. Rainier Arms only asserts that it has a time burden of determining "what the [Final R]ule covers and what [Rainier Arms] can't sell anymore." *Id.*; *cf. EPA*, 829 F.3d at 433 (finding "several irreparable injuries" from $2 billion compliance cost affecting Petitioner power companies and downstream third parties like everyday consumers, businesses, and unions members). And it is unclear why the asserted need to determine "what Rainier Arms can't sell anymore" is a compliance cost at all since the Final Rule does not ban Rainier Arms from selling anything. *See supra* Part I.A. The record simply does not illustrate the nature of Rainier Arms' compliance costs, let alone that they are more than *de minimis*. Therefore, Rainier Arms has not met its burden of showing likely irreparable harm.

Separately, the Court concludes a preliminary injunction is not appropriate because such relief would not prevent Rainier Arms' asserted business harms. The Final Rule has been in place for nine months, with this Court imposing an administrative stay and preliminary injunction for Plaintiffs for nearly five of those months pending the resolution of *Mock*. Docs. 62, 65, 82, 93. Rainier Arms' asserted "substantial" lost profits during part of the administratively imposed relief suggests a preliminary injunction would not prevent the threatened financial harm. *United States*

---

[12] If Rainier Arms turns out to be SOT payer, it would have no further tax obligation. Final Rule at 6,498 (explaining Form 2 registration notice is tax-free). Plaintiffs state without explaining that Rainier Arms' compliance costs are unrecoverable. Doc. 52, Pls' Br., 19; Doc. 59, Reply, 12. While there's a strong reason to believe that monetary compliance costs would be unrecoverable from the ATF, which enjoys sovereign immunity for any monetary damages, *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 488 (5th Cir. 2014), Plaintiffs have not sufficiently alleged monetary compliance costs such that they would be unrecoverable. *Cf. Rest. L. C Transcript*, 66 F.4th 593 (addressing unrecoverable compliance cost that was first found to represent significant monetary value).

*v. St. Bernard Par.*, 756 F.2d 1116, 1123 (5th Cir. 1985) ("It is black letter law that an injunction will not issue when it would be ineffectual."); Doc. 103-1, Hwang Add'l Decl.

### 2.   Harm as to SAF Members, Walley, and Green

Walley, Green, and other SAF members assert two types of harm arising out of the Final Rule: constitutional harms and compliance costs.[13] Doc. 52-2, Gottlieb Decl., 1; Doc. 103-2, Gottlieb Add'l Decl., 1; Doc. 52-4, Walley Decl. ¶ 5; Doc. 103-3, Walley Add'l Decl., 1; Doc. 52-3, Green Decl., 1; Doc. 106, Hearing Transcript, 28. The Court addresses the asserted constitutional harms under the Second Amendment in Part E. Plaintiffs assert three compliance costs: the time burden to understand the Final Rule, the practical injury of reduced efficacy from altering a brace-equipped firearm, and the $200 tax upon registration. *Id.*

As to their time burden, these Plaintiffs allege there is an "extraordinary" compliance cost of navigating the Final Rule's "complex" registration system that "requires specialized legal knowledge." *Id.* When asked for factual support behind the asserted harm, Plaintiffs' counsel simply replied the entire Final Rule is unclear. Doc. 106, Hearing Transcript, 22–23. Plaintiffs have also failed to tell the Court exactly what brace-equipped firearms they possess or wish to possess but cannot evaluate under the Final Rule. *See* Doc. 52-2, Gottlieb Decl., 1; Doc. 103-2, Gottlieb Add'l Decl., 1; Doc. 52-4, Walley Decl. ¶ 5; Doc. 103-3, Walley Add'l Decl., 1; Doc. 52-3, Green Decl., 1. Plaintiffs do not provide an estimate or any other metric for measuring an average SAF member's time cost to understand and comply with the Final Rule. Doc. 103-2, Gottlieb Add'l Decl., 1; Doc. 103-3, Walley Add'l Decl., 1; Doc. 52-3, Green Decl., 1; Doc. 106, Hearing Transcript, 22–24, 29; *cf. Rest. L. CTranscript*, 66 F.4th at 599–600 (finding district court erred when rejecting existence

---

[13] SAF asserts constitutional harms on behalf of itself and its members, as well as compliance costs on behalf of its members.

of compliance costs where "witnesses offered specific estimates of the additional time that managers would incur to comply with the rule"). Without more, the alleged costs are conclusory and therefore insufficient to establish a concrete, imminent harm. *See Wages & White Lion Invs., L.L.C.,* 16 F.4th at 1142.

The Court also finds the mere assertions of "complexity" unconvincing given that the registration form seeks basic information such as whether the registrant is a fugitive or intends to use the brace-equipped firearm to commit a felony. Doc. 106, Hearing Transcript, 59. Moreover, the ATF has published educational resources to address questions or concerns about the Final Rule. Doc. 55 at 10 n.4 (citing sources); Doc. 106, Hearing Transcript, 22. One of these documents is a "non-exhaustive" 38-page list with names and pictures of brace-equipped firearms that the ATF "has determined are short-barrel rifles." Doc. 55 at 10 n.4 (referencing *Commercially available firearms equipped with a "stabilizing brace" that are short-barrel rifles,* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVE, https://www.atf.gov/rules-and-regulations/docs/undefined/bracefinalruleguidance-commerciallypdf/download (last accessed, Oct. 19, 2023) (hereafter "Non-Exhaustive List"). The Court asked but did not learn whether these resources alleviate these Plaintffs' asserted time cost. *See* Doc. 106, Hearing, Transcript 23. Individuals still uncertain from the Final Rule and educational resources can also seek classification from the ATF. Doc. 55, ATF Resp., 31 (citing Final Rule at 6,552). While such classifications are not binding, there is a safe harbor protecting an individual's reliance on an ATF classification that later changes or is withdrawn. Doc. 106, Hearing Transcript, 59. The time compliance costs therefore have not been shown to be more than a *de minimis* amount.

Walley, Green, and SAF members additionally assert a "substantial practical injury" of reduced efficacy and safety from having to permanently separate the brace from their pistols. Doc.

52-4, Walley Decl. ¶ 5; Doc. 52-3, Green Decl. ¶ 7; Doc. 52-2, Gottlieb Decl. ¶ 6. Plaintiffs assert

this harm without providing any case suggesting that such a "practical injury" can constitute

irreparable harm or any factual support showing why the injury is "substantial." Doc. 52, Pls' Br.,

19, 21. Green's asserted practical injury also appears to be undercut by his own statement that he

can and does "utilize" other firearms as required by his job as a full-time police officer. Doc. 52-3,

Green Decl. ¶ 7 (expressing Green's utilization of firearms but not brace-equipped firearms). Oral

argument also suggests Green can handle a non-brace-equipped firearm. Doc. 106, Hearing

Transcript., 29–30. The "practical" injury does not sufficiently show likely irreparable harm.

Finally, Walley, Green, and other SAF members say they face an alternative monetary

compliance cost of $200—the tax on any newly acquired or transferred brace-equipped pistol. Doc.

106, Hearing Transcript, 23–24, 28; Doc. 52, Pls' Br., 20. Plaintiffs provide no case to support that

a $200 tax is more than *de minimis*. SAF asserts the tax is "financially onerous, not *de minimis*" since

many SAF members earn "near or below" the national average income.  Doc. 103-2, Gottlieb Add'l

Decl., 1. When asked, Plaintiffs' counsel did not further explain why the $200 tax was "onerous"

against his researched national average income figure of $70,000 per year. Doc. 106, Hearing

Transcript, 24. The Court asked for the average cost of a brace-equipped pistol purchased by an

average SAF member to see if the tax was proportionally "onerous." *Id.* at 26. But Plaintiffs' counsel

did not have a number. *Id.* A search on Rainier Arms' website of AK-styled pistols without any

add-ons or braces reveals a cost between $1,200 and $2,500. Search Results for AK-Style Pistols,

RAINER            ARMS,            https://www.rainierarms.com/athena/?q=pistols&page=

5&product_list_order=price_desc. Stabilizing pistol braces on the same website range from $64 to

$460. Search Results for "pistol brace," RAINIER ARMS https://www.rainierarms.com/athena/?q

=pistol+brace&product_list_order=price_desc&page=4. Plaintiffs ultimately do not provide

evidence to support their contention that choosing, from multiple options, to pay a $200 tax is more than a *de minimis* compliance cost.[14] Accordingly, these Plaintiffs have not met their burden to show their monetary compliance costs likely cause them irreparable harm.

### 3.   Constitutional Harms as to SAF and its Members

SAF asserts constitutional harm on behalf of itself and its members from compliance with the Final Rule. Doc. 103-2, Gottlieb Decl., 1 ("One of SAF's core functions is to vindicate the Second Amendment's right to keep and bear arms, including brace-equipped AR-style pistols that the Rule illegally regulates."); *id.* (explaining members are "similarly burdened by . . the Rule"). As SAF members, Green and Walley also assert constitutional harm arising from the Final Rule. Doc. 52-3, Green Decl., 1 ("Worst of all, compliance by way of firearm destruction or surrender inflicts the irreparable harm of abridging my Second Amendment right to keep and bear arms."); Doc. 52-4, Walley Decl., 1 (same); Doc. 103-3, Walley Add'l Decl., 1.

As a preliminary matter, it is not clear that the asserted individual harm is imminent or more than speculative. *Terex Corp.*, 2006 WL 3542706, at *9. Specifically, the Court does not understand Walley, Green, or any other SAF member to be choosing or seriously intending to choose either option at this time. Doc. 52-3, Green Decl., 1; Doc. 52-4, Walley Decl., 1; Doc. 103-3, Walley Add'l Decl., 1; Doc. 103-2, Gottlieb Decl., 1. The Final Rule does not impose a ban on brace-equipped firearm. *Supra* Part I.A.; *cf. Bruen*, 142 S. Ct. at 2138, n.9, 2162 (explaining licensing schemes "which often require applicants to undergo a background check," or similar reasonable measures are unlikely to pose a constitutional problem). The alleged constitutional

---

[14] The Court also does not know whether Walley, Green or any other SAF member has mitigated the $200 tax over their existing brace-equipped devices by registering during the registration grace period. *See Am. Telnet, Inc. v. GTE Corp.*, 1999 WL 242686, at *3 (N.D. Tex. Apr. 16, 1999) (Fitzwater, J.) (finding mitigation of costs undercuts finding of irreparable harm).

harm arises out of one's *choosing* to surrender or destroy a brace-equipped firearm out of the five options provided by the Final Rule. *See supra* Part I.A. For example, possessors are also free to continue to use their firearms without the brace if they do not want to register their brace-equipped firearm. *Id.*

It is also unclear whether allegations of Second Amendment violations alone are sufficient to establish irreparable harm is likely. *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 689 (W.D. Tex. 2015), *aff'd sub nom. Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  It is widely accepted that allegations of First Amendment violations can sufficiently show likely irreparable harm. *E.g., Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) ("Opulent Life has satisfied the irreparable-harm requirement because it has alleged violations of its First Amendment"); *see also* Wright & Miller, § 2948.1 Grounds for Granting or Denying a Preliminary Injunction—Irreparable Harm, 11A Fed. Prac. & Proc. Civ. § 2948.1, n.24–25 (3d ed.) (citing examples under the First Amendment). But the Fifth Circuit has never held that *allegations of Second Amendment violations alone* are sufficient to establish irreparable harm.

