No. 23-11157

_____

In the United States Court of Appeals for the Fifth Circuit

_____

Second Amendment Foundation, Incorporated;
Rainier Arms, L.L.C.;
Samuel Walley; William Green,

Plaintiffs – Appellants

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives;
Steven Dettelbach, in his official capacity Director of the
Bureau of Alcohol Tobacco Firearms and Explosives;
United States Department of Justice;
Merrick Garland, U.S. Attorney General,

Defendants – Appellees

*caption continued on the following page*

_____

On appeal from the United States District Court for the
Northern District of Texas
No. 3:21-cv-116

_____

**Brief of Appellants**

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

*consolidated with*

No. 23-11199

William T. Mock; Christopher Lewis; Firearms Policy Coalition, Incorporated, a nonprofit corporation; Maxim Defense Industries, L.L.C.,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General, in his official capacity as Attorney General of the United States; United States Department of Justice; Bureau of Alcohol, Tobacco, Firearms, and Explosives; Steven Dettelbach, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives;

Defendants-Appellants.

*consolidated with*

No. 23-11203

Darren A. Britto; Gabriel A. Tauscher; Shawn M. Kroll,

Plaintiffs-Appellees,

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendant-Appellant

*consolidated with*

---

No. 23-11204

Texas Gun Rights, Incorporated;
National Association for Gun Rights, Incorporated,

Plaintiffs-Appellees,

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendant-Appellant

---

*consolidated with*

---

No. 23-40685

State of Texas; Gun Owners of America, Incorporated; Gun Owners Foundation;
Brady Brown,

Plaintiffs-Appellees,

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives; United States Department
of Justice; Steven Dettelbach, Director of ATF;

Defendants-Appellants.

---

## Certificate of Interested Persons

The undersigned counsel of record certifies that, in addition to the persons already certified by parties to this action, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Appellees | Counsel |
|---|---|
| William Green<br>Rainier Arms, L.L.C.<br>Second Amendment Foundation, Incorporated<br>Samuel Walley | Flores Law PLLC<br>Chad Flores |

| Appellants | Counsel |
|---|---|
| Bureau of Alcohol, Tobacco, Firearms, and Explosives<br>Steven Dettelbach<br>Merrick Garland, U.S. Attorney General<br>United States Department of Justice | U.S. Department of Justice<br>Sean Janda<br>Benjamin Lewis<br>Abby Wright |

| Other Interested Parties | Counsel |
|---|---|
| Brady Center to Prevent Gun Violence<br>Everytown for Gun Safety Support Fund<br>Giffords Law Center to Prevent Gun Violence<br>March For Our Lives Foundation | Arnold & Porter Kay Scholer LLP<br>Samuel Ferenc |

Texas Public Policy Foundation

Texas Public Policy Foundation
Robert Henneke
Matthew Miller
Clayton Calvin

<u>/s Chad Flores</u>
Chad Flores
cf@chadflores.law
Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Counsel for Appellants

## Statement Regarding Oral Argument

The Court should grant oral argument in this case apart from the consolidated cases.  Though each appeal concerns the same rule, Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023), and similar APA and constitutional claims against it, several unique features of this action warrant the kind of maximum scrutiny that would be lost in a consolidated argument.

This appeal is the only one involving a district court that *denied* a preliminary injunction.  A separate oral argument will aid the Court's determination of why this outlying decision warrants reversal.

This appeal also involves several claims for relief that some or all of the other cases omit, such as the Fifth Amendment vagueness claim and the process-based APA claim showing that the Agencies promulgated the Final Rule without considering the Second Amendment factors and data made relevant by *New York State Rifle & Pistol Association, v. Bruen*, 142 S.Ct. 2111 (2022).   If the Court wants to resolve the entire controversy about this regulation in one fell swoop, a separate oral argument covering all of this appeal's issues will best facilitate that.

# Table of Contents

Certificate of Interested Persons .............................................................. iv

Statement Regarding Oral Argument ...................................................... vi

Table of Contents ...................................................................................... vii

Table of Authorities .................................................................................. x

Jurisdictional Statement ........................................................................... 1

Issues Presented ........................................................................................ 2

Statement of the Case .............................................................................. 3

I.      Facts ................................................................................................ 4

        A.      Congress made the "rifle" definition extremely consequential. ........... 4

        B.      A pistol with a brace is still a "pistol." ................................. 7

        C.      ATF deems a brace-equipped pistol a "rifle." ...................... 8

II.     Procedural posture. ...................................................................... 10

Summary of the Argument ...................................................................... 13

Argument ................................................................................................... 15

I.      The requisite likelihood of success exists. ................................. 16

        A.      The logical outgrowth claim will succeed. ........................... 17

                1.      *Mock* upholds the logical outgrowth claim. ................. 17

                2.      The district court raised the prejudice issue *sua sponte*. ........... 18

                3.      There is no party-specific prejudice requirement. .................... 20

                4.      Prejudice was shown. ............................................... 23

B.     The statutory contradiction claim will succeed. ................................ 25

        1.     The regulation goes beyond the statute's only measures. ........ 26

        2.     The regulation contradicts the statute's disjunctive and individualized measures. ........................................................... 27

        3.     The rule of lenity applies. ........................................................ 29

C.     The Due Process Clause claim will succeed. .................................... 30

        1.     Four serious vagueness problems exist. ....................................31

        2.     *Johnson* (U.S. 2015) and *Dimaya* (U.S. 2018) control. ............. 33

        3.     The district court's [sometimes clear] rationale fails. .............. 34

D.     The failure to consider claim will succeed. ......................................... 35

E.     The Second Amendment claim will succeed. .................................... 39

        1.     The Final Rule governs "rifles" and "pistols," which are clearly covered by the Second Amendment. ........................... 41

        2.     Brace-equipped pistols are in common use. ............................. 44

II.    The requisite irreparable harm exists. ......................................................... 47

A.     Multiple forms of irreparable harm are at issue. ................................. 47

B.     The Final Rule irreparably harms Rainier Arms. ............................... 50

C.     The Final Rule irreparably harms SAF and the Individual Plaintiffs. .............................................................................................. 54

D.     Given that the Final Rule's compliance costs are undoubtedly significant, their exact severity does not matter. ................................. 56

III.   The balance of harms and public interest favor relief. .................................... 58

Conclusion ................................................................................................................ 60

Certificate of Compliance ........................................................................ 61

# Table of Authorities

## Cases

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) ........................................................ 49

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ..................................................................... 45

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir. 2023) (en banc). ......................................... 29

*City of Arlington v. FCC*,
    668 F.3d 229 (5th Cir. 2012) ........................................................ 21

*City of Waukesha v. EPA*,
    320 F.3d 228 (D.C. Cir. 2003) ................................................21, 23

*Def. Distributed v. United States Dep't of State*,
    865 F.3d 211 (5th Cir. 2017) ........................................................ 16

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ................................................................. 53

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................ 41, 44

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ........................................................ 43

*Free Speech Coal., Inc. v. Paxton*,
    No. 23-50627, 2024 WL 982225  (5th Cir. Mar. 7, 2024). ........... 59

*Guerrero v. Whitaker*,
    908 F.3d 541 (9th Cir. 2018) ........................................................ 35

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013). ..................................................... 59

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021)........................................................17

*Johnson v. United States*,
    576 U.S. 591 (2015) ....................................................... 30, 33, 34, 38

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..................................................................

*Luis v. United States*,
    578 U.S. 5 (2016) ...................................................................... 43

*McLouth Steel Prods. Corp. v. Thomas*,
    838 F.2d 1317, 1324 (D.C. Cir. 1988) .......................................... 23

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ..................................................*passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*,
    463 U.S. 29 (1983) ..................................................................... 36

*New York State Rifle & Pistol Ass'n, v. Bruen*,
    142 S.Ct. 2111 (2022) ...........................................................*passim*

*O'Donnell v. Goodhart*,
    900 F.3d 220 (5th Cir. 2018)......................................................... 59

*Opulent Life Church v. City of Holly Springs*,
    697 F.3d 279 (5th Cir. 2012) ....................................................... 48

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ........................................................51

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ................................................ 30, 33, 34, 35

*Shell Oil Co. v. E.P.A.*,
    950 F.2d 741 (D.C. Cir. 1991) ................................................... 22

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
    245 F.3d 434 (5th Cir. 2001) ..................................................... 38

*Tesfamichael v. Gonzales*,
    411 F.3d 169 (5th Cir. 2005) ..................................................... 16

*Teter v. Lopez*,
    76 F.4th 938 (9th Cir. 2023) .....................................................

*Tex. v. Seatrain Int'l, S.A.*,
    518 F.2d 175 (5th Cir. 1975) ..................................................... 15

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ................................................ 48, 51

*Tripoli Rocketry v. ATF*,
    437 F.3d 75 (D.C. Cir. 2006) ..................................................... 31

*United States v. Evans*,
    333 U.S. 483 (1948) .................................................................. 33

*United States v. Johnson*,
    632 F.3d 912 (5th Cir. 2011) ..................................................... 37

*United States v. Lim*,
    444 F.3d 910 (7th Cir. 2006) ..................................................... 32

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) .................................................................. 31

*United States v. Palomares*,
    52 F.4th 640 (5th Cir. 2022) ..................................................... 28

*United States v. Rahimi*,
    61 F.4th 443 (5th Cir. 2023) ..................................................... 41

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ............................................................... 49

*U.S. Steel Corp. v. U.S. E.P.A.*,
    595 F.2d 207 (5th Cir. 1979).......................................... 22, 37

*Util. Air Regulatory Group v. E.P.A.*,
    573 U.S. 302 (2014)................................................................ 25

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ...............................................

*Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*,
    16 F.4th 1130 (5th Cir. 2021)............................... 48, 51, 58

*Winter v. NRDC*,
    555 U.S. 7 (2008) ...................................................................15

*Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017)............................................. 49

## Statutes

5 U.S.C. § 706 ....................................................................*passim*

18 U.S.C. § 921 .................................................................*passim*

18 U.S.C. § 922 ............................................................................5

26 U.S.C. § 5812 ..........................................................................5

26 U.S.C. § 5822 ..........................................................................5

26 U.S.C. § 5841 ..........................................................................5

26 U.S.C. § 5845 ..........................................................5, 6, 26, 28

26 U.S.C. § 5871 ..........................................................................5

**Regulations**

27 C.F.R. § 478.11 .................................................................................. 8

27 C.F.R. § 478.98 .................................................................................. 5

27 C.F.R. § 479.11 .................................................................................. 8

27 C.F.R. § 479.61 .................................................................................. 5

27 C.F.R. § 479.62 .................................................................................. 5

27 C.F.R. § 479.66 .................................................................................. 5

27 C.F.R. § 479.84 .................................................................................. 5

27 C.F.R. § 479.85 ..................................................................................

27 C.F.R. § 479.101 ................................................................................ 5

27 C.F.R. § 479.102 ................................................................................ 5

28 C.F.R. § 0.131 .................................................................................... 5

*Factoring Criteria for Firearms With Attached "Stabilizing Braces"*
    88 Fed. Reg. 6478 (Jan. 31, 2023) ............................................... *passim*

**Secondary authorities**

James A. D'Cruz, Note, Half-Cocked: The Regulatory Framework of Short-Barrel Firearms, 40 Harv. J.L. & Pub. Pol'y 493 (2017) ........................................ 47

Michael S. Obermeier, Comment, Scoping Out the Limits of "Arms" Under the Second Amendment, 60 U. Kan. L. Rev. 681 (2012). ...................................... 47

## Jurisdictional Statement

28 U.S.C. § 1331 gives the district court original jurisdiction because the complaint, ROA.43–99, establishes that the action arises under the Constitution and the Administrative Procedure Act.

28 U.S.C. § 1292 gives this Court appellate jurisdiction because the appellants timely filed a notice of appeal on November 13, 2023, ROA.1194, from the Document 109 order, ROA.1152–1193, that refuses a preliminary injunction.

## Issues Presented

This appeal concerns another of President Biden's anti-gun regulations, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023) (the "Final Rule"). Already the writing is on the wall because *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), held that the Final Rule violates the APA's logical outgrowth requirement. Nonetheless, the district court refused to issue a preliminary injunction for Plaintiffs asserting *Mock*'s claim and more. The main issues concern Plaintiffs' likelihood of success on each of five distinct claims:

1. Logical outgrowth: Whether Plaintiffs will succeed in claiming that the Final Rule did not constitute the logical outgrowth of its proposed version.

2. Statutory contradiction: Whether Plaintiffs will succeed in claiming that the Final Rule's "rifle" redefinition contradicts the statutes at issue.

3. Due Process Clause: Whether Plaintiffs will succeed in claiming that the Final Rule is unconstitutionally vague.

4. Failure to Consider: Whether Plaintiffs will succeed in claiming that the Agencies promulgated the Final Rule without considering the Second Amendment factors and data made relevant by *New York State Rifle & Pistol Association, v. Bruen*, 142 S.Ct. 2111 (2022).

5. Second Amendment: Whether Plaintiffs will succeed in claiming that the Final Rule's redefinition of "rifle" and "pistol" violates the Second Amendment.

Once the action's likelihood of success is established, relatively standard issues about irreparable harm and equity balancing should be decided as well.

## Statement of the Case

President Biden's new rule about brace-equipped pistols, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023), dramatically expands federal criminal law by redefining both "rifle" and "pistol." The distinction matters because Congress treats nearly all guns as one or the other and treats certain "rifles" far more harshly than "pistols." Whereas the Gun Control Act of 1968 applies to most "rifles" and "pistols" alike, with proscriptions that are plenty onerous, the National Firearms Act applies to short-barreled "rifles" but not "pistols," delivering far more severe criminal proscriptions for the covered "rifles."

The Final Rule changes the "rifle"/"pistol" distinction in a severe way. Millions of common firearms that the law used to define as "pistols" (covered only by the GCA) are now defined as "rifles" subject to the NFA's far more severe regime. By shifting this definitional boundary, the Final Rule turns millions of law abiding American "pistol" owners into lawbreaking short-barreled "rifle" owners overnight.

Changes to the Congressional criminal regime's "rifle"/"pistol" distinction must therefore be cogent, clear, and of course constitutional. The Final Rule is not. *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), already held that the Final Rule violates one of the APA's core tenets, and this action will show important further violations of the APA, Due Process Clause, and Second Amendment.

## I.    Facts

### A.    Congress made the "rifle" definition extremely consequential.

Federal firearms law consists of two main statutory schemes, the Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 ("GCA") (codified as amended mostly at 18 U.S.C. ch. 44), and the National Firearms Act of 1934, Pub. L. 73–474, 48 Stat. 1236 (1934) ("NFA") (codified as amended mostly at 26 U.S.C. ch. 53).  The GCA and NFA differ markedly, both in what they regulate and how they regulate it.  The exact legal regime governing firearm depends largely on which of these statutory schemes applies to it.  Definitional thresholds are critical.

The GCA's threshold "firearm" definition is broader than the NFA's.  The GCA defines "firearm" to generally cover both a "rifle" *and* a "handgun" (aka "pistol").  *See* 18 U.S.C. § 921(a)(3) ("The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device.").  To this broad set of "firearms," generally including most "rifles" and "handguns," Congress in the GCA opted to apply a wide variety of legal restrictions that are substantial but not as onerous as the NFA.

The NFA's threshold "firearm" definition is narrower than the GCA's. The NFA defines "firearm" to cover only short-barreled "rifles" and a few other discrete items—but not "pistols." *See* 26 U.S.C. § 5845(a). To this narrow set of "firearms," including short-barreled "rifles" but *not* "pistols," Congress in the NFA opted to impose a set of legal restrictions that are far more onerous than the GCA alone.

The legal and regulatory consequences of NFA coverage are very onerous. NFA firearm makers must submit an application to ATF and pay a tax. 26 U.S.C. § 5822; 27 C.F.R. §§ 479.61, 479.62. NFA firearm transfers must also submit an application and pay an additional tax. 26 U.S.C. § 5812; 27 C.F.R. §§ 479.66, 479.84. NFA firearm recipients must provide ATF with fingerprints and notify a local police department of the transfer. 26 U.S.C. § 5812; 27 C.F.R. §§ 479.84(c), 479.85. NFA firearm possessors must register themselves in a federal firearm database. 26 U.S.C. § 5841; 27 C.F.R. §§ 479.101, 479.102; 28 C.F.R. § 0.131(d). Violations of such NFA requirements can be punished with imprisonment for up to ten years and fines up to ten thousand dollars. 26 U.S.C. § 5871.

"Rifle" status therefore carries huge legal significance. A short-barreled firearm that Congress deems a "handgun" or "pistol" generally need only comply with the GCA (which itself has plenty of onerous provisions, *see, e.g.*, 18 U.S.C. § 922(b)(4); 27 C.F.R. § 478.98). But a short-barreled firearm that constitutes an

NFA "rifle" and not a "handgun" or "pistol" must comply with both the GCA and the extraordinarily consequences of NFA coverage as well.

"Rifle" is defined almost identically by the GCA and NFA. Both statutes make the "rifle" definition turn on whether the weapon is "designed," "made," and "intended" to be "fired from the shoulder." The GCA defines "rifle" this way in 18 U.S.C. § 921(a)(7), and the NFA defines "rifle" this way in 26 U.S.C. § 5845(c):

> The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

26 U.S.C. § 5845(c).

"Handgun" is defined by the GCA but not the NFA. The GCA "handgun" definition turns largely on whether the firearm has a "short stock" and is "designed" to be "held and fired by the use of a single hand":

> (a)     As used in this chapter –
>         . . .
>         (30)  The term "handgun" means—
>
>               (A)  a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and
>
>               (B)  any combination of parts from which a firearm described in subparagraph (A) can be assembled.

18 U.S.C. § 921(a)(30). On this definitional spectrum, many modern firearms in common usage occupy a position that is close to the "rifle"/"pistol" divide. Among them are brace-equipped pistols.

### B.    A pistol with a brace is still a "pistol."

"Arm braces," also known as a "stabilizing arm braces" or "stabilizing braces," are a mainstream firearm accessory in common usage. *See generally* Final Rule, 88 Fed. Reg. at 6,479–6,494. They function by letting the bearer stabilize the firearm against the forearm of the same arm that is holding the firearm in the main. *Id.* Originally developed for use by people with limb-related disabilities (two are Plaintiffs here), arm braces are now used both by those with and without disabilities to facilitate safe and accurate firearm use that cannot be otherwise achieved. *Id.* Millions of brace-equipped pistols exist in America today. *See Mock*, 75 F.4th at 567.

The Final Rule enacted in 2023 constitutes a marked departure from the Agencies' past position about whether brace-equipped pistols still constitute "pistols." For over a decade before that, the Agencies took the position that brace-equipped pistols did *not* constitute short-barreled "rifles." Between 2012 and 2014 in particular, ATF issued no fewer than 17 classification letters about one specific arm brace or another, all opining that arm brace designs did *not* convert pistols into short-barreled rifles. Final Rule, 88 Fed. Reg. at 6,502 & n.84.

### C.     ATF deems a brace-equipped pistol a "rifle."

The Final Rule arrived in 2023 as *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478, 6574 (Jan. 31, 2023).  It operates directly upon the regulations defining "rifle" for GCA and NFA purposes, bringing about a sea change with two key actions.  First, the Final Rule expressly invalidates every prior arm brace classification that ATF had issued. Final Rule, 88 Fed. Reg. at 6,480.

Second and critically, the Final Rule then overhauls the "rifle" definition of 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11.  It does so by adding (to the initial sentence mirroring the statutes) two new paragraphs and six subparagraphs:

> Rifle. A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.
>
> (1) For purposes of this definition, the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in paragraph (2), indicate that the weapon is designed, made, and intended to be fired from the shoulder.
>
> (2) When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:
>
>> (i)     Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii)    Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(iii)    Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv)    Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v)    The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi)    Information demonstrating the likely use of the weapon in the general community.