The Court is unaware of any circuit or district court finding an allegation of a Second Amendment violation alone to be sufficient to satisfy the irreparable harm prong. In the only relevant case this Court could find, *Defense Distributed*, the Fifth Circuit only assumed for purposes of appeal—but did not decide—that alleged deprivations of First and Second Amendment freedoms constituted irreparable harm. 838 F.3d at 457.  Issuing a preliminary injunction based only on a "possibility" of irreparable harm is inconsistent with the principle that injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Accordingly, the Court concludes that Plaintiffs'

mere allegations that their Second Amendment rights were violated do not establish likely irreparable harm.

### F.   *Balance of the Harms*

While Plaintiffs have not sufficiently shown they face likely irreparable harm, the Court considers their asserted harms against the public interest in the Final Rule. *See Fisher v. Texas*, 556 F. Supp. 2d 603, 610 (W.D. Tex. 2008) (considering balance of equities despite no likelihood of success and no irreparable harm); *see also Winter*, 555 U.S. at 20–26; *Nken*, 556 U.S. at 435. Plaintiffs contend the balance tips in their favor because they are likely to succeed on the merits of their claims and there is no public interest in perpetuating an unlawful agency action. Doc. 52, Pls' Br., 22. The Court does not deem the Final Rule to be invalid, *see supra* Parts A-D, and the Fifth Circuit expressly declined to hold the Final Rule unlawful in *Mock*. 75 F.4th at 587. The purported harm to public interest is losing a standard enforcement criterion and reduced public safety. Doc. 55, ATF Resp., 24–25. The Court understands there to be a dual public safety justification: enforcing the existing public safety justification behind the NFA's requirements over SBRs, as well as deterring the use of brace-equipped firearms by mass shooters. The Court agrees the public has a safety interest in the continued enforcement of the NFA and its regulation of SBRs. The Court also finds that there is at least some public interest in having a standard regulatory criterion over brace-equipped firearms, given the evolution of stabilizing braces. *See supra* Part I.A. The Court does not find Plaintiffs' unclear or unsubstantiated harms outweigh the interests of the public. Plaintiffs' balancing arguments do not change the Court's finding given the forgoing analysis. The Plaintiffs therefore fail to establish that the balance of equities tips in their favor.

**IV**

CONCLUSION

The Court has conducted a thorough inquiry into several factual questions that required resolution before a ruling could be issued in response to the instant motion. The Court does not find Plaintiffs have established a likelihood of success on the merits of any of their claims. Even assuming likelihood of success on the merits of one of Plaintiffs' claims, the Court finds Plaintiffs have not met their burden to show they likely face irreparable harm from the Final Rule. Finally, Plaintiffs have not established that the harms they face without a preliminary injunction outweigh the interests of the public. Accordingly, the Court finds that Plaintiffs have failed to establish the factors necessary for the relief they seek and **DENIES** Plaintiffs' Motion for a Preliminary Injunction.

SO ORDERED.

SIGNED: November 13, 2023.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

23-11157.1193

**TAB 10**

```
                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

SECOND AMENDMENT
FOUNDATION, INC.; RAINIER
ARMS, LLC; SAMUEL WALLEY; and
WILLIAM GREEN,

v.                              CASE NO. 3:21-CV-0116-B

BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES; STEVEN M.
DETTELBACH, in his official capacity
as Director of the Bureau of Alcohol,
Tobacco, Firearms, and Explosives;
UNITED STATES DEPARTMENT
OF JUSTICE; and MERRICK B.
GARLAND, in his official capacity as
Attorney General of the United States,

        Defendants.




       PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
            BEFORE THE HONORABLE JANE J. BOYLE
              UNITED STATES DISTRICT JUDGE
                     OCTOBER 18, 2023

                  A P P E A R A N C E S

For the Plaintiffs:

        CHARLES FLORES
        FLORES LAW, PLLC
        917 Franklin Street - Suite 600
        Houston, TX 77002
        713/893-9440
        Email: cf@chadflores.law
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1195

```
APPEARANCES (Continued)

For the Defendants:

     JODY DALE LOWENSTEIN
     FAITH LOWRY
     TAYLOR PITZ
     US DEPARTMENT OF JUSTICE
     Civil Division, Federal Programs Branch
     1100 L Street, NW
     Washington, DC  20005
     202/598-9280
     Email: jody.d.lowenstein@usdoj.gov

COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                  1100 Commerce Street
                  Dallas, Texas 75242


proceedings reported by mechanical stenography,
transcript produced by computer.
```

23-11157.1196

```
 1                 (In open court at 10:00 a.m.)
 2             THE COURT:  Good morning.  This is Case
 3    Number 3:21-CV-0116, Rainier Arms versus the Bureau
 4    of Alcohol, Tobacco, Firearms and Explosives, et al.
 5        So who is here for the plaintiffs?
 6             MR. FLORES:  Your Honor, for the
 7    plaintiffs I'm Chad Flores.
 8             THE COURT:  And you're all by yourself?
 9             MR. FLORES:  Yes, ma'am.
10             THE COURT:  And for the defense?
11             MR. LOWENSTEIN:  Jody Lowenstein with the
12    United States --
13             THE COURT:  I'm sorry.
14             MR. LOWENSTEIN:  Jody Lowenstein with the
15    United States Department of Justice on behalf of
16    defendants.  And I'm joined by colleagues Faith
17    Lowry and Taylor Pitz.
18             THE COURT:  Who is the other one?
19             MS. LOWRY:  This is our paralegal with the
20    U.S. Attorney's Office who has been kind enough to
21    assist us today.
22             THE COURT:  Great.  Thank you very much.
23        Well, this case has been up and down
24    everywhere, at least the Mock case has.  But I've
25    read through all of your pleadings, and I have a lot
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1197

```
 1   of questions.  We can ask those questions as we go.
 2   But the preliminary injunction is moved by the
 3   defendants.
 4        Who is going to argue that?
 5             MR. LOWENSTEIN:  I would be providing
 6   argument, Your Honor, on the irreparable harm
 7   factors, the public interest factors.  And I also
 8   intend to address just briefly the proper scope of
 9   any remedy the Court finds is warranted.
10             THE COURT:  Okay.
11             MR. LOWENSTEIN:  And my colleague,
12   Ms. Lowry, will be ready to present any argument on
13   any merits issues that Your Honor would like to
14   address.
15             THE COURT:  Okay.  Come on up.
16             MR. LOWENSTEIN:  Your Honor, just to
17   clarify, this is plaintiff's motion.  Would you like
18   defendants --
19             THE COURT:  I'm sorry, this is plaintiff's
20   motion, yes.
21             MR. FLORES:  Your Honor, I'm happy to let
22   them go first.
23             THE COURT:  Go ahead, plaintiff, I'm
24   sorry.
25             MR. FLORES:  Thank you for the time, Your
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1198

 1   Honor.  I will be brief and efficient, to start at
 2   least, so the Court can start with questions.
 3         Let me start first and articulate the relief
 4   that we want, and then talk about three paths we
 5   want for that relief.
 6         The relief we are asking for here is a
 7   preliminary injunction, a traditional injunction
 8   personalized, that binds these plaintiffs and these
 9   defendants.  We are not seeking a universal vacatur,
10   which is controversial in some cases.  That really
11   is pleaded for, perhaps, ultimately, but now at the
12   preliminary injunction stage, all we want is --
13               THE COURT:  Slow down.  All you want
14   is. . .
15               MR. FLORES:  -- a preliminary injunction
16   between these parties.  So not a universal vacatur,
17   which parties sometimes seek in other cases and we
18   may seek eventually, but right now we just want an
19   injunction that stops ATF from enforcing this rule
20   against my three clients.
21               THE COURT:  Go ahead.
22               MR. FLORES:  There are three paths for
23   that decision.  And those paths depend on how many
24   claims the Court performs a likelihood of success
25   analysis of.  There's a minimal path --

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1199

```
 1              THE COURT:  Slow down.  There's a minimal
 2    path.
 3              MR. FLORES:  Yes, ma'am.
 4         There's a minimal path, a medium path and a
 5    maximum; minimal, medium and maximum.
 6         The minimal path would have the Court perform
 7    its likelihood of success analysis and the other
 8    factors on just one claim, whatever claim is easiest
 9    to get there with.  That's probably the claim that
10    Mock has already upheld.
11         This is a logical-outgrowth claim.  We know as
12    a matter of law under current 5th Circuit precedent
13    that that claim is a valid claim.  So you could just
14    do a minimal analysis and take the logical-outgrowth
15    claim and follow it through to get our relief.
16    That's the minimal path.
17         The moderate path is to perform the analysis,
18    both for the logical-outgrowth claim and one of the
19    constitutional claims.  We have a Second Amendment
20    claim and a Fifth Amendment claim.  The reason to do
21    that second category of analysis is because those
22    merits questions implicate our irreparable harm, and
23    they implicate the remedy.  We have an even stronger
24    case on --
25              THE COURT:  Slow down.  Okay.  Go ahead.
```

```
 1              MR. FLORES:  Yes, Your Honor.

 2         We have an even stronger case with at least one

 3    of the constitutional claims.  So if you think it's

 4    a close case, we should probably add analysis of

 5    that merits decision.

 6         The maximum kind of decision would render a

 7    likelihood of success ruling on all of our claims.

 8    And we think that would be, in the long term, the

 9    most efficient way to resolve the case.  It would

10    take longer now.  But if this goes up to the

11    5th Circuit, which I imagine it will, we would

12    rather the Court have one clean shot at all of the

13    claims rather than go up and down and up and down.

14              THE COURT:  Okay.

15              MR. FLORES:  Very well.

16         So the first claim is easy and clean.  This is

17    the logical-outgrowth claim.  This is a claim under

18    the Administrative Procedure Act.