Final Rule, 88 Fed. Reg. at 6574-75.  The Rule took effect immediately. Final Rule, 88 Fed. Reg. at 6,478.

## II.     Procedural posture.

### A.     Plaintiffs sued to stop the Final Rule with all available claims.

This action began in 2021.  ROA.21.  Plaintiffs include the Second Amendment Foundation ("SAF") and Rainier Arms, a leading American seller of braces and brace-equipped firearms.  ROA.2329-230.  There are also two Individual Plaintiffs that use the brace-equipped pistols in question. ROA.232-233.  Defendants are the "Agencies": the United States Department of Justice, the Attorney General of the United States, the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives.  ROA.233.

The suit attacks the Final Rule with a series of distinct claims showing that it violates the Administrative Procedure Act, the Due Process Clause, and the Second Amendment.  ROA.228.  It seeks judgments holding the Arm Brace Rule unlawful and halting it both immediately and permanently.  *Id.*

This appeal arises from Plaintiffs' motion for a preliminary injunction below, which was filed in March of 2023.  ROA.252.  While the motion was being litigated below, the Court decided *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023)—a decision that now forms an indispensable part of this action's remaining procedural path.

**B.** *Mock* **held that the Final Rule violates the APA's "logical outgrowth" requirement.**

Independently of the instant Plaintiffs, other litigants across the country initiated APA-focused actions against the Final Rule. *Mock* was the first major appeal about the Final Rule to reach this Court, rendering several important holdings that undoubtedly put the writing on the wall.

While *Mock* was being briefed in the main, a panel issued a preliminary injunction pending appeal against enforcement of the Final Rule as to that case's plaintiffs. Plaintiffs below brought this to the district court's attention immediately. ROA.476. They explained to the district court that, "[t]hough the *Mock* injunction does not technically apply to this case's Plaintiffs, key case parallels make *Mock* effectively decisive here." ROA.476. "In all relevant respects, the instant Plaintiffs are at least as deserving of a preliminary injunction as the *Mock* plaintiffs; and in all relevant respects, the Defendants' position here is at least as weak as it is in *Mock*." ROA.477. The main *Mock* decision arrived in August 2023 with a decisive result:

> In conclusion, it is relatively straightforward that the Final Rule was not a logical outgrowth of the Proposed Rule, and the monumental error was prejudicial. The Final Rule therefore must be set aside as unlawful or otherwise remanded for appropriate remediation. . . . Plaintiffs are likely to succeed on the merits and have thus carried part of their burden to obtain a preliminary injunction.

*Mock*, 75 F.4th at 586.

### C.    The district court refused to enter a preliminary injunction

Plaintiffs' motion for a preliminary injunction was first filed in March of 2023. ROA.252.  As *Mock* made its way through this Court, the district court below temporarily granted the Plaintiffs' request for injunctive relief via a series of short administrative orders.  ROA.574; ROA.618; ROA.1056; ROA.19 (Electronic Order Nos. 99 & 102).  But ultimately, after *Mock*'s main decision was issued and the parties below submitted supplemental briefs about its impact, ROA.1058; ROA.1061; ROA.1065; ROA.1077; ROA.1130; ROA.1139, the district court here denied Plaintiffs' motion for a preliminary injunction.  ROA.1152.

The district court explained its decision in the Document 109 "Memorandum Opinion and Order" of November 2023.  ROA.1152.  As to the merits, it held that Plaintiffs lacked a likelihood of success as to any claim—including the claim that *Mock* upheld and the bevy of other claims that were fully pressed below as well. ROA.1163-1182.  The court also held that Plaintiffs failed to show any irreparable harm, rejecting all of the arguments regarding  compliance costs, business injuries, and constitutional harms.  ROA.1182-1192.  It ended with a harm balancing analysis that went in favor of the government.  ROA.1192.

Plaintiffs timely appealed. ROA.1194.

## Summary of the Argument

Congress defined "rifle" with a simple, limited provision that the Biden Administration thinks is too kind to the Second Amendment. The President wants more guns deemed "rifles" and not "pistols" so that administrative enforcers can wield the more onerous NFA more often. So the President took the law into his own hands, promulgating with the Final Rule a sweeping new "rifle" definition that covers far more than Congress or anyone else anticipated.

The Final Rule's capacious new "rifle" definition turns millions of law-abiding "pistol" owners into lawbreaking short-barreled "rifle" owners. Exactly how many new criminals this change creates is unknown, since the Final Rule uses a bewildering six-factor test that no normal American can comprehend. Vagueness dangers abound because the new "rifle" definition turns not on objective properties that citizens can predict, but on subjective conjecture about a firearm's "likely use" and the meaning of marketing materials to bureaucrats in DC. The Final Rule both exceeds what Congress actually enacted and exceeds what the Constitution allows.

Plaintiffs are very likely to succeed on all five their action's strongest claims. *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), already upholds the logical outgrowth claim in every relevant respect. And on top of that are several additional claims that show the Final Rule's illegality multiple times over.

All Plaintiffs have strong showings of irreparable harm. For the law-abiding citizens possessing pistols that are now deemed (vaguely) a short-barreled "rifle," enforcement of the Final Rule entails either surrendering their firearm entirely or bowing to the NFA's extraordinarily onerous demands. For the businesses that deal in the arms at issue, enforcement of the Final Rule entails cutting off critical streams of income, nullifying customer good will, and more compliance costs that will never be reclaimed. Likewise for the Second Amendment Foundation, whose law-abiding members include the named plaintiffs alongside many other similarly situated citizens and business that will suffer these irreparable harms unless relief is provided.

The Agencies have no pressing reason to lord this extraordinary new criminal power over the citizenry immediately. The prior "rifle" definition was in place for years and the sky did not fall. Nor did things go awry when the Agencies themselves bowed to political realities and delayed most of the Final Rule's effect for several months in 2023. Reverting to the status quo until this litigation reaches its end is sound in principle and practice, providing a completely fair balance of equities.

If ever there is a case where a strong likelihood of success on the merits should dominate the preliminary injunction inquiry, it is this one. A sweeping new criminal regulation that precedent has already deemed illegal on one ground and is soon to be deemed illegal on others should not be enforced against anyone in the meantime.

## Argument

Plaintiffs challenge the district court's decision to deny their motion for a preliminary injunction. Well-established standards of review apply.

The district court gets limited deference. "Although the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed *de novo*." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (cleaned up).

Preliminary injunctions are warranted if the movant shows that he "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). But "none of the four prerequisites has a fixed quantitative value." *Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.*

The district court here erred by employing incorrect legal rules and by abusing its discretion in their application to these facts. All of the test's factors pointed strongly in favor of relief and none of the government or district court's criticisms showed otherwise. The Court should reverse the district court's denial of Plaintiffs' motion for a preliminary injunction and render a judgment granting the motion.

## I.    The requisite likelihood of success exists.

Plaintiffs established the requisite likelihood of success on the merits with no less than five claims.  Standing alone, each of these five claims showed a strong enough likelihood of success to warrant the requested preliminary injunction. Together, these five meritorious claims make the case for relief overwhelming.

Because likelihood of success can be the injunction decision's "most important" factor, *Def. Distributed v. United States Dep't of State*, 865 F.3d 211, 212 (5th Cir. 2017); *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005)—and in this case clearly should be—the Court should address and uphold Plaintiffs' high likelihood of success on all five of the claims presented here.  In particular, the Court's decision should expressly uphold Plaintiffs' likelihood of success as to at least one statutory claim *and both of constitutional claims*.  Doing so ensures that later inquiries about irreparable harm and equities account for the correct species of harm. For while the overall test is certainly met with a calculus that accounts only for Plaintiffs' logical outgrowth claim, the fact that the Final Rule also violates Plaintiffs' constitutional rights makes the irreparable harm, equity balancing, and public interest inquiries even more lopsided.

**A.    The logical outgrowth claim will succeed.**

To establish the logical outgrowth claim's likelihood of success, Plaintiffs pleaded,[1] proved,[2] and argued[3] that the Agencies violated 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(C) because the Final Rule did not constitute the logical outgrowth of its proposed version.  Success on this claim is not just highly likely.  It is assured because *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), has already deemed this logical outgrowth claim successful.  The district court nonetheless rejected the claim by holding that Plaintiffs failed to show party-specific prejudice, rendering the APA violation itself harmless. ROA.1163-65.  This warrants reversal for two reasons.  Party-specific prejudice is not required for this claim and Plaintiffs showed it anyhow.

**1.    *Mock* upholds the logical outgrowth claim.**

*Mock* addressed a logical outgrowth claim that matches Plaintiffs' logical outgrowth claim.  Both concerned the Final Rule. *Compare Mock*, 75 F.4th at 566 n.1, *with* ROA.245-46.  Both assert that the Final Rule is "legislative" and not merely "interpretive." *Compare Mock*, 75 F.4th at 578-83, *with* ROA.245-46.  Both use the Fifth Circuit's leading prior precedent, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021), to assert that the Agencies here had to—but did not—supply a

---

[1] *See* ROA.245-46.
[2] *See* ROA.281 -382; ROA.1131-1136.
[3] *See* ROA.467-477; ROA.1058-60; ROA. 1061-64; ROA.1078-79; ROA.1140-41; ROA.1200.

proposed rule that "'adequately frame[d] the subjects for discussion' such that 'the affected party 'should have anticipated' the agency's final course in light of the initial notice.'" *Compare Mock*, 75 F.4th at 593 (quoting *Huawei Techs. USA*), *with* ROA.245-46 (complaint quoting the exact same passage). In these ways and every other relevant respect, *Mock* is on all fours with Plaintiffs' logical outgrowth claim.