19              THE COURT:  Slow down.  Slow down.  Okay.

20              MR. FLORES:  The logical-outgrowth claim

21    has already been upheld as a matter of law by the

22    5th Circuit.  So we know that there is a likelihood

23    of success already.  The only question is, do these

24    plaintiffs, in particular, necessitate relief, and

25    they do.  All of them have the likelihood of
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1201

1    irreparable harm, and all of them have a favorable
2    balancing of the equities.
3        This is a mainstream case where this rule is
4    going to harm these plaintiffs economically.  And
5    those economic harms require an injunction for two
6    separate reasons:  One reason that the economic
7    harms harm them is that they are not recoverable.
8    Even if we win the case at the end of the day, we
9    can't sue ATF to get that money back.  That's one
10   reason the precedence says economic harms are
11   irreparable; they can't be recovered.
12       The other reason they are irreparable, the
13   second reason, is the amount of the harm is
14   substantial.  We see, for example, that the business
15   plaintiff here, Rainier Arms, is losing thousands of
16   dollars every month because of this rule.  So that
17   is a substantial economic harm.  These are classic
18   irreparable harms that meet the test for injunctive
19   relief.
20       And then on the balancing of equities, this is
21   also a mainstream case where courts have held --
22   rightly so -- the government has no interest in
23   pursuing a rule that has already been found illegal.
24       And here, the real on-the-ground equities are
25   that the status quo ante is a (inaudible) without

```
 1   this rule.  We know that the government doesn't need
 2   to enforce this rule right now against everyone,
 3   because the government allowed the entire nation a
 4   long time to not comply with this rule at the
 5   beginning a little bit more time where these
 6   plaintiffs would not be particularly injurious.
 7               THE COURT:  Okay.
 8               MR. FLORES:  So that's the minimal way to
 9   resolve the case.
10        The moderate way involves looking at the
11   constitutional claims.
12               THE COURT:  Let's talk about the
13   constitutional claims.
14        Why is this a bearable arm?
15               MR. FLORES:  Your Honor, the frame of
16   analysis is about pistols and rifles.  The ATF wants
17   the Court to conduct its analysis about one
18   particular part, the actual arm brace.  But that's
19   wrong for two reasons.  It's wrong because that's
20   not how precedent looks at these cases, and that's
21   not how the Rule and the law looks at this.  The law
22   applies to a pistol and firearm -- sorry, a rifle.
23   They are changing the definition of pistol and
24   rifle, and so that's the frame of analysis.
25               THE COURT:  Yeah, but what about a
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1203

1  silencer?  Isn't that the same thing?  Because we

2  have -- silencers are definitely not bearable arms.

3          MR. FLORES:  Yeah, the silencer, itself,

4  is not an arm.  We wouldn't say that the pistol --

5  the brace here is the harm, but they are changing

6  the definition of pistol and rifle.  They say a

7  pistol becomes a rifle if you add a piece to it.  So

8  what they are acting on is the pistol.  What they

9  are acting on is the rifle.

10      That's the frame of analysis you see, for

11  example, in *Rahimi*, where we say, Where does the

12  granularity occur?  There has to be some granular

13  analysis.  Does it occur on the top side where we

14  determine whether the Second Amendment applies?  Or

15  does it occur on the bottom side where we determine

16  the government has met its burdens?

17      And *Rahimi* stands for the proposition that, on

18  the top side, when you determine whether the Second

19  Amendment applies, we do a broad analysis that looks

20  at broad categories, looks at the rifle and the

21  pistol.  And then on the bottom side is where they

22  can make their case about this particular kind of

23  part, this particular kind of regulation, and so

24  that is our answer there.

25          THE COURT:  All that is fine and good.

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1204

```
 1    But where are your facts?  You do not have facts in

 2    here like Mock did.  And you can't adopt from Mock

 3    your facts.  So where are your facts to show me

 4    irreparable harm and show me likelihood of success

 5    on the merits?

 6                THE COURT:  So the -- if the fact you're
```
 6    MR. FLORES:  So the -- if the fact you're

 7    looking for is what arm braces are at issue, you can

 8    see --

 9                THE COURT:  I'm looking for all the facts.

10    I mean, irreparable harm, prejudicial harm, all of

11    that.

12                MR. FLORES:  So let's take the plaintiff

13    Rainier Arms for example.  You will see their facts

14    of irreparable harm in Document --

15                THE COURT:  No, I want your facts, your

16    facts.

17                MR. FLORES:  So our facts -- Rainier Arms

18    is the plaintiff in this case --

19                THE COURT:  Oh, okay.

20                MR. FLORES:  -- and in Document 103 --

21                THE COURT:  I have it.

22                MR. FLORES:  -- precedent lists the exact

23    arm braces that they used to sell but don't.  And it

24    tells you that because of this rule, they are losing

25    thousands of dollars a day.  So those are our

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1205

1    irreparable harm facts.

2            THE COURT:  Yeah, but I mean that's not

3    nearly enough.  They have to show, you know, what's

4    their sales, what's your loss, how much money does

5    this involve?  I don't think that's irreparable harm

6    in and of itself.  You've got a lot more to show

7    than that.

8            MR. FLORES:  I understand the Court to be

9    asking two questions.  One is how granular our proof

10   has to be and what the threshold is.

11           THE COURT:  Yes.

12           MR. FLORES:  So the proof has told you

13   worth thousands of dollars -- the declaration says

14   they are losing thousands of dollars in revenue

15   every month.  So we have it happening monthly, and

16   it's thousands of dollars.  So that clearly meets

17   the threshold.

18       I don't understand the precedent to require

19   that we put in the spreadsheets.  The only proof you

20   have is the clear and direct proof from the CEO.

21           THE COURT:  Well, *Mock* had those, had a

22   lot more than you do.  A lot more.  And why is that?

23           MR. FLORES:  It's just a preference of how

24   to prove.  If the government really wanted to

25   dispute that we aren't actually losing this

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1206

```
 1   amount --
 2           THE COURT:  You're moving for the
 3   preliminary injunction.
 4           MR. FLORES:  That's right, Your Honor.  I
 5   understand the standards of preliminary injunction
 6   proof to day that the evidence is clear, direct and
 7   unconverted.  It suffices for this level of
 8   particularity.  We could, if the law permitted it,
 9   provide more, but I don't understand the law to
10   demand that.
11           THE COURT:  Okay.  All right.  Go ahead.
12           MR. FLORES:  So the other irreparable
13   harm, Your Honor, is the constitutional harms.  This
14   is separate from the financial harms.
15           THE COURT:  And skipping past, this might
16   be an unbearable arm.  Go ahead.
17           MR. FLORES:  Yes, Your Honor.
18        So the constitutional harms would be that each
19   plaintiff who is being stopped from engaging in
20   conduct protected by the Second Amendment suffers
21   irreparable harm automatically as a matter of law.
22   As a legal rule, that requires no particular proof
23   other than we want to engage in conduct that the
24   Constitution protects, and this rule doesn't let us.
25        So you see in the evidence here that the
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1207

```
 1   individual plaintiff, like Mr. Walley, for example,
 2   desires to purchase one of these firearms, a
 3   brace-equipped pistol, in the next year.  He needs
 4   this.  He has only one hand because of disabilities
 5   he suffered as a veteran.  This is how he defends
 6   his home, and he cannot do that because this rule
 7   prohibits it.  That's wrong under the EPA and wrong
 8   under the Constitution.  That's the classic
 9   irreparable harm there.
10           THE COURT:  Anything else?
11           MR. FLORES:  I think that hits it, Your
12   Honor.
13           THE COURT:  First, the preliminary
14   injunction granted in Mock is quite broad.  Do any
15   of the plaintiffs qualify for that injunctive relief
16   such that their motion is moot here?
17           MR. FLORES:  I don't understand that to be
18   the case, Your Honor.
19           THE COURT:  You don't.
20           MR. FLORES:  That's right.  These
21   plaintiffs need relief.  So we have Rainier Arms,
22   which is a company here, that's the company
23   plaintiff, and they are not covered by that
24   injunction.  And then neither are our individual
25   plaintiffs or the Foundation.
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1208

```
1              THE COURT:  Okay.  Are any members --
2   plaintiffs members of the Firearms Policy Coalition,
3   Inc., or downstream customers of Maxim Defense
4   Industries, including all direct consumers,
5   purchasers, intermediaries, dealers or retailers?
6              MR. FLORES:  Not to my knowledge, Your
7   Honor.
8              THE COURT:  Okay.  Okay.  You said how a
9   stabilizing brace implicated the Second Amendment.
10      Three or four out of the plaintiffs are not
11  from Texas.  Why did you sue here?
12             MR. FLORES:  I'm sorry, Your Honor?
13             THE COURT:  Three out of four --
14             MR. FLORES:  Oh.
15             THE COURT:  Why did you sue here?
16             MR. FLORES:  One plaintiff is here.  And
17  so we wanted to sue here because that plaintiff is
18  here, Mr. Green, he's our local plaintiff, and we
19  had to pick somewhere.  That's why.
20             THE COURT:  Okay.  Did any of the
21  plaintiffs participate in the Notice and Comment
22  period for the Final Rule?
23             MR. FLORES:  I don't think so.  So I have
24  been counsel for the Second Amendment Foundation
25  during the entire rulemaking proceeding.  And we
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1209

16

```
 1    have monitored the rulemaking to ensure that the
 2    comments we would have made were made.  And so we
 3    participated in that sense.  But we didn't submit a
 4    rulemaking, because we thought, as it was proposed,
 5    the comments that should have been made were made.
 6              THE COURT:  So none of the plaintiffs
 7    participated in the Notice and Comment period.
 8              MR. FLORES:  They didn't submit comments,
 9    but they certainly participated in the sense that
10    they received the notice and observed the notice.
11              THE COURT:  What were the comments, if
12    any, that plaintiffs would have liked to make to the
13    Final Rule had there been a second Notice and
14    Comment period?
15              MR. FLORES:  So we would have made due
16    process comments.
17              THE COURT:  Okay, that's too broad.  Go
18    ahead.
19              MR. FLORES:  Yes, Your Honor.
20        So some of the comments that we make are
21    applicable to both the rule that was announced and
22    the rule that came out.
23              THE COURT:  Fine.
24              MR. FLORES:  But the due process comments,
25    in particular, are unique to the new rule, and that
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1210

```
 1    wasn't allowed to be made.

 2         Our Second Amendment argument would have been

 3    the same, I think, in both cases with some slight

 4    differences.  Right?  When you think about a Second

 5    Amendment analysis, we have to look at what is the

 6    exact nature of the regulation.  And so since they

 7    changed the nature of the regulation, we would

 8    probably do a different kind of Second Amendment

 9    analysis and say, Is there a history and tradition

10    of this kind of regulation versus the point-based

11    system?  So there's a difference there as well.

12              THE COURT:  Okay.  What is Rainier Arms'

13    total monthly sales revenue?

14              MR. FLORES:  The record doesn't tell us

15    that, Your Honor.

16              THE COURT:  All right.  I will ask them,

17    then.

18         I'm sorry, you would know that.  You don't know

19    what their total monthly sales revenue is.

20              MR. FLORES:  I don't, Your Honor.  The

21    inquiry I posed to Rainier Arms was whether this was

22    a substantial financial detriment to them, and it

23    was.

24              THE COURT:  All right.  If, in the five

25    years or so prior to the promulgation of the Final
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1211

1    Rule in January 2023, what percentage of Rainier

2    Arms' average monthly income derived from the sales

3    of brace-equipped pistols?

4             MR. FLORES:  I don't know the percentage,

5    Your Honor.  And I'm not claiming today that this

6    rule is going to put Rainier Arms out of business,

7    because that isn't the test.

8        The test is to contrast de minimis financial

9    harms from substantial financial harms.  This is not

10   de minimis, because we have an absolute amount

11   that's not de minimis.  And the recurring amount,

12   right, thousands of dollars a month I think is not

13   de minimis.  I don't know any case to have ever held

14   that.  So that's the threshold.

15            THE COURT:  But they make millions, right?

16            MR. FLORES:  I don't know the full amount,

17   Your Honor.

18            THE COURT:  After the promulgation of the

19   Final Rule in January of 2023 -- I know you don't

20   know this -- what percentage of Rainier Arms'

21   average monthly revenue derived from the sales of

22   brace-equipped pistols?