*Mock's* holding about the logical outgrowth claim's merit is clear and decisive. In no uncertain terms, accounting for every objection the Agencies might lodge here, *Mock* holds that the Final Rule does indeed violate 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(C) because it did not constitute the logical outgrowth of its proposed version. To resolve the instant question of whether Plaintiffs' logical outgrowth claim is likely to succeed, the Court should simply apply *Mock*'s bottom line: "the Final Rule was not a logical outgrowth of the Proposed Rule, and the monumental error was prejudicial. The Final Rule therefore must be set aside as unlawful or otherwise remanded for appropriate remediation. . . ." *Mock*, 75 F.4th at 586.

### 2.    The district court raised the prejudice issue *sua sponte*.

In the decision tree below, *Mock*'s treatment of the logical outgrowth claim's merits should have made further "likelihood of success" analysis for this claim unnecessary. Plaintiffs argued that below, *e.g.*, ROA.1062–63, 1081, and to their credit, so did the Agencies. ROA.1066, 1073. They too submitted that, since *Mock*

had taken the logical outgrowth claim's merits off the table, all that was left to argue about (on this claim) were non-merits issues of irreparable harm and equity balancing. *Id.* This agreement on both sides seemed obviously correct and unremarkable at the time, but now requires special emphasis because the district court disregarded it on the way to committing both of its key errors.

Below, both Plaintiffs *and the Agencies* expressly agreed that *Mock* alone fully resolved the logical outgrowth claim's "likelihood of success" inquiry. Both sides read *Mock* to mean that the logical outgrowth claim's sole point of debate would concern the non-merits issues of irreparable harm and equity balancing. The Agencies made this concession expressly and repeatedly. "The parties agree that *Mock* likely controls this Court's analysis of whether plaintiffs' logical-outgrowth claim is likely to succeed on the merits." ROA.1073 (Agencies' brief). "Therefore, consistent with these principles, this Court's analysis of the likelihood-of-success factor should begin and end with *Mock*." *Id.* (Agencies' brief again).

To be sure, plenty of disagreement surrounded this structural point. (The parties disagreed about how the non-merits factors played out, and also about whether the court should reach the other claims' merits.) But on the instant question, all agreed that *Mock* fully resolves this claim's "likelihood of success" factor.

Despite all of this, the district court opted to challenge the merits *sua sponte*. Questions about party-specific prejudice and harmless error arose for the first and only time at the motion hearing when the district court came out of the blue to press Plaintiffs' counsel about them. ROA.1209-11. Again to their credit, the Agencies never said a word about these issues and stuck to what they had briefed. Undeterred, the district court made these unbriefed issues the decision's centerpiece. ROA.1163-65. Setting aside this errant procedural foundation, the logical outgrowth decision's prejudice holding presents two independent grounds for reversal.

### 3.    There is no party-specific prejudice requirement.

The prejudice holding's first error is a pure legal mistake, reviewed de novo. The district court held that relief on Plaintiffs' logical outgrowth claim requires a showing of party-specific prejudice—*i.e.*, a showing of what additional comments Plaintiffs would have submitted had notice been adequate. ROA.1163-65. But as a matter of law, there is no such party-specific prejudice requirement. The APA does *not* require plaintiffs asserting this kind of logical outgrowth claim to show what additional comments they would have submitted had notice been adequate.

*Mock* itself resolves this issue. It squarely rejects the party-specific prejudice requirement that the district court imposed here, confronting the very same case that the district court below relied upon (*City of Arlington*). *See* ROA.1164. Judge Smith's

opinion for the Court addresses the question of party-specific prejudice on page 586

and in footnote 58.  *Mock*, 75 F.4th at 586 & n.58.  *Mock* holds that, for this kind of

logical outgrowth claim, the core violation itself shows the necessary prejudice:

> Nor is the agency correct that "any error would be harmless." Although our circuit has held that plaintiffs challenging an agency's error for procedural challenges must "demonstrate prejudice," *City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012) (cleaned up), *aff'd*, 569 U.S. 290, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013), plaintiffs have easily proven that.  As they have illustrated, they could not comment on the specifics of the Final Rule, given how vastly different the Proposed and Final Rule turned out.  As a result, plaintiffs were not on notice, nor could they comment on the expanded rule. That is sufficient prejudice.[58]

> In conclusion, it is relatively straightforward that the Final Rule was not a logical outgrowth of the Proposed Rule, and the monumental error was prejudicial.  The Final Rule therefore must be set aside as unlawful or otherwise remanded for appropriate remediation.
> . . .

> [58] The ATF cites *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) (per curiam), to support the proposition that plaintiffs would have had to submit additional and different comments.  That requirement has no Fifth Circuit support, and in any event, the plaintiffs have suggested, through briefing, a number of comments they would have liked to have made against the Final Rule.  Moreover, as *City of Waukesha* itself declares,

> > [T]here are also situations where prejudice need not be shown by petitioners in a notice-and-comment rulemaking challenge, "where the agency has entirely failed to comply with notice-and-comment requirements, and the agency has offered no persuasive evidence that possible objections to its final rules have been given sufficient consideration"

> .... [A] rule requiring petitioners in all "logical outgrowth" cases to show what additional comments they would have submitted had notice been adequate would improperly merge the analysis on the merits of whether the final rule is a "logical outgrowth" with any applicable prejudice analysis.
>
> 320 F.3d at 246 (quoting *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991)).

*Mock*, 75 F.4th at 586 & n.58 (footnote 57 omitted).

*Mock*'s holding about the claim's need for prejudice showings applies here. There and here alike, Plaintiffs "could not comment on the specifics of the Final Rule, given how vastly different the Proposed and Final Rule turned out." *Id.* There and here alike, "plaintiffs were not on notice, nor could they comment on the expanded rule." *Id.* The bottom line is the same: "That is sufficient prejudice." *Id.*

Not that it matters, since the holding binds regardless, but *Mock*'s approach to prejudice requirements is correct. The APA does *not* impose a hard-and-fast requirement of party-specific prejudice in every instance. The statute says only to take "due account" for "the rule of prejudicial error," 5 U.S.C. § 706, which courts know to be a flexible doctrine with many important provisos and caveats. *See, e.g.*, *U.S. Steel Corp. v. U.S. E.P.A.*, 595 F.2d 207, 215 (5th Cir. 1979). *Mock*'s application

of that doctrine to the Final Rule's logical outgrowth violation is correct for its given reasons and accords with guiding D.C. Circuit precedent.[4]

For these reasons, the district court below was wrong to require that the Plaintiffs defeat a harmless error notion by affirmatively "explain[ing] what they would have said" to the agency had it complied. ROA.1164-65. Since no such showing was needed, the Plaintiffs could not be faulted for not supplying one.

### 4. Prejudice was shown.

Alternatively, even if Plaintiffs were required to show that the Final Rule's "monumental" logical outgrowth error caused prejudice by "explain[ing] what they would have said," ROA.1164-65, they did so in two separate satisfactory respects. If proper notice had been provided, Plaintiffs would have supplied the notice and comment process with both (1) the critique that is now their Due Process Clause claim, and (2) the critique that is now their Second Amendment claim.

First, Plaintiffs established at the hearing that they would have submitted comments asserting their current Due Process Clause complaints, ROA.1210, which

---

[4] The D.C. Circuit case that *Mock* relies upon, *City of Waukesha*, correctly draws upon the lessons of *Shell Oil Co. v. E.P.A.*, 950 F.2d 741, 752 (D.C. Cir. 1991), and *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1324 (D.C. Cir. 1988). *See City of Waukesha*, 320 F.3d at 246. In both *Shell Oil* and *McLouth Steel*, the prejudice requirement was either lifted or shifted because of the error's nature and gravity. *Shell Oil*, 950 F.2d at 752 ("agency has entirely failed to comply"); *McLouth Steel*, 838 F.2d ("the context of outright failure to comply"). *Mock* rightly used these decisions to conclude that the Final Rule's "monumental" logical outgrowth error inherently satisfies (or sets aside) the prejudice requirement. *Mock* 75 F.4th at 586. So too here as well.

had been detailed to the district court in the complaint and briefs, ROA.248-49; ROA.272-74; ROA.472-73. The Agencies never disagreed, since doing so would have contradicted their concession about *Mock*'s decisiveness.

Second, Plaintiffs established at the hearing that they would have submitted comments asserting their current Second Amendment complaints, ROA.1211, which likewise had been already detailed to the district court in the complaint and injunction briefs, ROA.247-248; ROA.270-72. The Agencies did not oppose this either, silently adhering to their concession about no further merits inquiry being necessary. Thus, even if the district court was right to demand a prejudice showing, it was wrong to hold that the demand went unmet.

For these reasons—this claim has no party-specific prejudice requirement and prejudice was shown anyhow—the district court's rejection of the logical outgrowth claim was error. In accordance with *Mock*, the Court should reverse and hold that the logical outgrowth claim a complete likelihood of success on the merits.

## B.    The statutory contradiction claim will succeed.

To establish the likely success of their statutory contradiction claim, Plaintiffs pleaded,[5] proved,[6] and argued[7] that the Final rule violates both 5 U.S.C. § 706(2)(A) and § 706(2)(C) because its "rifle" redefinition contradicts the statutes at issue and violates the rule of lenity. Congress defined "rifle" as far as that term goes—full stop. The Agencies have no authority to re-define that term more expansively. Yet that is precisely what the Final Rule does, and what the district court below allowed.

The district court rejected this claim by deeming the new regulatory definitions essentially "identical" to the statute, as though each aspect of the new multi-factor test was "textually grounded" in the statute. ROA.1167. But that easy pass does not grapple with the real discord. Close study shows that the Final Rule expands the "rifle" term far beyond its statutory boundaries. The Agencies did not just give Congress's "rifle" definition "crisper and more detailed lines." ROA.413 (the Agencies' position below). They moved the legal lines themselves, which is illegal no matter how genuine the President's sense of urgency is. *See Util. Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 327 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law.").

---

[5] *See* ROA.242-43.
[6] *See* ROA.281-382; ROA.1131-1136.
[7] *See* ROA.267-68; ROA.465-468.