23            MR. FLORES:  The record doesn't tell us,

24   Your Honor.

25            THE COURT:  And you don't know.

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1212

```
 1              MR. FLORES:  I don't know.
 2              THE COURT:  Okay.  Mr. Hwang's declaration
 3    states that Rainier Arms is losing tens of thousands
 4    of dollars in sales.  Is there any calculation to
 5    that whatsoever, spreadsheets or anything like that?
 6              MR. FLORES:  I don't have it.  No, he
 7    didn't submit it with the declaration, but he did
 8    the calculations to make the declaration.  He's the
 9    CEO, he looks at the books every day.
10              THE COURT:  All right.  Will the reduced
11    revenue Mr. Hwang asserts cause Rainier Arms to go
12    out of business or lay off workers?
13              MR. FLORES:  That's not what we're
14    asserting, Your Honor.  That's not the test.  But
15    no, I don't know that to be the case.
16              THE COURT:  I just need to know this.
17         How do you know that current and perspective
18    Rainier Arms' customers have reduced demand for
19    brace-equipped pistols because of the Final Rule?
20              MR. FLORES:  I understand Mr. Hwang to
21    know that, because this is his business, and he
22    talks to customers every day.
23              THE COURT:  Does he say that in his
24    declaration?
25              MR. FLORES:  No, he doesn't articulate the
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1213

1  basis for that.  He makes the assertion.

2          THE COURT:  Okay.  How does Rainier Arms

3  know that it's lost good will?

4          MR. FLORES:  How do they know they have

5  lost good will?  I don't understand that to be

6  articulated in the declaration.  I think this is his

7  inference about where customer good will comes from.

8          THE COURT:  Well, I mean, they say "good

9  will" in here somewhere, don't they?

10         MR. FLORES:  That's right.  Rainier Arms

11 knows why its customers like its product, because

12 they tell it that.  They have communications with

13 their customers as far as the reputation they build.

14 It's how they advocate for their company.  So they

15 have an understanding of what the market talks

16 about, what people say, the feedback they get.

17         THE COURT:  Okay.  How do you measure good

18 will?  How do you measure that?

19         MR. FLORES:  We can't.

20         THE COURT:  Okay.  What are Rainier Arms'

21 compliance costs stemming from the Final Rule?

22         MR. FLORES:  We don't have an amount of

23 compliance costs, Your Honor.  I understand there to

24 be legal fees for them, but I don't have the amount

25 of the legal fees.

```
 1              THE COURT:  Has Rainier Arms taken on any
 2    compliance costs thus far?
 3              MR. FLORES:  Yes, Your Honor.  The
 4    declaration tells you that the rules in division
 5    require them to make major changes.  So the obvious
 6    example is they have to determine what the rule
 7    covers and what they can't sell anymore, which is a
 8    complicated determination for all the reasons --
 9              THE COURT:  But you don't have the
10    figures, right?
11              MR. FLORES:  We don't, Your Honor.
12              THE COURT:  Okay.  What is Rainier's
13    estimated compliance in monetary terms?  Do you know
14    that?
15              MR. FLORES:  No, Your Honor.
16              THE COURT:  What is their estimated
17    compliance in terms of time?
18              MR. FLORES:  I don't have that specific
19    number.
20              THE COURT:  What's the cost of the average
21    brace-armed pistol sold by Rainier Arms?
22              MR. FLORES:  The average cost?
23              THE COURT:  Yes.
24              MR. FLORES:  I don't know.
25              THE COURT:  Okay.  What particular aspects
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1215

1    of the Final Rule's registration process are so

2    complex that the SAF members say they require legal

3    knowledge to register?

4            MR. FLORES:  The aspect that's complex is

5    determining whether or not they have a firearm

6    covered by the Rule.

7            THE COURT:  Well, I mean, how is that

8    complex?  The rules are like one, two, three, and

9    anyone could pick that up and look at it, right?

10           MR. FLORES:  No, they can't, Your Honor.

11   That's why we are here debating the rule.  ATF can't

12   tell us exactly what items are covered and what are

13   not.  They say most are covered, but not everything

14   is covered.  They have this factor list, and it

15   depends on things that differ from person to person.

16           THE COURT:  Okay.  But you don't have

17   specific knowledge of what's complex.  You just say

18   it's complex -- well, besides what you just said.

19           MR. FLORES:  I mean, the application form,

20   itself, requires this determination of what is

21   covered and what isn't.

22           THE COURT:  Does a legal lawyer have to

23   help you with that?

24           MR. FLORES:  Probably.

25           THE COURT:  Everyone who buys a brace has

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1216

23

```
 1   to have a lawyer?
 2           MR. FLORES:  They have to either
 3   themselves engage in a complex legal analysis or
 4   engage counsel.  That's what Mr. Walley says.
 5           THE COURT:  The ATF has a number of
 6   educational resources in Footnote 4 of its Response
 7   to Plaintiffs' Motion for Preliminary Injunction
 8   that would help a customer identify whether their
 9   brace-equipped firearm is subject to the Final Rule.
10       Why are these resources insufficient to help an
11   SAF member determine whether or not to seek a
12   device -- register a device?
13           MR. FLORES:  So the question is whether
14   it's a burdensome process, not whether it can be
15   completed by someone.  And the reason it's
16   burdensome is because it is complex and takes a long
17   time.  The second reason is it is not authoritative.
18       What ATF is going to try to enforce against
19   people is the Rule.  And the Rule is what they say
20   carries the force of law.  And the Rule is not
21   clear.  So additional materials that they will later
22   say are not binding and you can't rely upon are no
23   consolation for the members.
24           THE COURT:  Okay.  Mr. Gottlieb's October
25   15, 2023, declaration states that registering "would
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1217

24

```
 1  entail extraordinary outlays of personal effort,

 2  time, and risk."

 3      What does that mean?

 4          MR. FLORES:  Those are the outlays of

 5  trying to fill out the forms successfully, realizing

 6  that the question is complex.  And if you get it

 7  wrong, they are going to try to fine you or jail

 8  you.  Right?  It is a high stakes game to fill out

 9  this application, and people can't do that lightly

10  because of the high consequences that the NFA

11  imposes.

12          THE COURT:  Okay.  What's the estimated

13  monetary time and cost for an active SAF member to

14  register?

15          MR. FLORES:  To register I understand the

16  tax to be $200.  And we see in the declaration of

17  Mr. Walley that, for simple folk like him and most

18  Americans, that amount of money matters.

19          THE COURT:  In Mr. Gottlieb's October 15,

20  2023, declaration he states that many of the members

21  have incomes near or below the national average

22  income.

23      What do you mean by "many"?

24          MR. FLORES:  A substantial number of the

25  members, not de minimis.
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1218

```
 1              THE COURT:  How do you know that?

 2              MR. FLORES:  He knows that because they

 3   know who their members are.  They see the members

 4   come in.  They interact regularly with the members.

 5   They just had an annual conference.

 6         I don't know that they track them and conduct a

 7   census, but I do know that the Foundation has a

 8   competent understanding of what most of its members

 9   are.  The inquiry posed to these organizational

10   plaintiffs is whether a substantial number of their

11   members are involved in this, and that is clearly

12   the case here.

13              THE COURT:  Okay.  Is the subset of many

14   members that Gottlieb would say purchased a

15   brace-equipped AR rifle in the next year -- what is

16   the -- yeah.  Is this the same subset of many

17   members that Gottlieb said would purchase a

18   brace-equipped AR rifle in the next year?

19              MR. FLORES:  Yes, sir.

20              THE COURT:  Okay.  What's your source for

21   the national average income?

22              MR. FLORES:  I mean, you can look at -- I

23   understand the government's own sources to say the

24   national income is --

25              THE COURT:  What's your source?
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1219

```
 1            MR. FLORES:  My source?  I googled it,
 2   Your Honor.  And I found something that ended in
 3   ".gov," which I think the Court can take notice of.
 4   Any average they would peg, I will take.  I think
 5   it's 70-something.
 6            THE COURT:  What's the average cost of a
 7   brace-equipped AR pistol purchased by SAF members?
 8            MR. FLORES:  We don't know that answer.
 9            THE COURT:  You don't know?
10            MR. FLORES:  No, Your Honor.
11            THE COURT:  Okay.  Let's talk about
12   Mr. Walley.
13        Did Mr. Walley mitigate monetary costs by
14   registering the brace-equipped firearms he possessed
15   in January 2023 during the Final Rule's four-month
16   grace period?
17            MR. FLORES:  I don't know the answer, Your
18   Honor.
19            THE COURT:  You don't know.
20            MR. FLORES:  No.
21            THE COURT:  All right.  Mr. Walley states
22   in his October 15, 2023, declaration that he would
23   purchase another brace-equipped firearm within the
24   next year if not for the Rule's chilling legal
25   effects.
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1220

```
1          What is it about the Final Rule that has
2     chilled his purchasing decision?
3               MR. FLORES:  The Final Rule chills it
4     because he doesn't know what it covers and what it
5     doesn't cover.
6          Mr. Walley is the prime example.  He's someone
7     who only has one hand and doesn't know which of
8     these products he can buy and not be getting a
9     short-barreled rifle.
10              THE COURT:  Okay.  If he were to purchase
11    a brace-equipped firearm that he says now he would
12    buy, how much would it cost Mr. Walley?
13              MR. FLORES:  His declaration doesn't say
14    that.  You can take any average from the products
15    that are in the Rule, itself, and see that the cost
16    is substantial.
17              THE COURT:  Okay.  Is a stabilizing brace
18    necessary to Mr. Walley's use of the firearm?
19              MR. FLORES:  It is, Your Honor.  His
20    declaration states that the brace is necessary both
21    for safety and efficacy.
22              THE COURT:  Does he possess any firearms
23    that are not brace-equipped?
24              MR. FLORES:  I don't know, Your Honor.
25              THE COURT:  Okay.  Is he a police officer?
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1221

```
1              MR. FLORES:  No, Your Honor, he is a

2    veteran.

3              THE COURT:  That's the other one.

4              MR. FLORES:  That's Mr. Green.

5              THE COURT:  Did Mr. Green mitigate his tax

6    costs by registering the brace-equipped firearm he

7    possessed during the Final Rule's four-month grace

8    period?

9              MR. FLORES:  I don't know the answer.  And

10   Your Honor, it's important to remember that every

11   plaintiff in this case was, until Monday, covered by

12   an injunction and didn't have to comply.

13             THE COURT:  Okay.  What is the dollar

14   value and the time value of the substantial

15   financial industries (sic) Mr. Green says he will

16   face by registering his device?

17             MR. FLORES:  I'm sorry, the substantial --

18             THE COURT:  What is the dollar value and

19   the time value of the substantial financial injuries

20   that Mr. Green says he will face by registering his

21   device?

22             MR. FLORES:  So the substantial cost is

23   the tax that has to be paid.