### 1.    The regulation goes beyond the statute's only measures.

Congress's "rifle" definitions turn on how the weapon is "designed or redesigned, made or remade, and intended to be fired"—and no more. 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c). But the Final Rule goes beyond that. It expands the term's meaning by adding a litany of triggering elements to the definitions that Congress never made part of the law. Four of those extensions make this evident.

First, Congress's statutory "rifle" definitions did not care how a weapon is physically "equipped"—a term that must be different than "made." Yet the Agencies' "rifle" definition uses that concept centrally, expanding the "rifle" term beyond just firearms "made" as a "rifle." That extension is nowhere in the statute.

Second, Congress's statutory "rifle" definitions did not care how one firearm compares to another. Either it's a "rifle" or it's not, regardless of what else the market will sell someone. Yet the Final Rule's "rifle" definition uses that concept as a means of expansion, defining firearms in terms of whether they are "consistent with similarly designed" firearms. That extension is nowhere in the statute either.

Third, Congress's statutory "rifle" definitions did not care how a firearm is marketed by others. Yet the Final Rule's "rifle" definition uses that non-statutory concept as yet another means of expansion, defining a physical item by reference to its "manufacturer's direct and indirect marketing and promotional materials."

Surely ATF would never concede a "pistol" becomes a "rifle" just because someone identifies it as such. But when it suits the Agencies' political goals, they themselves flip that logic to make millions of law-abiding Americans felons in possession.

Fourth, Congress's statutory "rifle" definitions did not care about what the "general community" has in its possession. Yet here again, the Final Rule uses a non-statutory concept as a means of expansion, determining whether an item is criminal based on "[i]nformation demonstrating the likely use of the weapon in the general community." That extension is nowhere to be found in the statute.

It did the Agencies no good to say below that "it is the statue—not the Rule—that would impose the relevant obligations on Plaintiffs," ROA.410, because statutory hijacking is the lawsuit's whole point. Plaintiffs' suit does indeed seek relief from the Final Rule—not the statute it supposedly administers—because the Final Rule's APA-violating "rifle" definition criminalizes conduct that Congress did not.

> ### 2. The regulation contradicts the statute's disjunctive and individualized measures.

The Final Rule contradicts the statute not just by creating those four expansions without Congressional authorization. It also contradicts the statute by running afoul of two key statutory principles that Congress did affirmatively enact.

First, the Final Rule violates the *disjunctive* nature of the "designed" "made" and "intended" requirements. In this respect, Congress's "rifle" definitions impose the "designed" "made" and "intended" requirements with "and"—not "or." The statutes deem a weapon a "rifle" only if (among other things) all of the following are true: (1) the weapon is "designed or redesigned…to be fired from the shoulder," *and* (2) the weapon is "made or remade…to be fired from the shoulder," *and* (3) the weapon is "intended to be fired from the shoulder." 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c).

A proper agency interpretation must therefore operate disjunctively to give the "designed" *and* "made" *and* "intended" requirements distinct meanings. I.e., it must require that *all three be met. See, e.g.*, *United States v. Palomares*, 52 F.4th 640, 644 (5th Cir. 2022) (on the giving every clause meaning and avoiding surplusage). But with the Final Rule, the Agencies repeatedly conflate and conglomerate those terms, overriding Congress's disjunctive scheme to let satisfaction of just one suffice.

Second, the Final Rule violates the individualized nature of the statutory "designed" "made" and "intended" requirements. *See* 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c). Congress's "rifle" definition has no guilt by association. It does not cover weapons "like a rifle" or "related to a rifle" or "similar to a rifle." It covers only weapons that in fact meet all aspects of the "rifle" test individually. *Id.* If the

28

individual weapon at issue does not itself satisfy the statute's "designed" "made" and "intended" requirements, that ends the inquiry regardless of whether or not the requirements are met by other weapons the Agencies think are related to the weapon at issue. But with the Final Rule, the Agencies repeatedly allow for guilt by association—be it of associated designs or of associated makes—overriding Congress's individualized scheme.

### 3.    The rule of lenity applies.

At best, the statutes are ambiguous as to whether the "rifle" definition can cover a brace-equipped pistol. The rule of lenity therefore provides that Agencies and courts alike are bound to construe Congress's enactment as *not* extending so far. *See Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023) (en banc).

The need for lenity is particularly dire as to the statute's "intended" requirement. When the statute says that the weapon must be "intended to be fired from the shoulder," 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c), it is best read—or at least reasonably read—as requiring that that intent be harbored by the weapon's designer, maker, *and end user*. Hence the 2015 Open Letter that rightly made *the end user's* intent necessary. *See* ROA.404. Yet the Final Rule gives no meaningful value to the end user's intent, opting instead to have the definition turn only on the intent

of those that "made" and "designed" the weapon. If the statutory "rifle" definition itself does not clearly require end user intent, the rule of lenity does.

"Circumvention" is revealing codespeak. When the Agencies said repeatedly below that the citizenry's widespread use of brace-equipped pistols was "circumvented" something, ROA.399; ROA.412; ROA.416; ROA.430; ROA.434, they did not mean that anyone actually broke the law. In truth, the millions of Americans that treat brace-equipped pistols as "pistols" have fully complied with the GCA and NFA all along. The only thing being "circumvented" is the Agencies' desired new statutory "rifle" definition—the one Congress refused to enact.

### C.    The Due Process Clause claim will succeed.

To establish the likely success of this action's vagueness claim, Plaintiffs pleaded,[8] proved,[9] and argued[10] that the Final Rule violates the Due Process Clause's vagueness doctrine because its "rifle" redefinition both uses inherently amorphous terms that deny citizens fair notice of what is punishable and also is so inherently subjective that it invites arbitrary enforcement. *Johnson v. United States*, 576 U.S. 591 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), are controlling. There and here alike, the government failed to define key criminal terms in terms of objective

---

[8] *See* ROA.248-49.
[9] *See* ROA.281-382; ROA.1131-1136.
[10] *See* ROA.272-74; ROA.472-73.

"real-world facts" knowable by the citizenry. *Id.* at 1213. There and here alike, the government instead yielded "hopeless indeterminacy" by making the law turn on a government official's "imagined" "hypothesis" about what is "ordinary." *Id.* Those dangerous vagaries cannot be tolerated for any criminal law, and especially not for one that strikes at the heart of the Second Amendment. *See also United States v. Mead Corp.*, 533 U.S. 218, 241 (2001) (Scalia, J., dissenting) (on "th'ol' 'totality of the circumstances' test"). Specifically, the vagueness violation stems from four separate unconstitutionally vague aspects of the Final Rule.

### 1.  Four serious vagueness problems exist.

The Final Rule's unconstitutional vagueness stems first from the provision saying that the "rifle" definition entails assessing whether a brace "provides surface area that allows the weapon to be fired from the shoulder." Final Rule, 88 Fed. Reg. at 6575. Yet the rule does not say, and no reasonable person can reliably infer, what amount of surface area meets that threshold. The Agencies instead expressly decline "to specify a quantifiable metric for what constitutes surface area that allows for shouldering of the weapon" and will not "attempt to precisely measure or quantify the surface area." Final Rule, 88 Fed. Reg. at 6529. Vacuous metrics like this are invalid. *See Tripoli Rocketry v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006)

The Final Rule's unconstitutional vagueness stems next from the provision saying that the "rifle" definition entails assessing whether brace-affixed pistols have a weight, length, and length of pull that are "consistent with" "similarly designed rifles." Final Rule, 88 Fed. Reg. at 6575. Yet the rule does not say, and no reasonable person can reliably infer, what constitutes the requisite "consisten[cy] and "similar[ity]." Specific measurements would be needed to cure this fault, *see United States v. Lim*, 444 F.3d 910, 916 (7th Cir. 2006), and the Final Rule has none.

The Final Rule's unconstitutional vagueness also stems from the provision saying that the "rifle" definition entails assessing "marketing and promotional materials." Final Rule, 88 Fed. Reg. at 6575. Yet the rule does not say, and no reasonable person can reliably infer, which "marketing and promotional materials" this inquiry will focus on and what inferences are to be drawn from them. Does a Rainier billboard in Seattle turn a Florida "rifle" into a "pistol"? No one can know.

The Final Rule's unconstitutional vagueness finally stems from the provision saying that the "rifle" definition entails assessing "[i]nformation demonstrating the likely use of the weapon in the general community." Final Rule, 88 Fed. Reg. at 6575. Yet the rule does not say, and no reasonable person can reliably infer, what the "general community" is and what its "likely uses" are.

## 2.     *Johnson* (U.S. 2015) and *Dimaya* (U.S. 2018) control.

Crimes cannot be defined by government imagination. So held *Johnson v. United States*, 576 U.S. 591 (2015), which deemed the law at issue unconstitutionally vague because it "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* The Final Rule is just as bad, in that it ties the definition of all "rifle"-based crimes to an administratively imagined notion of what a "rifle" really is, based on little more than a DC bureaucrat's ipse dixit. "It is one thing to apply an imprecise . . . standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." *Id.* The Final Rule's Agency-imagined abstraction is no better.

Importantly, the Supreme Court in applying this test "has acknowledged that the failure of 'persistent efforts ... to establish a standard' can provide evidence of vagueness." *Id.* So it is here with the Agencies' decade-long unsuccessful struggle to cogently explain what a "rifle" is.

"Each of the uncertainties in the [Final Rule] may be tolerable in isolation, but 'their sum makes a task for us which at best could be only guesswork.'" *Id.* (quoting *United States v. Evans*, 333 U.S. 483, 495 (1948)). "Invoking so shapeless a provision to condemn someone to prison . . . does not comport with the Constitution's guarantee of due process." *Id.*; *accord Dimaya*, 584 U.S. at 159 n.3.