24             THE COURT:  Which is how much?

25             MR. FLORES:  That's $200.  And then he has
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1222

29

```
 1   to have a substantial outlay of personal time and
 2   effort.  Either he, himself, has to not work and
 3   figure out whether his stuff is covered, or he has
 4   to engage in an attorney and figure out --
 5               THE COURT:  Why?  Why does he not have to
 6   work?
 7               MR. FLORES:  Because it takes a long --
 8   he's a working man.  He has to take off a day of
 9   work to spend a day looking through the regs,
10   looking through the other advisories and --
11               THE COURT:  Can he do it on a Saturday?
12               MR. FLORES:  He works on Saturdays, Your
13   Honor.
14               THE COURT:  He has a day off, right?
15               MR. FLORES:  He does, but that's his time
16   and effort.  I think time and effort is substantial.
17               THE COURT:  Okay.  Does Mr. Green have any
18   firearms that are not brace-equipped?
19               MR. FLORES:  I don't know the answer.  I
20   presume he does.  I'm sure he has actual traditional
21   rifles that are not brace-equipped that he may use
22   in that capacity.  But the question here is about
23   pistols and if he may effectively use a pistol in
24   that situation.
25               THE COURT:  Well, a cop has to have a
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1223

30

1  pistol, right?

2          MR. FLORES:  Um-hum.

3          THE COURT:  So is it brace-equipped?

4          MR. FLORES:  I don't know what other

5  firearms he has.  I just know that he has a desire

6  to acquire this brace-equipped pistol for reasons of

7  efficacy and safety.  He also has disabilities.

8          THE COURT:  But on the job he doesn't have

9  a brace-equipped pistol, right?

10          MR. FLORES:  The declaration I believe

11  says that he doesn't carry that regularly, but that

12  there are some scenarios where he would resort to

13  that kind of firearm as the most efficacious and

14  safe scenario.

15          THE COURT:  How can he fulfill his

16  professional responsibilities as a policeman by

17  operating those firearms without a -- operating

18  those firearms without a stabilizing brace?  How can

19  he do it?

20          MR. FLORES:  Your Honor, as I understand

21  it, the normal course of his duties does not require

22  the use of a stabilizing brace-equipped pistol, but

23  that there are extraordinary circumstances where he

24  would need to resort to that type of firearm.

25          THE COURT:  Okay.  What else do you have

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1224

```
 1  upfront?
 2           MR. FLORES:  I will answer any other
 3  questions the Court has, but I am happy to yield --
 4           THE COURT:  I think you have answered them
 5  for now.
 6       And I would ask the defense, finally, to get up
 7  here and argue your case.
 8           MS. LOWRY:  Your Honor --
 9           THE COURT:  Up to the lectern.
10           MS. LOWRY:  -- would it be more helpful to
11  the Court to address irreparable harm first, which
12  my colleague would address?  Or the merits issues of
13  the constitutional claims, specifically because --
14           THE COURT:  Irreparable harm and -- and
15  substantial likelihood of success on the merits.
16           MS. LOWRY:  Okay, great.  My colleague
17  will first address the Court as to irreparable harm,
18  and then I will step up to address substantial
19  likelihood of success.
20       In part of my argument, as we noted in our
21  disclosure yesterday, we have actual stabilizing
22  brace-equipped weapons.  I have just been informed
23  that the ATF has arrived with those weapons.  We
24  weren't sure they would make it in time.
25       May my colleague, Ms. Pitz, step out to assist
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1225

32

```
 1   them into the courtroom?
 2             THE COURT:  Sure.  Absolutely.
 3             MS. LOWRY:  And Mr. Lowenstein will
 4   address irreparable harm.
 5             THE COURT:  Go ahead, Mr. Lowenstein.  And
 6   speak up and speak slow.
 7             MR. LOWENSTEIN:  Yes, Your Honor.
 8        May it please the Court?
 9        Your Honor, as Your Honor knows, there's two
10   groups of -- or three groups of plaintiffs in this
11   case.  And there are --
12             MS. LOWRY:  May I briefly interrupt, Your
13   Honor?  We have a PowerPoint to assist with both of
14   our presentations, if we can pull it up.
15             THE COURT:  Okay.  You have no objection
16   to the PowerPoint?
17             MR. FLORES:  No, Your Honor, that's fine
18   with us.
19             THE COURT:  Okay.  Go ahead.
20             MR. LOWENSTEIN:  Thank you, Your Honor.
21             THE COURT:  Please speak up.  Go ahead.
22             MR. LOWENSTEIN:  As I was saying, there
23   are three groups of plaintiffs in this case.  There
24   are individual plaintiffs, there's a business
25   plaintiff, Rainier Arms, and then there is a
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1226

```
 1   membership organization --
 2            THE COURT:  Second Amendment.
 3            MR. LOWENSTEIN:  -- Second Amendment
 4   Foundation.  And I will address each of their
 5   irreparable harm theories in turn.
 6        But just to step back for a moment, now that
 7   the 5th Circuit has resolved the interlocutory
 8   appeal in Mock, this Court set this as an
 9   evidentiary hearing to give plaintiffs a chance to
10   support their request for a preliminary injunction.
11            THE COURT:  I did.
12            MR. LOWENSTEIN:  And plaintiffs have
13   essentially passed on that opportunity.  They have
14   submitted a few half-page declarations that are as
15   vague and conclusory as the ones they originally
16   submitted in support of their motion nearly eight
17   months ago.
18        So despite the 5th Circuit's warning in Mock
19   not to give short shrift for three remaining
20   equitable factors that are necessary for the
21   issuance of a preliminary injunction, that's what
22   plaintiffs have done here, and the record reflects
23   it based on Your Honor's questions.  There's much
24   that is unknown in this record.  And I think my
25   friend on the other side, his answers reflect that
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1227

```
 1    as well.  So neither the record nor the law supports
 2    their request for a preliminary injunction, and the
 3    Court should deny it accordingly.
 4         So I will start with the individual plaintiffs.
 5    They present two distinct theories of irreparable
 6    harm.  One is based on alleged compliance costs, and
 7    the other is an alleged constitutional injury.
 8         And I want to clarify one point at the outset
 9    before addressing the compliance cost theory that
10    the individual plaintiffs put forward.
11         Your Honor asked a lot of questions to my
12    friend on the other side about the burdens of the
13    registration requirement and --
14              THE COURT:  You don't have to call him "my
15    friend," just "Counsel."  Okay?
16              MR. LOWENSTEIN:  Yes, Your Honor.
17              THE COURT:  All right.
18              MR. LOWENSTEIN:  But there is no
19    allegation here that was timely made that any
20    plaintiff in this case intends to purchase a new
21    brace-equipped pistol.
22         In the Preliminary Injunction Motion in the
23    supplemental briefing from plaintiffs -- and
24    essentially throughout the entire course of this
25    litigation -- their complaints about compliance
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1228

35

```
 1   costs have been based on their currently-possessed
 2   brace-equipped weapons.
 3        But over this last weekend, Mr. Walley
 4   submitted a declaration that added a new allegation
 5   in Paragraph 3 suggesting that, but for the Rule, he
 6   would like to purchase another brace-equipped weapon
 7   sometime over the next year.
 8        Now, setting aside that that bare allegation
 9   doesn't put forward a concrete, actual, imminent
10   irreparable harm, it's also untimely.  At the
11   11th hour, plaintiff cannot add a new theory of
12   irreparable harm to this case.  We would submit that
13   that theory has been waived and has -- and there's
14   been no argument provided on that theory in
15   plaintiffs' briefing.
16        So as to their currently-possessed weapons,
17   plaintiffs' argument in their motion is that if the
18   individual plaintiffs were to attempt to try to come
19   into compliance with federal firearms laws, NFA in
20   particular, by altering the configuration of their
21   weapons, it would cost them some money and it would
22   cost them some time, which they claim is good enough
23   to establish irreparable harm.
24        I think it's helpful to look at that argument
25   in three ways, each of which shows that that theory
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1229

```
 1   is untenable and does not establish irreparable harm
 2   to support a preliminary injunction.
 3        First and foremost, there are essentially two
 4   options for the individual plaintiffs to reconfigure
 5   or to change the configuration of their
 6   currently-possessed weapons to come into compliance
 7   with the NFA.  And by coming into compliance, what I
 8   mean is to ensure that those weapons do not fall
 9   under the definition of an NFA firearm and therefore
10   not subject to NFA controls.
11        They can either swap out the barrel to ensure
12   that it is a 16-inch barrel or longer, or they can
13   remove the brace and dispose of it or alter it in a
14   way so it cannot be reinstalled.  Although
15   plaintiffs invoke that as a theory, they never claim
16   that they would ever consider or actually intend to
17   take either of those options.
18        So based on the argument that plaintiffs put
19   forward in their declarations and the state of the
20   record, that is merely a theoretical harm.
21   Preliminary injunctions do not issue to protect
22   hypothetical situations.  They issue to prevent
23   actual, concrete, imminent injuries.  And
24   plaintiffs' allegations regarding the compliance
25   costs with respect to their currently-possessed
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1230

```
 1   weapons are simply theoretical.  They are not
 2   imminent.  They are not concrete.  They are not
 3   actual.
 4        However, if the Court were to entertain that
 5   theory, I think it's notable that there are -- the
 6   individual plaintiffs have done nothing to
 7   substantiate this argument of compliance cost.
 8   There is no evidence in the record for the Court to
 9   determine what those costs would even be if they
10   were actually incurred.
11        Now, plaintiffs do try to evade that
12   requirement by arguing that any costs whatsoever,
13   whatever they may be, no matter how minimal, is good
14   enough to support a finding of irreparable harm
15   sufficient to support a preliminary injunction.
16        That's inconsistent with the state of
17   5th Circuit precedent, which -- which holds that
18   compliance costs -- a theory of irreparable harm
19   based on compliance costs, those costs must both be
20   unrecoverable and more than de minimis.  In the
21   state of the record, there is no way for this Court
22   to find any evidentiary basis in this record to find
23   that any cost of those two compliance options would
24   arise to an injury that is more than de minimis.
25        And I'd like to just point the Court's
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1231

38

```
1    attention to a couple of cases that reaffirm that
2    principle.
3         Just earlier this year, the 5th Circuit issued
4    an opinion in *Restaurant Law Center* that is, I
5    believe, cited in the District Court's opinion on
6    remand in *Mock*.  That's cited there.
7         And they say very clearly --
8              THE COURT:  What's the cite?
9              MR. LOWENSTEIN:  I do not have --
10             THE COURT:  Okay.  Go ahead.  Go ahead.
11             MR. LOWENSTEIN:  Thank you, Your Honor.
12        They say very clearly, "Our precedent requires
13   only that alleged compliance costs must be 'more
14   than de minimis' --"
15             THE COURT:  Start again.
16             MR. LOWENSTEIN:  The panel there stated
17   very clearly:  "Our precedent requires only that
18   alleged compliance costs be 'more than de minimis.'"
19        And they applied that principle in the context
20   where those compliance costs were unrecoverable.  So
21   there's no reason for them to reapply that principle
22   unless that was an additional requirement to assert
23   compliance costs as a basis of irreparable harm.
24        So, Your Honor, those are two points that we
25   wanted to highlight from our brief with respect
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1232

39

```
 1    to -- from our briefing with respect to the
 2    individual plaintiffs.
 3        Now, the individual plaintiffs do also assert
 4    that they will suffer an imminent irreparable injury
 5    based on an alleged constitutional violation.
 6        Now as we said, my colleague, Ms. Lowery, will
 7    be presenting argument on the actual merits of that
 8    claim.  But we would contend that Your Honor can
 9    reject that theory of irreparable harm on its facts
10    without ever needing to opine on the Second
11    Amendment's application or scope in this case.
12        Plaintiffs' argument in their motion is that
13    they allege that they would suffer constitutional
14    injury, a Second Amendment injury, if they were
15    required to destroy or surrender their firearms.
16    That would be the infringement of their Second
17    Amendment rights.  That's the theory they have put
18    forward.
19        But they are not required to destroy their
20    brace-equipped weapons or to surrender them.  There
21    are other options for them to come into compliance
22    with federal law.  So we think Your Honor can reject
23    that theory on its facts.
24        So unless the Court has any questions --
25            THE COURT:  I have some questions.  I
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1233