### 3.      The district court's [sometimes clear] rationale fails.

The district court rejected the vagueness claim, but not by holding that the Final Rule gives fair notice of *all* that is punishable under it.  It held only that the Final Rule gives fair notice of *some* of what is actually punishable: "There are *at least some instances* in which a reasonable person can infer meaning from the Final Rule to determine whether a brace-equipped pistol is 'designed, made, and intended to be fired from the shoulder' under the NFA."  ROA.1174 (emphasis added).  *Johnson* and *Dimaya* defeat this reasoning and were never meaningfully grappled with below.

First, *Johnson* confronted the district court's reasoning and rejected it.  Just like the district court below, the government in *Johnson* argued that a vagueness challenge should fail because "there will be straightforward cases" of easy application.  *Johnson*, 576 U.S. at 602-03.  But according to *Johnson*, "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."  *Id.*

Then in *Dimaya*, the Court confronted the district court's reasoning again and rejected it again: "*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct

that clearly falls within the provision's grasp.'" *Dimaya*, 584 U.S. at 159 n.3.; *accord Guerrero v. Whitaker*, 908 F.3d 541 (9th Cir. 2018).

The Agencies also said below that the current rule is not void for vagueness because "it is clearer and provides more notice than ATF's previous classification system." ROA.428. But of course the Due Process Clause does not operate in that kind of relative fashion. The Agencies cite no case holding that because none does.

The Due Process Clause claim here does not amount to a formalistic demand for always-quantified mathematical rules of total arithmetic certainty. The claim instead centers on the minimal rules of *Johnson*, and *Sessions*, which the district court brushed aside without any real analysis. These cases are central to the vagueness claim and were never meaningfully addressed by the court below.

### D.    The failure to consider claim will succeed.

To establish the likely success of this action's failure-to-consider claim, Plaintiffs pleaded,[11] proved,[12] and argued[13] that the Final Rule violates 5 U.S.C. § 706(2)(A) because the Agencies promulgated it without considering the Second Amendment factors and data made relevant by *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S.Ct. 2111 (2022). This is *not* the same as Plaintiffs' Second Amendment

---

[11] *See* ROA.2440245.
[12] *See* ROA.281 -382; ROA.1131-1136.
[13] *See* ROA.269-70; ROA.468-72.

claim, which asserts an outcome-based APA and constitutional violation. This claim is process-focused (not outcome-focused), and though it invokes Second Amendment precedent, the resulting violation is of the APA, not the Constitution.

Whenever an agency makes a rule, the Agency's rulemaking process "must examine" "relevant factors" and "relevant data." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983).  For this rule, the Agencies had to consider the "relevant" Second Amendment inquiry upheld by *New York State Rifle & Pistol Association, v. Bruen*, 142 S.Ct. 2111 (2022). That is, the APA required the Agencies to consider whether this "regulation is consistent with this Nation's historical tradition of firearm regulation" and to do so strictly—i.e., without using the "means-end scrutiny" that *Bruen* deemed unconstitutional. *Id.* at 2126-32.  No such inquiry occurred here.

When promulgating the Final Rule, the Agencies violated the APA by both (1) failing to consider the factors and data that *Bruen* deems mandatory and (2) relying instead on factors and data that *Bruen* deems improper.  Most importantly, the record shows no *Bruen*-compliant considerations because the Agencies did not even try to determine whether this "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126-32. The Agencies never attempted to consider whether the new Final Rule "addresses a general societal problem that has

persisted since the 18th century," and if so whether there was "a distinctly similar historical regulation addressing that problem." *Id.*

In this way, the failure-to-consider claim targets the Agencies' use of an APA-violating promulgation process, which the APA makes actionable regardless of whether or not the resulting rule is also unconstitutional. That is the whole point of process-based requirements like the need to examine all "relevant factors" and "relevant data." If such failures were actionable only in the event of an independent APA violating outcome, the process requirements would never matter. But compliance with rulemaking processes does matter, which is precisely why the Supreme Court has repeatedly deemed process-based APA claims to be fully actionable standing alone.

Specifically, this APA violation caused actionable harm by impacting the rulemaking procedure used and the substance of the decision reached. Harm warranting relief occurs when an APA error has a "bearing on" either "the procedure used" or "the substance of the decision reached." *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011) ("In this circuit, an administrative body's APA deficiency is not prejudicial "only 'when [it] is one that clearly had no bearing on the procedure used or the substance of decision reached.'"); *U.S. Steel Corp. v. U.S. E.P.A.*, 595 F.2d 207, 215 (5th Cir. 1979) ("Here the Agency's error plainly

affected the procedure used, and we cannot assume that there was no prejudice to petitioners."). The requisite "bearing" exists when the erroneous aspect of the process "directly informed" and "guided" the agency's conclusion. *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001).

Here, the failure-to-consider violation had a "bearing" on the "procedure used" and a "bearing" the "substance of the decision reached," as it (wrongly) defined the universe of historical materials the Agencies had to account for and (wrongly) told them to employ means-ends scrutiny. Depriving this rulemaking process of its constitutionally-required methods and ingredients necessarily infected the end result. Such process harms are especially evident where, as here, the rule concerns a "complex regulatory decision" and not a mere "yes or no" decision. *Johnson*, 632 F.3d at 932.

Below the Agencies denied the need for any *Bruen*-style historical analysis to have occurred during the Final Rule's promulgation. ROA.425 n.17. Instead of saying such an analysis did in fact occur, the Agencies said that it *did not need to occur* because "short-barreled rifles are dangerous and unusual weapons that fall outside the scope of the Second Amendment." ROA.425 n.17. But for the reasons explained in part of the next argument, the Court should reject this and hold a *Bruen*-compliant historical analysis of these regulations was required. Then the Court has two options:

(1) carry out the necessary historical analysis and deem the Final Rule in violation of the Second Amendment, or (2) stop short of actually carrying out the historical analysis needed to decide the Second Amendment claim on its merits, revert to this procedural claim, and hold that the Final Rule's promulgating process violated the APA regardless of whether the outcome rule violated the constitution. One way or another, the Final Rule's disrespect for the Second Amendment cannot be sustained.

### E.    The Second Amendment claim will succeed.

To establish the likely success of this action's Second Amendment claim, Plaintiffs pleaded,[14] proved,[15] and argued[16] that the Final Rule regulates firearms that are in lawful common use with a regime that is inconsistent with the Nation's historical tradition of firearm regulation. This claim is thus likely to succeed.

To determine whether a government restriction is constitutional, the first question is whether "the Second Amendment's plain text covers an individual's conduct"; if so, "the Constitution presumptively protects that conduct," the restriction is presumed unconstitutional, and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition

---

[14] *See* ROA.247-248.
[15] *See* ROA.281-382; ROA.1131-1136.
[16] *See* ROA.270-72.

of firearm regulation." *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S.Ct. 2111 (2022).

No one seriously contends that the Final Rule could survive a *Bruen*-compliant inquiry into history and tradition. So both the Agencies and district court below pinned everything on an effort to avoid any Second Amendment inquiry whatsoever. Relegating the Second Amendment to footnote 145, the Final Rule itself tried to skirt the constitutional inquiry by saying that, "based on historical tradition, the Second Amendment does not extend to dangerous and unusual weapons." 88 Fed. Reg at 6,548 n.145. The district court below agreed: "The Court concludes Plaintiffs are unlikely to succeed on their claim because the Final Rule does not implicate the Second Amendment." ROA.1177.

The district court's resolution of the Second Amendment claim should be reversed because the Final Rule *does* implicate the Second Amendment, requiring a *Bruen*-compliant analysis of history and tradition that the regulation clearly cannot survive. Whether this rule escapes the Second Amendment altogether is the only real issue, and the correct application of *Heller* and *Bruen* shows that it does not.

### 1. The Final Rule governs "rifles" and "pistols," which are clearly covered by the Second Amendment.

The Second Amendment's operative terms plainly cover what the Final Rule regulates. The term "Arms" includes "all instruments that constitute bearable arms," *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), and covers "even those that were not in existence at the time of the founding." *Id.* The Final Rule regulates such "Arms" because it acts upon "pistols" with arm braces by deeming them NFA "rifles." The "Arms" inquiry here is as easy as it was in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted* (on a different issue), 143 S. Ct. 2688 (2023), which held as to "Arms" status that "possession of a pistol and a rifle easily falls within the purview of the Second Amendment." *Id.* at 454.

Yet according to the district court, the Final Rule escapes any Second Amendment analysis because it regulates only firearm "accessories"—as opposed to a rifle or pistol itself. ROA.1178. The "accessory" status was decisive for the district court, which thought the rule was this: "Laws that regulate the use of firearm accessories or attachments do not generally implicate the Second Amendment." *Id.*

This is wrong for two reasons. The Final Rule acts upon Second Amendment arms themselves—the "rifle" and "pistol"—not merely their accessories. And even if it acted only upon accessories, the Second Amendment would still be implicated.

The district court's first error is its most obvious. The Final Rule does not merely act upon "arm braces" standing alone in the abstract. It acts upon "rifles" and "pistols"—the firearms themselves. The challenged provisions literally change federal law's definition of what is and isn't a "pistol" and what is and isn't a "rifle," overhauling the prior "rifle" definition that determines NFA coverage. The district court's formal relabeling of the Final Rule cannot override its actual substance.

Indeed, the Final Rule's own introduction realizes that it acts upon firearms themselves—"rifles"—not merely accessories. *See* Final Rule, 88 Fed. Reg. at 6478 ("Nothing in this rule bans 'stabilizing braces' or the use of 'stabilizing braces'' on pistols . . . this rule does not impose any new legal obligations on owners of ''stabilizing braces'' at all."). So did the Agencies below. What the Final Rule really addresses are "requirements for the manufacture and possession of short-barreled rifles." ROA.399 (Agencies' brief). The Agencies use these definitions to "determine, *inter alia*, whether the ***weapon***, as configured, is 'designed or redesigned, made or remade, and intended to be fired from the shoulder,' and therefore a '***rifle***' under the terms of the statute." ROA.403 (emphasis added). There is therefore no escaping the conclusion that the Final Rule's true subjects are "rifles" and "pistols" that the Second Amendment's text clearly covers.