40

```
 1    don't know if they are right for you or for her, but
 2    let me go ahead.
 3        On page 31 of the Government's Response to
 4    Plaintiffs' Motion for Preliminary Injunction, it
 5    states that, "An individual may request a
 6    classification determination from ATF for clarity as
 7    to the treatment of a brace-equipped firearm."
 8        How does that work?
 9            MR. LOWENSTEIN:  Your Honor, I don't know
10    the exact process by which they can go about
11    requesting that classification.  But I think it's an
12    important point that, if there is actual confusion
13    as to the status of their brace-equipped weapon
14    under the NFA, they can ask for ATF to make that
15    assessment.
16        And it's important, because that determination
17    depends on the actual configuration of their
18    brace-equipped weapons, not -- and so whether or not
19    they need to comply with the NFA will depend on the
20    precise configuration of those weapons.  And those
21    facts also are not in the record.  We do not have
22    sufficient facts to know essentially if they are out
23    of compliance with the NFA under the understanding
24    of -- ATF's understanding of that statute.
25            THE COURT:  Would that classification from
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1234

41

```
 1   the ATF, should you get it, be binding?  I mean,
 2   such that they -- a determination of the Final Rule
 3   does not apply to them?
 4             MR. LOWENSTEIN:  Your Honor, ATF's NFA
 5   handbook does provide a caveat that a classification
 6   can be essentially revoked, or if it is found later
 7   to be erroneous, or based off of, you know,
 8   incorrect law, or if there is a change in law.
 9             THE COURT:  Under the Final Rule, how much
10   time does a new buyer of a qualifying brace-equipped
11   firearm have to register his device before
12   purchasing it?
13        Under the Final Rule, how much time does a new
14   buyer of a qualifying brace-equipped firearm have to
15   register his device after purchasing it.
16             MR. LOWENSTEIN:  Your Honor, I don't know
17   when that -- the ATF Form 1, which would be the
18   proper form for registering a newly-purchased
19   brace-equipped weapon would need to be sent in to
20   ATF.  My understanding is that the individual --
21   this individual would not be able to take possession
22   of the weapon until it was registered.
23        However, again, I just want -- I just want to
24   highlight that no plaintiff here has an
25   allegation -- an argument that they actually intend
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1235

42

```
1    to purchase a new weapon.  So registration and that
2    process would not pertain to any of the allegations
3    here.
4              THE COURT:  The government has stated that
5    brace-equipped firearms are dangerous because they
6    are used by gunmen in mass shootings.  Can you
7    explain how the Final Rule's continued
8    implementation impacts any decision-making by the
9    gunman in mass shootings?
10             MR. LOWENSTEIN:  Your Honor, what I will
11   say is -- on that question is that the Rule seeks to
12   effectuate a determination by Congress that
13   short-barreled rifles are uniquely dangerous
14   firearms, and that Congress imposed controls on
15   those types of firearms to help ensure public safety
16   or to promote public safety.
17        The Rule seeks to effectuate that.  And -- and
18   so it -- the determination that these are uniquely
19   dangerous are Congress's, and the Rule tries to
20   fulfill that.  And no court has called into question
21   that the Rule accurately interprets the statute and
22   does appropriately apply NFA's controls to these
23   types of weapons.
24             THE COURT:  Okay.  Is there anything else
25   that you have?
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1236

```
 1            MR. LOWENSTEIN:  Your Honor, if Your Honor
 2    would like to hear -- have me address Rainier Arms'
 3    theories of irreparable harm.
 4            THE COURT:  Sure.
 5            MR. LOWENSTEIN:  Yes, Your Honor.
 6        I will turn there, and then I will hand the mic
 7    over to my colleague.
 8        So Rainier Arms asserts a basic business
 9    injury.  They allege that they have suffered a -- in
10    their terms, a substantial financial injury --
11    though that is a legal conclusion -- because the
12    Rule has deprived it of profits and revenues because
13    of its effect on consumer demand.
14        Now, we have highlighted several problems with
15    that theory in our briefing.  I would just like to
16    highlight at least two this morning.
17        First of all -- and I think as Your Honor's
18    questions elucidated -- that theory is completely
19    unsubstantiated.  Now, it's well established that
20    financial injuries generally do not satisfy the
21    irreparable harm factor, but under 5th Circuit
22    precedent, substantial financial injury might.
23    However, plaintiffs have put no evidence forward on
24    the record upon which this Court can make a
25    determination that Rainier Arms is and will continue
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1237

44

```
 1   to suffer a substantial financial injury.

 2        The closest they come, and -- and as Counsel

 3   highlighted, it was in the second declaration from

 4   Rainier's CEO.  There he asserts that they have lost

 5   revenue from sales of brace-equipped pistols and,

 6   quote, components thereof that exceed tens of

 7   thousands of dollars per month.  That's at

 8   Paragraph 2.

 9        But that does not provide this Court with the

10   sufficient evidentiary basis to find that Rainier's

11   financial harms, as they are alleged, are of a

12   sufficient magnitude to be the type of harm that

13   would support a preliminary injunction.

14        And I think most importantly, Rainier provides

15   no evidence of what portion or what percentage tens

16   of thousand of dollars makes up of its overall

17   business.  And I think that's notable, because in

18   cases where the 5th Circuit has applied this

19   principle, they have found extremely magnitudinous

20   harms to businesses.

21        Just for example -- and this is a case the

22   plaintiffs rely on -- it is the case of *Wages and*

23   *White Lion Investments*.  I believe it's a case from

24   2021.  There the 5th Circuit found that it was

25   undisputed that the challenged action had caused the
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1238

1    petitioner directly to stop production of products

2    that make up 90 percent of its revenue.

3         And oftentimes, the 5th Circuit will mention

4    that when it's talking about substantial financial

5    injuries, it is talking about an injury that would

6    threaten the existence of the plaintiffs' business.

7         Now, there is not an evidentiary basis for this

8    Court to find whether the substantial harm that

9    Rainier is suffering comes anywhere close to that.

10        It would -- and there are times where the Court

11   can make reasonable inferences from evidence in the

12   record.  But I think what the plaintiffs are asking

13   the Court to do is to simply speculate or assume

14   that this is a sufficiently large --

15             THE COURT:  Because of *Mock* partly.  Go

16   ahead.

17             MR. LOWENSTEIN:  I think that's correct,

18   Your Honor.  And there, the business plaintiff was

19   very differently situated as -- as Judge O'Connor

20   pointed out, Maxim Defense's essentially entire

21   business revolved around brace-equipped pistols and

22   braces.

23        Now, all the evidence that seems to be lacking

24   in the record here is presumably in possession of

25   Rainier.  And they had an opportunity today to bring

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1239

```
 1    that evidence, yet they failed to do so even though
 2    they have had multiple opportunities.
 3          The only other point I will make, Your Honor,
 4    and I will make it quickly.  If this Court were to
 5    accept Rainier's allegations of continued financial
 6    harms over these last couple of months, it would
 7    only serve to prove that any preliminary injunction
 8    that this Court would issue would be ineffective at
 9    preventing the irreparable harm that plaintiffs
10    allege.
11          Rainier alleges that it is losing thousands of
12    dollars every month.  But for the last nearly five
13    months, it's been protected under a preliminary
14    injunction.  And so plaintiffs -- it is plaintiffs'
15    burden under 5th Circuit precedent in the
16    St. Bernard Parish case to show that a preliminary
17    injunction would actually be effective in preventing
18    the harm.  They have not done so here and -- and
19    have alleged that it would be ineffectual.  And the
20    5th Circuit has been clear that ineffective
21    preliminary injunctions cannot issue.
22          So if the Court has any questions, I'll --
23                THE COURT:  I don't.
24                MR. LOWENSTEIN:  Then I will pass the mic
25    to my colleague.
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1240

```
 1              THE COURT:  Come on.
 2              MS. LOWRY:  If I may have just a moment to
 3    connect.
 4              THE COURT:  Yes, you may.
 5              MS. LOWRY:  Thank you, Your Honor.
 6              (Pause.)
 7              MS. LOWRY:  Thank you, Your Honor.
 8        I will address the merits of each of
 9    plaintiffs' Second Amendment-related claims.  They
10    have two different buckets of Second
11    Amendment-related claims.
12        The first is really a procedural APA alleged
13    violation, that ATF failed to take into
14    consideration -- improperly failed to take into
15    consideration the effect of Bruen and a required
16    historical analysis that Bruen demands when it
17    promulgated the rule.
18        And then the second claim is a substantive
19    Second Amendment claim that I will also be prepared
20    to address in full.
21        Plaintiffs' first bucket of Second Amendment
22    violations, this procedural APA claim, just fails on
23    the face of the rule itself.  This is at page 6548
24    of the Rule.
25              THE COURT:  I can't read it.
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1241

```
 1            MS. LOWRY:  You don't need to.  It's only
 2    to suggest that there is a whole page of the Rule
 3    that addresses Second Amendment concerns.  And this
 4    part of the Rule addressed thousands of comments
 5    that were directed at Second Amendment violations.
 6            So these plaintiffs have the opportunity to say
 7    and submit comments, if they desire, you need to do
 8    a granular historical analysis.  As we heard, they
 9    did not submit comments.  This analysis was done in
10    response to the comments that were made to the Rule.
11            And the standard under State Farm is whether
12    the agency "entirely failed to consider an important
13    aspect of the problem" in promulgating its rule.
14    ATF did not entirely fail to consider the effect of
15    Bruen or the Second Amendment more broadly.
16            Plaintiffs specifically criticize ATF for
17    relegating their Bruen analysis to a footnote.  I
18    have now zoomed in.  The footnote was part of a
19    larger Bruen discussion.  But then Footnote 145 goes
20    into more detail to address Bruen specifically in
21    which they basically say that the regulation of
22    dangerous and unusual weapons, Bruen, which
23    reaffirms that portion of Heller, said that it is
24    consistent with historical traditions to regulate
25    dangerous and unusual weapons.
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1242

49

```
1          So the more granular analysis is not only
2    unnecessary under Bruen, it's not granularly
3    necessary under the State Farm standard.  The
4    analysis of Bruen that was provided in the Rule and
5    that is included at page 6548 is more than
6    sufficient to pass APA muster for considering that
7    aspect of this problem.
8               THE COURT:  Um-hum.
9               MS. LOWRY:  Moving, then, to plaintiffs'
10   substantive Second Amendment claim.  As Your Honor
11   suggested and plaintiffs conceded, stabilizing
12   braces themselves -- we argued this at page 24 of
13   our brief -- are not bearable arms.  Because
14   plaintiffs have conceded that, and in interest of
15   the best use of our time, I'll address the Second
16   Amendment as it applies to combined combinations and
17   why that is consistent with the Second Amendment.
18   And there's three basic reasons.
19          First:  Because there are at least some
20   combinations of pistol-brace combinations that are
21   short-barreled rifles under the NFA.  And that's
22   important, because plaintiffs make facial challenges
23   to the Rule.  They are not making as-applied
24   challenges to the Rule.  So the question is whether
25   there is any constitutional application of the Rule.
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1243

```
 1   And for these purposes, then, we will establish that
 2   there are some combinations at a minimum that do
 3   meet the definition of a short-barreled rifle.
 4        Second:  Because short-barreled rifles are
 5   dangerous and unusual weapons, they are not entitled
 6   to Second Amendment protection.
 7        Third:  Even if they were subject to Second
 8   Amendment protection as non-dangerous and unusual
 9   weapons, the NFA's registration requirements are
10   constitutional.  And I will reiterate this when I
11   get to that point, but this is not a --
12             THE COURT:  Slow down.
13             MS. LOWRY:  Thank you, Your Honor.
14        This is not a ban.  Any plaintiff who wishes to
15   keep and bear a heavy pistol equipped with a
16   stabilizing brace, assuming that they are not a
17   felon, assuming that they are not a fugitive,
18   assuming that they meet -- they would be legal
19   possessors, can keep and bear one.  They merely have
20   to go through the registration process.
21        As I mentioned, these are facial challenges.
22   So we are going to look for and establish whether,
23   for purposes of this proceeding, there are at least
24   some combinations of pistols -- heavy pistols and
25   braces that meet the definition of short-barreled
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1244

51

1   rifle.  As a reminder, that definition is whether a

2   weapon is designed or redesigned, made or remade,

3   and intended to be fired from the shoulder.