42

Furthermore, the Final Rule must comply with the Second Amendment because, even if it acted only upon accessories, the Second Amendment would still be implicated. In this respect, the Court should follow what Judge Willett rightly explained in his *Mock* concurrence. *See Mock*, 75 F.4th at 588 (Willett, J., concurring). Under *Bruen*, "protected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms." *Id.*

The "braces" at issue here fall squarely within that realm, as they "improve a pistol's stability, and thus a user's accuracy." *Id.* Because of the inherent relationship between these "accessories" and the Arms themselves, the Second Amendment's protections are implicated. *See id*; *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."). For this reason as well, the district court was wrong to hold that the Second Amendment's protections do not apply the Final Rule.

### 2.    Brace-equipped pistols are in common use.

Both the Agencies and the district court below relied heavily on the notion that brace-equipped pistols are "dangerous and unusual." According to the district court, "brace-equipped pistols subject to the Final Rule are equivalent to [short-barreled rifles], which are 'dangerous and unusual weapons' outside of the protection of the Second Amendment." ROA.1180. This conclusion is wrong because of a burden-placement error and also wrong at bottom, regardless of where burdens lie.

First, burdens were clearly misallocated below. *Heller* and *Bruen* dictate that courts can deem regulated firearms "dangerous and unusual" and not in "common use" only if *the government carries its burden of proving that*; citizens never bear a burden of disproving "dangerous and unusual" status and never bear a burden of proving "common use." *See Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 47. The district court got that burden allocation backwards, *presuming* the "dangerous and unusual" status of brace-equipped pistols without actually having the government establish that fact with compelling evidence. ROA.1180-82. This keystone error poisoned all of the court's surrounding analysis and requires reversal without more.

Regardless of burdens, the district court's analysis of this issue reached the wrong conclusion. The brace-equipped firearms that the Final Rule addresses are in common use today and therefore not dangerous and unusual. The Agencies' own rulemaking record establishes this in accordance with other recognized evidence.

Whatever the numerical threshold is has been met. Just "200,000" was enough to establish "common use" status in *Caetano v. Massachusetts,* 577 U.S. 411 (2016), *see id.* at 420 (Alito, J., concurring), and the current count for brace-equipped pistols is at least *ten times that*.

The Final Rule itself attests to the fact that brace-equipped pistols are normal weapons very much in common use now. *See* Final Rule, 88 Fed. Reg at 6479. Ever since the "diversity of 'brace' devices yielded a plethora of firearms with an attached 'stabilizing brace,'" usage amongst law-abiding citizens has gone into the "millions." *Id.* at 6566. The record shows that recent brace sales exceed—and this is the most conservative estimate—*3 million units*. 86 Fed. Reg. at 30,845-46. (Another view of that same data suggests a count of over *40 million* in circulation. *Id.*)

*Mock*'s view of brace-equipped pistols being in common use backs this conclusion up. The commonality of brace-equipped pistols is why the Final Rule gave rise to "hundreds of thousands of negative comments." *Mock*, 75 F.4th at 567. Over time, "the number of pistol braces in America increased rapidly, as ATF's letter

45

rulings approving the braces helped create a thriving market." *Id.* at 572. "As of 2023, the ATF estimates there are about 3 million pistol braces in circulation (with 7 million at the high end)." *Id.* (citing ATF's own analysis). Financial impacts show the commonality, *id.* at 574 ("The Proposed Rule also had an estimated cost over ten years, at a 3% discount rate, of $114.7 million."), and supporting proof also comes from what happened once the Final Rule took effect nationwide: "The ATF reported it received about 250,000 applications to register pistol-brace-equipped firearms before the deadline, for an estimated registration-compliance rate (on the high end) of approximately 8%." *Id.* at 576. That is not the stuff of "unusual" firearms.

For these reasons, the record before the district court left open only one conclusion. The brace-equipped firearms that the Final Rule addresses are in common use and therefore not dangerous and unusual. The court therefore erred in holding that the Final Rule need not comply with the Second Amendment.

Once the case crosses that threshold, the rest of *Bruen* is easy to apply. To meet its burden, the government would had to have "affirmatively prov[e] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. But just as Judge Willett's opinion in *Mock* explained, "ATF has not identified any historical tradition of requiring ordinary citizens to endure a lengthy, costly, and discretionary approval

process just to use accessories that make an otherwise lawful weapon *safer*." *Id*. The government did not even try to do that below, let alone carry the burden. Plaintiffs' Second Amendment claim will therefore succeed.[17]

## II.    The requisite irreparable harm exists.

The district court's next basis for refusing to issue a preliminary injunction was the holding that "Plaintiffs have failed to sufficiently establish they likely will face irreparable harm in the absence of a preliminary injunction." ROA.1182. The Court should reverse this because each Plaintiff made the showing several times over.

### A.    Multiple forms of irreparable harm are at issue.

Across all Plaintiffs, monetary compliance costs constitute a form of irreparable harm that suffices on its own to meet the injunction threshold. This holds true no matter which compliance path is taken. If compliance means adhering to the NFA's heightened requirements for possession and sale of these firearms, doing so will entail non-*de minimus* monetary expense (e.g., the $200 tax). And if compliance forces Plaintiffs to avoid NFA requirements by altering their brace-equipped pistols

---

[17] This case does not present the distinct question of whether the Second Amendment protects all short-barreled rifles—a category not coextensive with what the Final Rule proscribes. So while the district court's analysis of the short-barreled-rifle history is probably wrong, *compare* ROA.1180-81, *with* James A. D'Cruz, Note, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 503–04 (2017), Michael S. Obermeier, Comment, *Scoping Out the Limits of "Arms" Under the Second Amendment*, 60 U. Kan. L. Rev. 681, 706 (2012), *and* Amicus Br. for Texas Public Policy Foundation at 17, it is not a holding in need of reversal.

(e.g., by changing barrel lengths), doing so will be expensive as well. Either way, the Plaintiffs face the irreparable harm of having to pay substantial compliance costs.

These costs constitute "irreparable" harm for two reasons. They are irreparable because they are "substantial" in amount, regardless of whether or not they can be later recovered. *Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). And they are irreparable because they cannot be later recovered (because of the Agencies' immunity from suit), regardless of their amount. *Id.*

The same is true of Plaintiff Rainier Arms' lost business revenue. The Final Rule's enforcement stands to deprive it of business revenues "easily exceeding tens of thousands of dollars per month." ROA.1131. That is irreparable because it is both "substantial" in amount and cannot be later recovered.

Another form of irreparable harm that all Plaintiffs face is constitutional. If compliance forces Plaintiffs to destroy or yield away their brace-equipped pistols, doing so will injure their Second Amendment right to keep and bear Arms, as well as their Due Process Clause right to be free from illegally vague legal threats. The violation of constitutional rights constitutes irreparable harm—even and indeed especially when the plaintiff has to desist from engaging in protected conduct. *See, e.g., Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012).

The Second Amendment is no exception to this rule. *See Baird v. Bonta*, 81 F.4th 1036, 1041-42 (9th Cir. 2023); *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017).

In light of these key principles, the proof detailing each Plaintiffs' particular situation showed the irreparable harm with all of the certainty and particularity that is required. None of the objections accepted below are valid, mainly because they repeatedly raised the Plaintiffs' evidentiary bar too high. Lost on both the Agencies and district court were fundamental rules of preliminary injunction procedure.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal *and evidence that is less complete than in a trial on the merits*." *Id.* (emphasis added).

Instead of following this paradigm, the district court acted as though the Plaintiffs need to supply proof of sufficient form and force to hold a verdict on appeal. But though that kind of proof would suffice, it is certainly not required. Even if imperfect or not yet completely developed, the fact that Plaintiffs' proof was all clear, direct, detailed, and uncontroverted should have carried the day. *See id.*

**B.      The Final Rule irreparably harms Rainier Arms.**

Proof of Rainier's irreparable harm came from two detailed declarations of its CEO.  One was done in March 2023, when the motion for a preliminary injunction was first filed.  ROA.1132.  The other was done in October 2023, just before the hearing on the motion.  ROA.1131.  Together, these declarations supply all of the evidentiary details needed to carry Rainier's burden—especially given that the Agencies supplied literally no evidence to the contrary.

The Rainier CEO's declarations begin by explaining the overall business structure.  Rainier is in the business of selling—mostly via the internet—a wide variety of firearms and firearm parts and accessories to customers nationwide.  ROA.1132 (March 2023 declaration of Rainier's CEO); ROA.1131 (October 2023 declaration of Rainier's CEO).  Until the Final Rule took effect, Rainier's business entailed selling arm braces and brace-equipped firearms ("arm brace products").  *Id.*  This aspect of Rainier's business was longstanding, "substantial" in economic magnitude, a "significant" driver of customer good will, and "critical" to the company's overall financial health.  *Id.*

Then the declarations show how enforcement of the Final Rule injures Rainier concretely and "substantially" in multiple irreparable ways.  ROA.1131-32. Immediately upon issuance, the Final Rule deprived Rainier of "substantial profits"

by causing customers to cancel then-pending orders; and ever since its issuance, the Final Rule has deprived Rainier of "substantial" profits by making otherwise willing customers either legally ineligible or practical incapable of using Rainier's arm brace products. *Id.* The Final Rule also injured and continues to injure Rainier by forcing it to incur "substantial" compliance costs that are "unrecoverable." *Id.* All of these financial harms are irreparable both because they are "substantial" in magnitude and because they are "irrecoverable" in nature. *See Wages & White Lion Investments, L.L.C.*, 16 F.4th at 1142; *Texas v. EPA*, 829 F.3d at 433.

Next, the CEO's declarations show that enforcement of the Final Rule also injures Rainier by depriving it of substantial customer "good will," as its products have now arguably triggered onerous federal firearms regulations. *Id.* Lost business good will is another form of irreparable harm. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (explaining that "loss of reputation, good will, and business opportunities" constitutes irreparable harm).