4        Then there's a size restriction.  And the

5   reason there's a size restriction -- this comes up

6   in the dangerousness analysis -- is because the NFA

7   is primarily concerned with these kinds of dangerous

8   weapons.  Short-barreled rifles are more dangerous

9   than full-length rifles because you have those large

10  calibers, you have the greater capacity for

11  destruction from a single fire, but it's much more

12  concealable because it's short.  It's not a

13  full-length rifle that somebody would not be able to

14  hide under a jacket.

15       You also have then, as compared to a pistol,

16  the accuracy and stability that comes with shoulder

17  firing versus single-handed firing.  So that's why

18  the definition is what it is.  It reflects the

19  dangerousness concerns of Congress in promulgating

20  the NFA -- in passing the NFA.

21       Then the Rule that's being challenged in this

22  litigation is ATF saying to the regulated parties

23  and industries, Here's how we are going to determine

24  whether this is designed, made, and intended to be

25  fired from the shoulder.  We're going to use these

52

```
 1    kind of objective criteria.  We're going to look at

 2    marketing materials.  That's what the Rule actually

 3    does.  But the real question -- and then the part of

 4    the law that has any repercussions -- is the NFA

 5    saying, Here are the requirements for weapons

 6    intended to be fired from the shoulder.

 7         This is one of the examples from the Rule that

 8    we have.  On the top is a Q Honey Badger heavy

 9    pistol equipped with a stabilizing brace.  And on

10    the bottom is a Honey Badger short-barreled rifle.

11    And as we see, they are nearly identical in

12    appearance.  They are nearly identical, if not

13    identical, in size.

14         The top -- the weapon with the stabilizing

15    brace is equipped with some kind of scope, which

16    would only be effective if this weapon was fired

17    from the shoulder.  And we have today a member of

18    ATF who is here with these actual weapons, if it

19    would be beneficial to the Court.

20              THE COURT:  I don't think so.  I hate that

21    you came all the way down here.  Just with the

22    pictures, I don't think I need them.  Thank you so

23    much for coming all the way from ATF.

24         Go ahead.

25              MS. LOWRY:  Absolutely, Your Honor.
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1246

53

1      We also found the weapons -- the photos to be

2 sufficient.  The actual weapons aren't necessary,

3 but if it were going to assist the Court, we wanted

4 to be sure they were available.

5      Here we have another weapon that is featured in

6 the Rule.  This is at Page 6546 of the Rule.  This

7 weapon is being marketed as a pistol even though it

8 is so heavy it is set up on a tripod, even though

9 this individual has shouldered what is, for all

10 intents and purposes, a buttstock into their

11 shoulder.

12      And even though the upper -- we call these

13 heavy pistols.  But the upper is a rifle bore.

14 That's the category of weapons that we are talking

15 about.  You have to have a rifle receiver to be

16 covered by the Rule.  So this is a rifle receiver

17 that is heavy enough to require a tripod that is

18 being shouldered, yet it is being marketed as a

19 pistol.

20      Just like in other parts of the law, creative

21 pleading isn't going to change the nature of your

22 claim; creative marketing is not going to change the

23 true nature of these weapons.  This is a

24 short-barreled rifle.

25      And we saw it in both *Mock* and the *Texas Gun*

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1247

```
 1    Rights case.  Part of the findings in that case was

 2    that with time the devices -- meaning stabilizing

 3    braces -- began to include characteristics

 4    resembling shoulder stocks.  And the ATF soon

 5    learned that manufacturers were widely marketing

 6    these braces to consumers as a means of creating

 7    functional short-barreled rifles without complying

 8    with the NFA.

 9         So it's not an accident that this weapon is

10    being marketed as a pistol.  It was done to avoid

11    NFA registration requirements as a marketing matter.

12         We have about a minute of a YouTube video

13    demonstrating this same point, the -- whether a

14    weapon with a stabilizing brace is intended to be

15    fired from the shoulder.

16         (Video Played.)

17              MS. LOWRY:  This is single-handed firing.

18         (Video Continued.)

19              THE COURT:  Okay.

20              MS. LOWRY:  We see here the dangerousness

21    the ATF is talking about reflected in a video, that

22    the firing became much more accurate stabilized, and

23    we're talking about a rifle upper.  And we obviously

24    see shouldering and intent to fire from the

25    shoulder.
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1248

1       So these -- what we've just shown demonstrates

2  there are -- at least for purposes of this facial

3  challenge -- some combinations of a pistol and

4  stabilizing brace that meet the NFA definition of a

5  short-barreled rifle given the intent to fire them

6  from the shoulder.

7       Then the question is, are short-barreled rifles

8  entitled to Second Amendment protection?  They are

9  not, because they are uniquely dangerous and unusual

10 weapons.

11      That is established through --

12           THE COURT:  In *Bruen*.

13           MS. LOWRY:  -- *Bruen*, going back to

14 *Heller*, which was dealing --

15           THE COURT:  *Heller*, yes.

16           MS. LOWRY:  -- with short-barreled

17 shotguns.  But as I will have cites, courts have not

18 distinguished constitutional distinction between

19 short-barreled shotguns and short-barreled rifles.

20 Constitutionally, each of them are dangerous and

21 unusual weapons.

22      And in fact, this court -- another judge

23 sitting in this court three weeks ago was dealing --

24           THE COURT:  I have it.  I have it.  United

25 States versus --

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1249

```
 1              MS. LOWRY:  Miller.

 2              THE COURT:  Yeah, yeah, right here.

 3              MS. LOWRY:  Yes, Your Honor.  So this was

 4     a January 6 defendant who wound up being charged

 5     with possessing an unregistered short-barreled

 6     rifle.

 7         And Judge Scholer watched through a very

 8     careful Second Amendment analysis and found that

 9     every district court post-Bruen who has considered

10     the question found short-barreled rifles to be

11     dangerous and unusual weapons.

12         So in terms of a substantial likelihood of

13     success on the merits, plaintiffs can't show it

14     based on law coming out of this court.  Of course,

15     this was in a criminal case, because they were

16     talking about a certain individual with a certain

17     firearm and whether it was constitutional to apply

18     the NFA to that individual, and the Court said yes.

19         So in terms of a facial challenge, we are

20     seeing this court, the Northern District of Texas,

21     saying there are at least some short-barreled rifles

22     that can be regulated under the NFA consistent with

23     the Second Amendment.

24         There was a specific analysis of the

25     dangerousness prong.  And the fact that it is an NFA
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1250

1   weapon was evidence of its dangerousness, given the

2   purposes of the NFA.  And so the Court held that

3   this is a weapon, given its -- that it was not in

4   common use and was, instead, subject to the history

5   and tradition of prohibiting the carrying of

6   dangerous and unusual weapons.

7            THE COURT:  And not protected by the

8   Second Amendment.

9            MS. LOWRY:  Not protected by the Second

10  Amendment.

11      In a related case that we have been litigating

12  out of the Eastern District of Virginia --

13            THE COURT:  I have it, *Miller*.

14            MS. LOWRY:  Yes, Your Honor.  There's a

15  lot of Millers going around in this.

16            THE COURT:  Yeah, there are a lot of

17  Millers.

18            MS. LOWRY:  The Court basically did the

19  same analysis and found that short-barreled rifles

20  are not meaningful and distinct from short-barreled

21  shotguns, and there's no constitutional protection

22  for them.  Each of these courts collected cases.  We

23  have *United States v. Royce*.

24            THE COURT:  You don't have to tell me.  I

25  know them.

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1251

```
 1              MS. LOWRY:  Yes, Your Honor.

 2         So then moving to the third question -- if Your

 3    Honor reaches it -- to say that they're -- all

 4    applications of this rule implicate Second Amendment

 5    rights, we would ask, then, is it constitutionally

 6    proper to put forth registration requirements for

 7    these weapons?

 8         And this is important, because Heller and Bruen

 9    affirm a historical tradition of prohibiting the

10    possession of dangerous and unusual weapons.  The

11    NFA is not trying to prohibit the possession of

12    short-barreled rifles, it's a registration

13    requirement.  And this is addressed in the Rule,

14    that this is not a ban.

15         In regulating short-barreled rifles, Congress

16    only requires the registration of the firearms and

17    the payment of a making or transfer tax, neither of

18    which prohibits a person's ability to possess these

19    weapons.

20         And in terms -- Your Honor brought up seeking a

21    classification letter.  I believe there is language.

22    Some of these are available online.  I don't know if

23    they are in this record.

24              THE COURT:  There are all sorts of

25    regulations.
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1252

59

```
 1              MS. LOWRY:  Yes, Your Honor, about a sort
 2    of safe harbor for acting in reliance of an
 3    applicable classification letter.  While my
 4    colleague is correct that the classification letter
 5    can be changed, it can be withdrawn, there is a safe
 6    harbor if there is a classification letter.
 7              THE COURT:  Okay.  That's good to know.
 8              MS. LOWRY:  And the Form 1 is asking
 9    questions that are uniquely in the mind of the
10    potential purchaser:  Are you a fugitive from
11    justice?  Are you intending to use this weapon to
12    commit a felony?  These are not hard questions to
13    answer.
14              THE COURT:  Of course the mass gun shooter
15    would say no to those, but go ahead.
16              MS. LOWRY:  Yes, Your Honor.  And that is
17    within Congress's prerogative and assessment that
18    there is at least some deterrent effect.  And I
19    believe early Supreme Court precedent about whether
20    the tax is constitutional talks about taxes being
21    used to deter behavior or encourage other behaviors.
22    So all of that is baked into the NFA itself.
23         In Justice Kavanaugh's *Bruen* concurrence, he
24    stated:  "From Blackstone through the 19th-century
25    cases, commentators and courts routinely explained
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1253

60

```
 1   that the right was not a right to keep and carry any
 2   weapon whatsoever in any manner whatsoever and for
 3   whatever purpose."
 4        And that's what the plaintiffs here are really
 5   arguing when they say that mere registration
 6   violates their Second Amendment rights.  They want
 7   an unbridled right, and that's not how the Supreme
 8   Court has articulated the scope of the Second
 9   Amendment.
10        The Bruen majority specifically said:  "Nothing
11   in our analysis should be interpreted to suggest the
12   unconstitutionality of licensing regimes under which
13   a general desire for self-defense is sufficient to
14   obtain a permit."
15        Again, these aren't as-applied challenges.  But
16   none of these plaintiffs have said, "I'm concerned
17   that I would not be approved if I tried to register
18   this weapon."
19        And what Bruen is saying is the licensing
20   requirements are fine as long as you -- you know,
21   depending on whether it's actually going to be
22   granted or not.  The plaintiffs here haven't raised
23   a concern about whether they would actually be
24   approved.  They don't want to go through the
25   licensing, quote, requirement, which is here merely
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1254

1  registration.