The evidence proving Rainier's irreparable harms was not "conclusory," as both the Agencies and court below thought. Both declarations backing up Rainier's irreparable harm speak clearly and in full detail. ROA.1131-32. Both are authored by Rainier's founder and current CEO. They explain the nature of Rainier's business with detail. ROA.1132 (¶¶2-3). They specify not just that Rainier "sells arm braces

and brace-equipped firearms," but exactly which kinds of arm braces exemplify Rainier's overall offerings. *Id.* (¶¶ 3-4). And in a critical passage about harm, a declaration says in no uncertain terms that the "Arm Brace Rule injures Rainier concretely and substantially" by, among other things, "imposing substantial economic losses." Id. (¶5). It then details those losses with particularity. *See id.* ("the Arm Brace Rule deprived Rainier of substantial profits by causing customers to cancel then-pending orders"); *id.* ("the Arm Brace Rule has deprived Rainier of substantial profits by making otherwise willing customers either legally ineligible or practical incapable of using Rainier's arm brace products"); *id.* ("The Arm Brace Rule also injures Rainier by depriving it of customer good will, as its products have now arguably triggered onerous federal firearm regulations."); *id.* ("The Arm Brace Rule also injured and continues to injure Rainier by forcing it to incur substantial unrecoverable compliance costs."). All of that is sufficiently proven, not conclusory. And all of that was *uncontradicted*.

The Agencies argued below that the record needed proof of losses the Final Rule "caused." ROA.1066. Yet right there in paragraph five, the declaration of Raineir's CEO explained that the Final Rule's enforcement "deprived Rainier of substantial profits by causing customers to cancel then-pending orders," that "ever since its issuance, the Final Rule has deprived Rainier of substantial profits by making

otherwise willing customers either legally ineligible or practical incapable of using Rainier's arm brace products," and that the rule "also injures Rainier by depriving it of customer good will, as its products have now arguably triggered onerous federal firearms regulations." ROA.1132.

The Agencies below also wondered below "why" these customers would stop buying the products at issue, ignoring the obvious answer. ROA.1066. Many law-abiding Americans oppose the NFA's registration and tax requirements on principle—Second Amendment principles, in particular—and rightly so. They would never willingly bend a knee to that regime, even if the Agency deems it not all that bad. This conclusion "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

The assertion of harm caused by the Final Rule's enforcement is not "speculation," as the Agencies said below. ROA.10667. It is proven by the CEO that best knows both his business and his market. He did not arrive at his conclusions with some hypothetical model. He witnessed the Final Rule go into force and witnessed its financial effects on his business firsthand; of course his declaration sufficiently shows what will happen if enforcement goes on ad nauseum.

Whatever doubt may have existed at first was laid to rest in the Rainier CEO's October 2023 declaration. ROA.1131. With even more detail than before, this proof met all of the Agencies' demands for specific assertions of what exactly the irreparable harm was—both in terms of quantifiable economic losses and unquantifiable lost good will. ROA.1131 ("The amount of these lost revenues for Rainier is substantial, easily exceeding tens of thousands of dollars per month."); *id.* ("Because of the Rule, Rainier continues to lose substantial customer good will that it would otherwise be sustaining and growing.").

Last but not least, the "speculative" nature of substantial compliance costs is also directly belied by the Agencies own rulemaking record. By the government's own estimation, the financial cost to the public of the Final Rule is *$471.3 million* in costs from surrendering firearms, including $2,526 in costs to an average individual and $8,754 to the average federally licensed firearms dealer. ROA.850.

## C. The Final Rule irreparably harms SAF and the Individual Plaintiffs.

Proof of the other Plaintiffs' irreparable harm came from similarly solid sources: Detailed declarations by SAF's founder, ROA.1134-35, as well as the two individual plaintiffs, ROA.283; ROA.1135-36. These declarations supplied all of the evidentiary details needed to carry their burden of proof—especially given that the Agencies supplied nothing to the contrary.

For SAF's members that use brace-equipped pistols by necessity, evidence showed that Final Rule compliance causes serious and irreparable injuries no matter what compliance method occurs. For these SAF members, the NFA registration process costs are "substantially injurious" and "irrecoverable." *Id.* Altering their firearms would "significantly lessen" the firearm's "safety and/or efficacy." *Id.* And a requirement of firearm destruction or turnover would abridge their Second Amendment right to keep and bear arms. *Id.*

The Individual Plaintiffs, each of whom is a SAF member, exemplify these irreparable harms. William Green owns a brace-equipped pistols because of his disability and by necessity. ROA.283. "Without an arm brace, [his] disability prevents the operation of these firearms with sufficient safety and efficacy." *Id.* But "[w]ith an arm brace, [he is] able to safely and effectively operate these firearms despite [his] disability." *Id.* Samuel Walley is a United States Army veteran with disabilities incurred during active duty that impact his firearm capabilities. ROA.1135-36. He too owns brace equipped pistols because of his disability and by necessity. *Id.* His "disability prevents the operation of these firearms with sufficient safety and efficacy" when not brace equipped. *Id.* But with an arm brace, he can "safely and effectively operate these firearms despite [his] disability." *Id.*

According to their uncontradicted declarations, the Final Rule injures Mr. Green and Mr. Walley directly, concretely, and substantially no matter which compliance path is forced. ROA.283; ROA.1135-36. For them, complying via the NFA registration process would inflict "substantial financial injuries" that would never be recovered. *Id*. Complying by altering their firearms would both be costly and inflict the practical injury of "significantly lessened firearm safety and/or efficacy." *Id*. "Worst of all, compliance by way of firearm destruction or surrender inflicts the irreparable harm of abridging [his] Second Amendment right to keep and bear arms." *Id*.

For these reasons, the district court should not have totally dismissed every single claim of irreparable harm the Plaintiffs' made. Each Plaintiff threaded the needle as to at least some substantial irreparable harm, and no more was needed.

### D.     Given that the Final Rule's compliance costs are undoubtedly significant, their exact severity does not matter.

Each aspect of the district court's overall irreparable harm analysis suffers from the same fatal flaw. Point by point, as it went through each form of irreparable harm and the corresponding public interests, the district court repeatedly invoked the same keystone logic: Because Final Rule compliance simply isn't *that* difficult, Plaintiffs' harms are too small to warrant a preliminary injunction even if technically "irreparable." Of course Plaintiffs disagree with the premise and maintain that

compliance is truly onerous.  But at bottom is more fundamental flaw: Even if Final Rule compliance really isn't *that* difficult, the point does not tip the preliminary injunction scales one way or another.  It cuts both ways equally.

Practically speaking, debates about compliance difficulty are a zero sum game because the Final Rule's impact is always two-sided.  One side has the citizen's compliance burden.  The other side has the government's compliance benefit.  They do not operate independently.  They rise and fall together.

The whole point is to have penalty threats change what citizens do, and change happens only insofar as the Final Rule makes its stick felt (there is undoubtedly no carrot here).  All of this is by design.  As complying with the Final Rule gets harder, both citizen burdens *and government benefits* rise; and as it gets easier, *both* citizen burdens *and government benefits* fall.  These practical truths about the Final Rule bear out in the preliminary injunction's balancing inquiry.

Legally, Final Rule compliance is likewise a two-sided, zero-sum game. Raising the stakes raises them for everyone, and so does lowering them.  As compliance gets harder, *both sides of the injunction equation rise in tandem*: the government's benefit goes up only as much as the Plaintiffs' irreparable harm.  And as  compliance gets easier, *both sides of the injunction equation fall in tandem*: The Plaintiffs' irreparable harm drops only as much as the government's benefit.

Because it ignored this reality, the district court's work was fatally one-sided. It used the idea that compliance isn't *that* onerous on only one side of the equation instead of both. It reduced the Plaintiffs' side of the equation (irreparable harm) *without ever reducing the government's corresponding side* (public benefit). But if Final Rule compliance isn't *that* burdensome for Plaintiffs, then by that same token, Final Rule enforcement isn't *that* helpful for the government. Marginal quibbling about exactly how bad the Final Rule is does not change the formula's output.

To correct that error, the Court should recognize that the preliminary injunction formula's real differentiating work occurs elsewhere—in the debates about who is likely to succeed on the merits and which interests are legitimately protected. Since likelihood of success on the merits weighs so heavily in favor of relief, the Plaintiffs need only have shown irreparable harms that were more than *de minimus*, which they certainly did.

## III. The balance of harms and public interest favor relief.

Maintaining the status quo is a prime directive for harm balancing and the associated measure of public interest. *See Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021). Here, a preliminary injunction maintains the status quo by returning the law's "rifle" definition to what it had been for decades.

The public interest also favors a preliminary injunction because the "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* "And 'there is generally no public interest in the perpetuation of unlawful agency action.'" *Id.* (cleaned up). For "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Id.* Indeed, it is now almost a per se rule that "the government suffers no injury when a court prevents it from enforcing an unlawful law" *Free Speech Coal., Inc. v. Paxton*, No. 23-50627, 2024 WL 982225, at *19 (5th Cir. Mar. 7, 2024).

Last but not least, preserving constitutional rights always serves the public interest, *see, e.g.*, *O'Donnell v. Goodhart*, 900 F.3d 220, 232 (5th Cir. 2018), whereas "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

## Conclusion

The Court should reverse the district court's denial of preliminary injunctive relief and enter the decision that the district court should have—a preliminary injunction lasting until this litigation's conclusion that postpones the Final Rule and enjoins the Agencies from enforcing it against the Plaintiffs, including SAF's members and Rainier's customers.

Respectfully submitted,

/s Chad Flores
Chad Flores
cf@chadflores.law
Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Counsel for Appellants

## Certificate of Compliance

This filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32 because it contains 12,874 not-exempted words.

This filing complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 and Fifth Circuit Rule 32 because it has been prepared in a proportionally spaced typeface in 14-point font using Microsoft Word for Mac Version 16.74.

/s/ Chad Flores
Chad Flores