2       The 5th Circuit in *Bezet*, which is an

3  unpublished opinion, cited *Lane v. Holder*, a Fourth

4  Circuit opinion, to say these are really mere

5  inconveniences.  There will be "'additional costs

6  and logistical hurdles' that all citizens bear as

7  ancillary to living under a government."

8       That's what plaintiffs are seeking to avoid,

9  and that's why it's not irreparable harm for them to

10  comply with the rule as well.

11       The only case besides *Heller* and *Bruen* that the

12  plaintiffs cite to support their argument is the

13  *Rahimi* case that came up in counsel's argument as

14  well.

15       That was, as Your Honor is well familiar, a

16  922(g) issue.  922(g) prohibited possession -- the

17  Rule does nothing of the sort -- of all firearms,

18  pistols and rifles.  And again, the Rule does

19  nothing of the sort.  It is a registration

20  requirement that only applies at issue here to

21  short-barreled rifles.  So the concerns of *Rahimi*

22  and the constitutional analysis that was required

23  there simply don't apply.

24            THE COURT:  I agree.

25            MS. LOWRY:  We have our sources here.  And

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1255

62

```
 1   if Your Honor has any other questions, I'm prepared
 2   to answer them.
 3            THE COURT:  I don't.
 4        Anything else?  Let me just turn back to the
 5   plaintiff.
 6        Mr. Flores, go ahead.
 7            MR. FLORES:  Thank you, Your Honor.
 8        I'd like to say a few things about irreparable
 9   harm and then talk about the merits we just heard.
10        Let me start with the decisional structure that
11   I began with.  To grant the plaintiffs an injunction
12   here, the Court needs to adjudicate at least one of
13   the claims.  It doesn't necessarily have to
14   adjudicate all of the claims.  To deny, you would
15   have to adjudicate all of the claims.
16        And so I don't want to give short shrift here
17   to the constitutional claims, because they may
18   matter.  But let's recall that one of the claims,
19   right, the logical-outgrowth claim, we know as a
20   matter of law is likely to succeed.  And when the
21   courts do the analysis of a preliminary injunction,
22   precedent says that likelihood of success is the
23   predominant factor.
24        There is a debate between the parties about how
25   burdensome this rule is.  How bad is it?  How big a
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1256

```
 1    deal is it?  Let me clear in emphasizing that that
 2    analysis impacts both sides.  If this rule doesn't
 3    burden us that much, it also doesn't get the
 4    government that much.  And if it burdens us
 5    severely, then maybe it gets the government more,
 6    but those go both ways.  So either this is a really
 7    big deal for both sides or it's a little deal for
 8    both sides.  In either case, the tiebreaker has to
 9    be likelihood of success.  And we know with a clear
10    on-all-fours 5th Circuit precedent they are going to
11    lose.
12              THE COURT:  As far as your logical
13    outgrowth, I mean, I agree with you partially.  But
14    there are no facts in this case to support that
15    argument in this case.  Right?  I mean, you get them
16    in Mock, but you don't have them here.
17              MR. FLORES:  Oh, no, they are absolutely
18    implicated, Your Honor.  The logical-outgrowth claim
19    applies to the Rule in toto as a matter of law.
20    There is no such thing as an as-applied version of
21    that argument versus a facial version of that
22    argument.  If they violated that part of the APA's
23    requirement, it is invalid as to the entire country.
24         There is an argument about newly-acquired
25    pistols versus existing pistols, both are implicated
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1257

64

```
1   in this case.  You can see that we pleaded that our
2   plaintiffs were going to acquire new pistols soon.
3   That's in Paragraph 9 of the complaint.  So our
4   proof there is validly in the case.
5        But remember when this case began, all of our
6   plaintiffs had in their possession pistols.  And
7   then they were protected from the Rule's enforcement
8   for a number of months.  So for them, now is the
9   critical time.  If they get the preliminary
10  injunction, they will have to comply by one of these
11  methods.  If not, then they're going to be subjected
12  to these harms.
13            THE COURT:  On the logical outgrowth, you
14  have to show prejudice, right?
15            MR. FLORES:  The harm is inherent.  The
16  whole point is that the lack of notice doesn't allow
17  process.  That's over.  *Mock* has already decided
18  that.
19            THE COURT:  Yeah, but you've got to
20  produce facts in this case that affects you.  You
21  just can't say "*Mock*" and get your injunction.
22            MR. FLORES:  On that claim we can, Your
23  Honor.  I don't understand any precedent to say that
24  a particular plaintiff has to say that they would
25  have submitted a comment in order for that legal
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1258

65

```
1   error to matter.  It is a harmful error as a matter
2   of law precisely because we didn't receive the
3   notice, it's not a particularized claim.
4       Let me say something about the question of
5   getting a new gun, right, the idea that the
6   plaintiffs can get a different kind of pistol and
7   still meet their needs.  That is not true in this
8   case for Mr. Walley.  It's not true for Mr. Green.
9   And it's not true for the similarly-situated Second
10  Amendment Foundation members.  They need this
11  particular type of weapon for reasons of safety and
12  efficacy.  There is a reason that this particular
13  type of weapon is in common use, because people need
14  it.  That's why it is there.
15      Let me move to the Second Amendment merits and
16  say three things.  These weapons are in common use
17  now.  This not-a-ban argument is wrong, and they
18  have zero history.
19      Number one is that these weapons are in common
20  use now.  The test that *Bruen* poses is a contrast;
21  either a weapon is in common use or it is dangerous
22  and unusual.
23      This weapon is in common use.  We know it,
24  because ATF's own analysis says that there are
25  millions of these brace-equipped pistols in use now.
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1259

```
 1   That meets the test for common use, so
 2   definitionally they are not unusual and beyond
 3   Second Amendment protection.  That's the first
 4   point.
 5        The second point is that this not-a-ban
 6   argument is wrong.  Bruen wasn't a ban, either.
 7   Bruen was a licensing regime, and yet the same
 8   threshold requirements apply.  Licensing regimes,
 9   just like total bans, require a full-fledged
10   historical justification, and they don't have it
11   here.
12        There is zero history of the federal government
13   using taxes or licenses to create classes of guns at
14   the founding.  They weren't trying to go after
15   colonial gangsters with a tax or a licensing
16   requirement.  They didn't have but two or three
17   anyway.  But both the how of the law and the why of
18   the law have to matter.  They have zero historical
19   foundation for this kind of regulation history.  So
20   they fight hard to get out of that threshold battle,
21   but they are going to lose that on the question.
22        If I may, Your Honor, let me jump back to the
23   irreparable harm and make one point.
24             THE COURT:  I want to just say --
25             MR. FLORES:  Yes.
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1260

67

```
 1                THE COURT:  -- you make the point that
 2     it's been decided.  But it has -- you know, you have
 3     to show that you were prejudiced by the ATF's
 4     procedural error to get a preliminary injunction,
 5     right?
 6                MR. FLORES:  Yes, Your Honor.
 7                THE COURT:  Okay.  You haven't shown that.
 8                MR. FLORES:  Our position, Your Honor, is
 9     that when the agency violates the logical-outgrowth
10     test, prejudice is inherent.
11                THE COURT:  Okay.  Do you have any cases
12     on that?
13                MR. FLORES:  I think Mock stands for that
14     proposition, Your Honor.
15                THE COURT:  Okay.
16                MR. FLORES:  We haven't heard anything
17     about our first claim, the statutory contradiction
18     claim and that we submit with equal force and equal
19     efficacy.
20         I don't really think we heard a cogent argument
21     from the government today about a critical
22     proposition.  They say lots and lots of things about
23     what this rule covers.  But ATF says at the same
24     time, this rule does not cover all brace-equipped
25     pistols.  And they can't articulate what it doesn't
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1261

68

```
 1    cover without blowing up the entire regime, and
 2    that's the problem.
 3         You saw videos of people using these firearms,
 4    both as a pistol and a rifle.  My plaintiffs can't
 5    do that; literally physically, they can't do that.
 6    That is not their situation.  And this rule
 7    definitively doesn't let them acquire these weapons
 8    or makes it so vague as they can't tell.
 9         If the Court has any further questions, I am
10    happy to answer those.
11              THE COURT:  Thank you very much.
12         Anybody else from the defense?
13              MR. LOWENSTEIN:  Your Honor, just a
14    couple.
15              THE COURT:  Just a quick -- yes,
16    Mr. Lowenstein.
17              MR. LOWENSTEIN:  Just a couple of points
18    to emphasize, Your Honor.
19         The four factors of the preliminary injunction
20    test are laid out in Winter, and have been applied
21    by courts across the country, are prerequisites of
22    this Court's exercise of equitable jurisdiction.
23         Winter, itself, makes clear that a federal
24    judge is not obligated to mechanically issue an
25    injunction simply because there's been a showing of
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747
shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com

23-11157.1262

<sup>69</sup>

```
 1   likelihood of success on the merits on a claim.  It
 2   says quite clearly that that is not enough.
 3        We would also just be -- we would also just
 4   like to say we are happy to answer any other
 5   questions.  And one point on the historical evidence
 6   on the Second Amendment issue.  We presented
 7   historical evidence in our briefing, and those were
 8   unrebutted in plaintiffs' supplemental briefs and
 9   reply brief.
10        That's all I have, Your Honor.
11             THE COURT:  Thank you very much.  Those
12   were great arguments.
13        I'm going to take a break and then come back
14   out.
15        (Recess taken.)
16             THE COURT:  I want to thank you-all,
17   especially the lady from ATF who came all the way
18   down here.  Thank you-all very much.  That was very
19   interesting.
20        I am going to issue an order, but it's going to
21   be a couple of days -- not long -- and rule on the
22   motion.  But that's it for today.  Okay?  Be in
23   recess.
24             (Court in recess at 11:22 a.m.)
25
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1263

```
1                C E R T I F I C A T E
2           I, Shawnie Archuleta, CCR/CRR, certify
3     that the foregoing is a transcript from the record
4     of the proceedings in the foregoing entitled matter.
5           I further certify that the transcript fees
6     format comply with those prescribed by the Court and
7     the Judicial Conference of the United States.
8           This 21st day of October 2023.
9
10
11                      s/Shawnie Archuleta
                        Shawnie Archuleta CCR No. 7533
12                      Official Court Reporter
                        The Northern District of Texas
13                      Dallas Division
14
15
16    My CSR license expires:  December 31, 2023
17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747
19
20
21
22
23
24
25
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**
**shawnie_archuleta@txnd.uscourts.gov or shawniearchuleta7@gmail.com**

23-11157.1264

**Certificate of Service**

I certify that on March 22, 2024, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon all counsel of record.

S/Chad Flores

Chad Flores