No. 23-11157

_____

In the United States Court of Appeals for the Fifth Circuit

_____

Second Amendment Foundation, Incorporated;
Rainier Arms, L.L.C.;
Samuel Walley; William Green,

Plaintiffs – Appellants

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives;
Steven Dettelbach, in his official capacity Director of the
Bureau of Alcohol Tobacco Firearms and Explosives;
United States Department of Justice;
Merrick Garland, U.S. Attorney General,

Defendants – Appellees

*caption continued on the following page*

_____

On appeal from the United States District Court for the
Northern District of Texas
No. 3:21-cv-116

_____

**Reply Brief of Appellants**

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

*consolidated with*

No. 23-11199

William T. Mock; Christopher Lewis; Firearms Policy Coalition, Incorporated, a nonprofit corporation; Maxim Defense Industries, L.L.C.,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General, in his official capacity as Attorney General of the United States; United States Department of Justice; Bureau of Alcohol, Tobacco, Firearms, and Explosives; Steven Dettelbach, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives;

Defendants-Appellants.

*consolidated with*

No. 23-11203

Darren A. Britto; Gabriel A. Tauscher; Shawn M. Kroll,

Plaintiffs-Appellees,

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendant-Appellant

*consolidated with*

No. 23-11204

Texas Gun Rights, Incorporated;
National Association for Gun Rights, Incorporated,

Plaintiffs-Appellees,

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendant-Appellant

*consolidated with*

No. 23-40685

State of Texas; Gun Owners of America, Incorporated; Gun Owners Foundation;
Brady Brown,

Plaintiffs-Appellees,

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives; United States Department
of Justice; Steven Dettelbach, Director of ATF;

Defendants-Appellants.

# Table of Contents

Table of Contents ...................................................................................iv

Table of Authorities.................................................................................v

Argument ...................................................................................................1

I.     The requisite likelihood of success exists. ......................................1

     A.     The logical outgrowth claim *Mock* upheld will succeed. .......................1

          1.     There is no party-specific prejudice requirement.......................2

          2.     Prejudice was shown. ...................................................6

          3.     The logical-outgrowth claim was properly presented below. .......................................................7

     B.     The statutory contradiction claim will succeed. ................10

     C.     The Due Process Clause claim will succeed........................13

     D.     The Second Amendment claim will succeed.......................16

II.     The requisite irreparable harm exists. ..........................................21

     A.     The Final Rule causes harm independently of the statute. .................21

     B.     Plaintiffs' injuries constitute sufficient irreparable harm. ...................23

III.     The balance of harms and public interest favor relief. ...................25

Conclusion ...............................................................................................27

Certificate of Compliance .......................................................................28

# Table of Authorities

## Cases

*Career Colleges & Sch. of Tex. v. U.S. Dep't of Ed..,*
    98 F.4th 220 (5th Cir. 2024) ................................................................... 23, 24

*City of Arlington v. FCC,*
    668 F.3d 229 (5th Cir. 2012) ........................................................................ 3

*City of Waukesha v. EPA,*
    320 F.3d 228 (D.C. Cir. 2003) ...................................................................... 2

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .............................................................................. 17, 19

*Free Speech Coal., Inc. v. Paxton,*
    95 F.4th 263 (5th Cir. 2024). ..................................................................... 25

*Johnson v. United States,*
    576 U.S. 591 (2015) .............................................................................. 6, 16

*Mid Continent Nail Corp. v. United States,*
    846 F.3d 1364 (Fed. Cir. 2017) ................................................................... 4

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) ........................................................... *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022)........................................................................... 17, 19

*NRDC v. Winter,*
    518 F.3d 704 (9th Cir. 2008) ..................................................................... 26

*O'Donnell v. Goodhart,*
    900 F.3d 220 (5th Cir. 2018) ..................................................................... 25

*Posters 'N' Things, Ltd. v. United States,*
    511 U.S. 513 (1994) ............................................................12

*Restaurant Law Center v. U.S. Dep't of Labor,*
    66 F.4th 593 (5th Cir. 2023), ........................................24

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) ................................................ 6, 16

*Sig Sauer, Inc. v. Brandon,*
    826 F.3d 598 (1st Cir. 2016) ........................................10

*Texas v. Lyng,*
    868 F.2d 795 (5th Cir. 1989)..........................................5

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ..................................... 3, 25

*United States v. Cox,*
    235 F. Supp. 3d 1221 (D. Kan. 2017) .........................20

*United States v. Daniels,*
    77 F.4th 337 (5th Cir. 2023) ........................................18

*United States v. Gilbert,*
    286 F. Appx. 383 (9th Cir. 2008) ...............................20

*United States v. Johnson,*
    632 F.3d 912 (5th Cir. 2011) .........................................5

*United States v. Kates,*
    174 F.3d 580 (5th Cir. 1999) .......................................10

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir. 2023) .......................................18

*United States v. Reynolds,*
    710 F.3d 498 (3d Cir. 2013) ...........................................4

*United States v. Stepp-Zafft*,
　　733 F. App'x 327 (8th Cir. 2018)..................................................20

*United States v. Syverson*,
　　90 F.3d 227 (7th Cir. 1996)..........................................................10

*United States v. Thompson/Center Arms Co.*,
　　504 U.S. 505 (1992)......................................................................12

*U.S. Steel Corp. v. EPA*,
　　595 F.2d 207 (5th Cir.1979)............................................................5

*Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*,
　　16 F.4th 1130 (5th Cir. 2021)........................................................25

*Whole Woman's Health v. Hellerstedt*,
　　579 U.S. 582 (2016)......................................................................26

*Winter v. NRDC, Inc.*,
　　555 U.S. 7 (2008).........................................................................26

## Statutes

18 U.S.C. § 921(a)(7)...............................................................11, 12

26 U.S.C. § 5845(c)..................................................................11, 12

## Administrative Materials

Factoring Criteria for Firearms With Attached "Stabilizing Braces"
　　86 Fed. Reg. 30,845 (June 10, 2021)........................................19, 20

Factoring Criteria for Firearms With Attached "Stabilizing Braces"
　　88 Fed.Reg. 6478 (Jan. 31, 2023)............................................. *passim*

## Argument

## I.     The requisite likelihood of success exists.

Plaintiffs established their likelihood of success on the merits with multiple claims, including the logical outgrowth claim that this Court already upheld in *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), as well as constitutional claims regarding the Due Process Clause and Second Amendment.  Br. of Appellants at 16-47.  Given all of this illegality, there is no serious debate about *whether* irreparable harm exists; the only debate is about precisely how terrible it is.  And the government certainly has no interest in enforcing its new illegal rules.  Likelihood of success on the merits is this appeal's controlling issue and it strongly supports the requested injunction.  *Id.*

### A.     The logical outgrowth claim *Mock* upheld will succeed.

In the district court, Plaintiffs did everything needed to establish a likelihood of success for the logical outgrowth claim that *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), upheld as meritorious.  *See* Br. of Appellants at 16-24.  To resist this, the Agencies embrace the district court's prejudice analysis.  They argue both that (1) the logical outgrowth claim required a showing of party-specific prejudice, and (2) Plaintiffs did not show that.  Agency Br. at 8.  But just like the district court below, the Agencies on appeal are doubly wrong because (1) party-specific prejudice need not be shown and (2) was shown here anyhow.  *See* Br. of Appellants at 20-24.

### 1. There is no party-specific prejudice requirement.

The main error committed by both the district court and Agencies is the imposition of the party-specific prejudice requirement. *See* Br. of Appellants at 20-23. As a matter of law, no such requirement exists here. Though party-specific prejudice has to be shown for certain kinds of APA claims, it does not have to be shown for the kind of APA claim at issue here—the logical-outgrowth action that *Mock* upheld. *Id.* *Mock* itself correctly decides this question in the operative holding of footnote 58, which expressly rejects a requirement of party-specific prejudice for the logical-outgrowth claim that Plaintiffs bring. *Id.* Since *Mock* itself rightly holds that this claim required no party-specific prejudice showing, the Plaintiffs cannot be faulted for supposedly not making that showing below. *Id.*

Specifically, *Mock* used its two footnote 58 holdings to reject the "proposition that plaintiffs would have had to submit additional and different comments." *Mock*, 75 F.4th 586 & n.58. *Mock*'s first footnote 58 holding rejected that proposition by deciding that the law did not require a showing of party-specific prejudice. *Id.* It held this by announcing that "[t]hat requirement has no Fifth Circuit support," *id.*, and by adopting via block quote the applicable logic of *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) (per curiam), *id.* ("Moreover, as *City of Waukesha* itself declares, . . .). *Mock*'s second footnote 58 holding rejected that proposition by

deciding that plaintiffs had shown the demanded prejudice. *Id.* The operative holding here is the one that *Mock* started and ended with—the conclusion that party-specific prejudice need not be shown for this action's logical-outgrowth claim.

The Agencies have no true answer for *Mock*'s footnote 58 holding. Of course overruling this holding is not an option, even if was given in the alternative. *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015) ("alternative holdings are binding precedent"). Yet overruling *Mock* is essentially what the Agencies seek.

Despite the Plaintiffs having block quoted the key holding, the Agencies give it short shrift. The say only that this part of *Mock* is "inconsistent with this Court's earlier decisions." Agencies' Br. at 20. But that is too little and too late. *Mock*'s footnote 58 holding is correct, *see* Br. of Appellants at 22-23 & n4, and in any event is now a full-fledged circuit precedent to be followed under the rule of orderliness.

*City of Arlington v. FCC*, 668 F.3d 229 (5th Cir. 2012) (cited by the Agencies at 16-17), does not control for the reasons that *Mock* itself explained. When *Mock* held that there is no party-specific prejudice requirement for this kind of claim, it did so with analysis that expressly confronted the *City of Arlington* case now touted by the Agencies. *Mock*, 75 F.4th 586 & n.58. *Mock*'s reconciliation of *City of Arlington* is correct and its correctness is beside the point because *Mock*'s express holding cannot now be undone.

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017) (cited by the Agencies at 19-20), squarely supports the Plaintiffs. Just like *Mock*, the Federal Circuit there held that certain kinds of APA claims entail a "complete failure" of process that does *not* require any showing of party-specific prejudice:

> In determining whether a procedural error committed in the course of rulemaking was harmless under the APA, courts have distinguished between an agency's 'technical failure'' or substantial compliance with the APA's procedural requirements on one hand (which may constitute harmless error), and its 'complete failure' to do so on the other (which may prevent the error from being harmless).

*Id.* at 1383. Under this rule, the APA claim at issue here entails no mere "technical" failure. Rather, as *Mock* already expressly holds, the logical-outgrowth claim at issue here entails a "complete failure" and therefore needs no party-specific prejudice.

The same is true of *United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013) (cited by the Agencies at 20). It too accords with *Mock* by recognizing that party-specific prejudice need *not* be shown where, as here, the claim entails a "complete failure":

> In these "complete failure" situations, the petitioner does not need to show that he would have offered comments that would have invalidated the rationale underlying the promulgated rule. *Id.*; *see also McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323–24 (D.C. Cir. 1988) (explaining that the "imposition of [ ] a burden [to show specific prejudice] on the challenger is normally inappropriate where the agency has completely failed to comply with § 553").

*Id.* at 516.

*United States v. Johnson*, 632 F.3d 912 (5th Cir. 2011) (cited by the Agencies at 8), does not control for that same reason and more. It addressed a different kind of APA violation, it addressed a different kind of APA rule, and it rightly admitted that its harmless error conclusion was exceptional.[1] None of *Johnson*'s resulting analysis overrides what *Mock* held about the exact claim and rule at issue here.

*Texas v. Lyng*, 868 F.2d 795 (5th Cir. 1989) (cited by the Agencies at 17), is easily distinguished as well. It involved only a minor technicality about notice timing. *Id.* at 796. It did not entail a logical-outgrowth failure, and because of that, does not fit into *Mock*'s paradigm for situations in which "the agency has entirely failed to comply with notice-and-comment requirements." *Mock*, 75 F.4th at 586 & n.58 (quoting *City of Waukesha* 320 F.3d at 246).

For these reasons, both the district court below and Agencies on appeal are wrong to assert that Plaintiffs' logical outgrowth claim required a showing of party-specific prejudice. As a matter of law, it did not. This alone warrants reversal.

---

[1] First, *Johnson* does trump *Mock* because it failed to confront the kind of APA violation that is at issue here. Whereas *Mock* confronted the logical-outgrowth claim that Plaintiffs here assert, *Johnson* did concerned APA violations of a totally different kind. *Johnson*, 632 F.3d at 931-32. Second, *Johnson* does trump *Mock* because it failed to confront the kind of APA rule that is at issue here. Whereas the Final Rule delivers a complex definition with a multifaceted, multifactor test, *Johnson*'s rule decided a "binary" "yes or no decision" with no such complexity. Hence, *Johnson* admitted that its harmless error conclusion was exceptional and did not override the general rule that *Mock* aligns with: "In this circuit, an administrative body's APA deficiency is not prejudicial 'only when [it] is one that clearly had no bearing on the procedure used or the substance of decision reached.'" *Id.* (quoting *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir.1979)).

## 2.  Prejudice was shown.

Alternatively, the district court's prejudice analysis does not justify the result below because Plaintiffs showed what was demanded.  Br. of Appellants at 23-24.  If a party-specific prejudice requirement exists, Plaintiffs met it by demonstrating that they would have supplied the critique that is now their Due Process Clause claim and the critique that is now their Second Amendment claim.  *Id.*

The Agencies deny (at 8-9) that their APA violation inhibited the Plaintiffs' ability to submit these arguments to the rulemaking process.  But that argument is unpreserved because it was never made below, depriving Plaintiffs of the opportunity to show otherwise with record evidence.  Indeed, the Agencies never made any prejudice argument whatsoever below.  The issue was raised only by the district court *sua sponte* at the preliminary injunction hearing.  Br. of Appellants at 18-20.

The Agencies also think that "other commenters did make such comments, and the agency considered and responded to those comments in the preamble." Agencies Br. at 9.  But the record belies this, as critical issues like the vagueness decisions of *Johnson v. United States*, 576 U.S. 591 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)—central components of Plaintiffs' Due Process Clause argument—were never meaningfully grappled with in the Final Rule.

### 3. The logical-outgrowth claim was properly presented below.

In their last arguments about the logical-outgrowth claim's merits, the Agencies lodge procedural objections about how and when the claim was briefed. Agencies Br. at 22. The Court should reject these arguments as both unpreserved and obviously wrong because the Agencies expressly agreed to have the logical-outgrowth claim presented as it was. In the district court, Plaintiffs pressed the logical-outgrowth claim in a perfectly diligent fashion by obtaining the district court's advance permission via motions *that the Agencies expressly consented to*.

The key event was this Court's issuance of the main *Mock* decision, which arrived in the midst of the preliminary injunction proceedings below—after briefing on Plaintiffs' motion for a preliminary injunction had commenced, but before the district court had held its preliminary injunction hearing and before the district court had issued the decision under review.[2] Once *Mock* arrived, the Plaintiffs expressly sought—and the Agencies expressly delivered—their consent to have the logical-outgrowth claim presented exactly as it was. So when the district court did as both sides had requested, no error occurred.

---

[2] Indeed, the Agencies are the ones that sought a stay of all proceedings below while *Mock* was pending. ROA.940. They told the district court to stay everything until *Mock* was decided because "the Fifth Circuit's decision in *Mock* will likely provide significant guidance—and potentially a dispositive rule of decision—for resolving this case on the merits." ROA.942.

First, all sides expressly consented to the procedures used below in Document 92, the "Joint Status Report and Proposed Schedule for Further Proceedings." ROA.1053. In that joint filing, both sides explained that "Plaintiffs wish to move to amend their Motion to assert their logical-outgrowth claim as an additional basis for preliminary relief." ROA.1053. And in that same joint filing, both sides explained that the "Defendants do not oppose Plaintiffs' proposed amendment." ROA.1053. The joint filing also said that both sides "believe that concise supplemental briefs concerning Plaintiffs' logical-outgrowth claim will aid the Court in evaluating Plaintiffs' argument and Motion." ROA.1053. Then the parties jointly proposed the procedure that the district court ended up adopting:

> The Court requested the parties' views as to the impact of *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) on the preliminary injunction currently in place in this matter and on the stay of proceedings. The parties agree that by their terms both the injunction and stay will remain active until issuance of the mandate in the *Mock* appeal.
>
> The Court also requested the parties' views as to the impact the effect of *Mock* on Plaintiffs' Motion for Preliminary Injunction. In light of the decision in *Mock*, Plaintiffs wish to move to amend their Motion to assert their logical-outgrowth claim as an additional basis for preliminary relief. *See* Am. Compl. ¶¶ 66-69, ECF No. 50. Defendants do not oppose Plaintiffs' proposed amendment. However, the parties believe that concise supplemental briefs concerning Plaintiffs' logical-outgrowth claim will aid the Court in evaluating Plaintiffs' argument and Motion.
>
> Accordingly, the parties respectfully propose that the Court adopt the following briefing

deadlines, with the briefs limited to five pages in length:

- Plaintiffs will file an unopposed motion to amend their Motion for Preliminary Injunction and supplemental brief on September 8, 2023.

- Defendants will file their responsive supplemental brief on September 15, 2023.

ROA.1053-54 (emphasis added).

Briefing proceeded in perfect accordance with what the Agencies agreed to. The district court entered an order adopting the briefing structure that the Agencies themselves had proposed, ROA.1056, and both sides filed supplemental briefs, ROA.1061 (Plaintiffs' brief); ROA.1065 (Agencies' brief). Never in any of these filings did the Agencies complain about the procedures being used for the claim.

Second, the Agencies supplied consent to the procedures used below vis-a-vis Document 103. ROA.1130. In that filing, Plaintiffs submitted additional declarations in support of their motion for a preliminary injunction. ROA.1130. The Agencies did *not* oppose this submission. *Id.* Nor did the Agencies attempt to lodge any more evidence or argument, despite a full and fair opportunity to go tit-for-tat.

Third, the Agencies could have objected to the procedures used for the logical-outgrowth claim at the preliminary injunction hearing. ROA.1195-1264. But once again, the Agencies made no such objection whatsoever. The present arguments about how and when the claim was briefed are totally unpreserved and, in light of the Agencies' repeated consent to what happened below, totally meritless.

For these reasons, the district court's rejection of the logical outgrowth claim on no-prejudice grounds was error. In accordance with *Mock*, the Court should reverse and hold that the logical outgrowth claim establishes a complete likelihood of success on the merits. Standing alone, this claim's likelihood of success supports the Plaintiffs request for a preliminary injunction.

### B.     The statutory contradiction claim will succeed.

Next, the Court should hold that Plaintiffs established a likelihood of success for the statutory contradiction claim showing that the Final Rule contradicts the statutes at issue and violates the rule of lenity. Br. of Appellants at 25-30. The Final Rule does not merely clarify the statute's definitional boundaries. It changes them, using the guise of mere clarification to perform what is in fact a major expansion. *Id.*

*Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016) (cited by the Agencies at 27), does not resolve this claim. The Agencies cite that case (and others[3]) to prove that "objective" factors can sometimes help determine "subjective" elements. Agencies' Br. at 27-28, 31. But of course, *Sig Sauer* never suggested the definitional retooling it upheld is always permitted. The question is always context dependent, and the context here shows that the Final Rule's retooling exceeds the statute.

---

[3] *See United States v. Syverson*, 90 F.3d 227 (7th Cir. 1996) (cited by the Agencies at 28), and *United States v. Kates*, 174 F.3d 580, 582 (5th Cir. 1999) (per curiam) (cited by the Agencies at 31)

The Final Rule's most severe fault concerns the statutory test's disjunctive nature. *See* Br. of Appellants at 27-29. Even though Congress made the statute operate disjunctively to give the "designed" *and* "made" *and* "intended" requirements distinct meanings, the Final Rule lets a conflated satisfaction of just one or two suffice for independent satisfaction of all three. *Id.*

In particular, Congress's test requires a showing of how the weapon is "intended to be fired." 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c). Yet after over 100 pages of briefing in this Court, the Agencies still do not clearly say *whose* "intent" matters—the designers, the makers, or the end users. On a clean slate, this statute is best read—or at least reasonably read—as requiring that the intent be harbored by the weapon's designer, and by its maker, *and by its end user*. Yet the Final Rule gives no meaningful value to the end user's intent, opting instead to have the definition's operative measures turn only on the intent of those that "made" and "designed" the weapon. If the statutory "rifle" definition itself does not clearly require end user intent, the rule of lenity does. The Final Rule's treatment of this issue no mere clarification. It is administrative deletion of a statutory element—end user intent— that Congress made mandatory.

*Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513 (1994) (cited by the Agencies at 29), does not control. Though it addressed the kind of question at issue here (Whose intent matters?), several distinctions make its conclusions inapposite.

First, *Posters 'N' Things* does not control because its immediate statutory text is distinguishable. Whereas the *Posters 'N' Things* statute used a *two*-prong definition looking at how an item is "designed" and "intended," *id.*, the instant statutes use a *three*-prong definition looking at how an item is "designed" *and* "intended" *and* "made." 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c). Since the force of "made" played so prominent a role in *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992), it certainly cannot be assumed away here as making no difference.

Second, *Posters 'N' Things* does not control because its statutory context is clearly distinguishable as well. Whereas the *Posters 'N' Things* statute followed its immediate statutory text with a huge illustrative laundry list, *Posters 'N' Things*, 511 U.S. at 521 ("a list of 15 items constituting per se drug paraphernalia"), the instant statutes have none. The *Posters 'N' Things* statute also had the context of a special amendment history, *see id.* at 520-21, that the instant statutes lack. All of these distinctions make *Posters 'N' Things* inapposite.

## C. The Due Process Clause claim will succeed.

The Court should next hold that Plaintiffs established a likelihood of success for their vagueness claim, which shows that the Final Rule violates the Due Process Clause because its "rifle" redefinition both uses inherently amorphous terms that deny citizens fair notice of what is punishable and also is so inherently subjective that it invites arbitrary enforcement. *See* Br. of Appellants at 30-35.

This claim does not exist in a "vacuum," as the Agencies suggest (at 61). It arises on a set of concrete facts—all shown to the district court below—clearly demonstrating the kind of brace-equipped pistols these Plaintiffs are involved with. For Rainier Arms, the record below details exactly which arm braces and brace-equipped firearms the vagueness claim implicates. See ROA.277 ("Rainier's arm brace products are designed and manufactured by well-established third-party firms such as A3 Tactical and SB Tactical, whose current arm brace offerings are generally representative of Rainier's arm brace products. Ex. 1 at 1. Specific representative examples of Rainier's arm brace products include the 'SB TACTICAL SOB BRACE BLACK,' the 'SB TACTICAL SBA3 PISTOL STABILIZING BRACE,' the 'SB TACTICAL SBM47 AK47/74 BRACE,' the 'A3 TACTICALALUMINUM OFFSET MODULAR SIDE FOLDING STEADY ARM BRACE,' and the 'SIG SAUER MCX / MPX PIVOTING CONTOUR

BRACE.'"). For SAF, the case entails just as much detail because SAF's members are suing about firearms with the arm braces that Rainier supplies. ROA.282. The Individual Plaintiffs give sufficient detail as well. *See* ROA.283 ("Because of my physical disability, I possess multiple brace-equipped pistols. Each has a common "AR pistol" configuration and includes an SB Tactical "SBA3" arm brace."); ROA.284 (similar). For each of these implicated contexts, the Final Rule gives Plaintiffs no way to know with any reasonable certainty whether or not the Agencies will deem their brace-equipped pistols a short-barreled rifle.

In this respect, the Final Rule's "shall also be considered" command bears emphasis. This rule is not just an advisory list of things the Agencies *might optionally* consider in making "rifle"/"pistol" classifications. The Final Rule overhauls the "rifle"/"pistol" threshold by dictating exactly what "***shall*** also be considered" in every case. Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6574-75 (Jan. 31, 2023) (emphasis added). This unequivocal mandatory command drives the resulting unpredictability. Plaintiffs know—because of the "shall also be considered" command—that Agency officials will be accounting for everything that the Final Rule deems probative. But because the enumerated considerations that must always occur are too vague to reasonably understand, they have no idea how those mandatory considerations will be accounted for.

*Mock* understood the Rule's vagueness problems correctly and should be followed again, this time as a Due Process Clause holding:

> Under the Final Rule, it is nigh impossible for a regular citizen to determine what constitutes a braced pistol, and outside of the sixty contemporaneous adjudications that the ATF released, whether a specified braced pistol requires NFA registration. Various AR pistols without a recognizable "brace" may fall into the strictures of the Final Rule.54 Such an owner may not be on notice that his firearm is subject to criminal penalties without registration.

> Nor does the ATF bother to clarify the matter. The agency maintains that its six-factor test objectively assesses "design features common to rifles." *See* Final Rule at 6513. But it simultaneously declares that the objective criteria given to assess certain factors "are not themselves determinative," *see id.* at 6518, and that adjudications are made "on a case-by-case basis," *id.* at 6495.

> Predictably then, the six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace. The ATF did not provide explanations with its contemporaneous adjudications that certain weapons and platforms with stabilizing braces were SBRs under the Final Rule, nor did the ATF provide a single example of a stabilizing brace with a handgun that would be permitted under the Final Rule. . . .

> Other serious infirmities in the Final Rule that vastly expand its scope are unrelated to, and do not correlate with, anything mentioned in the Proposed Rule. In particular, the requirements involving analysis of third parties′ actions, such as the "manufacturer′s direct and indirect marketing and promotional materials," and "[i]nformation demonstrating the likely use of the weapon in the general community," Final Rule at 6480, would hold citizens criminally liable for the actions of others, who are likely unknown, unaffiliated, and uncontrollable by the person being regulated.

*Mock v. Garland*, 75 F.4th 563, 585-86 (5th Cir. 2023) (footnotes omitted).

It is no answer for the Agencies to say (at 61-62, 65) that anyone looking for clarity can "request a determination from ATF for additional clarity." For as *Johnson* rightly emphasizes, the doctrine exists not just because a vague law "fails to give ordinary people fair notice of the conduct it punishes," but also because it "invites arbitrary enforcement." *Johnson*, 576 U.S. at 695. If Plaintiffs and others were to take the Agencies up on their invitation to seek individual determinations, the Final Rule's lack of meaningful standards would invite the very "arbitrary enforcement" that the doctrine protects against. "In that sense, the doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Dimaya*, 584 U.S. at 156. By suggesting that everyone just ignore the Final Rule's vagueness because bureaucrats will take care of things internally, the Agencies are making the Due Process Clause violation even worse than before.

### D. The Second Amendment claim will succeed.

Next, Plaintiffs established a likelihood of success for their Second Amendment claim. Br. of Appellant at 39-47. The district court below both misallocated the Second Amendment's burdens and reached the wrong bottom line result. The Agencies double down, committing those same two errors as well.

First, the Court should hold that the Plaintiffs met their initial and only burden of establishing that the Final Rule implicates the Second Amendment's protections. *See* Br. of Appellants at 39-43. Since the text—"[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed"—applies to all "people" and "Arms" without qualification, the resulting protections belong to "all instruments that constitute bearable arms," including any "thing that a man . . .takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581-82 (2008). Brace-equipped pistols obviously meet that test. Plaintiffs therefore succeeded in showing that the Final Rule implicates Second Amendment protections.

Everything else argued on appeal pertains to a burden held by the government. *See Bruen*, 142 S. Ct. at 2126. It was the government—not the Plaintiffs—that bore the burden of showing that brace-equipped pistols are *not* in lawful common use; and it was the government—not the Plaintiffs—that bore the burden of showing that brace-equipped pistols are dangerous and unusual. *See id*. Yet the district court and Agencies turned these burdens upside down, faulting Plaintiffs for not winning an issue that Plaintiffs will not need to win at trial and thus need not preliminarily. Standing alone, this burden-allocation error requires reversal. *See* Br. of Appellants at 44.

The Agencies do not deny that, *if* the burden misallocation occurred, reversal is warranted. Instead, the Agencies insist that no burden misallocation occurred. But in so doing, the Agencies continue to defy *Heller* and *Bruen*'s burden allocation by conflating what the Supreme Court insists on distinguishing.

*Bruen* in particular distinguishes (1) the question of whether a regulation *implicates* the Second Amendment, from (2) the question of whether an implicated regulation *satisfies* the Second Amendment. The first is a matter of text, and its burden lies with a plaintiff. The second is a matter of history and tradition, and its burden lies with the government. But as the Agencies see it (at 11), these two burdens are one and the same and plaintiffs bear it all.

This Court has already correctly concluded, in several important prior cases, that disputes like the matter of a weapon's "lawful common use" are part of the government's burden because they go *not* to the textual question of whether a regulation *implicates* the Second Amendment, but to the historical and traditional question of whether an implicated regulation *satisfies* the Second Amendment. *See United States v. Daniels*, 77 F.4th 337, 341 (5th Cir. 2023), *petition for cert. filed* (No. 23-376); *United States v. Rahimi*, 61 F.4th 443, 451-52 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023). Those holdings about where the burdens lie are correct. They should be followed or, if necessary, renewed.

Second and apart from any burden-allocation error, the Court should hold that what the Final Rule regulates—brace-equipped pistols—are in lawful common use. Because of this, the district court below and Agencies now are wrong to say that the Final Rule need not satisfy the Second Amendment demands that *Bruen* extolled. To the contrary, the fact that brace-equipped pistols are in common use means that law-abiding citizens have an absolute right to possess them for lawful purposes. *See District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21, 31-32, 47 (2022); Br. of Appellants at 45-47.

As to the crucial facts regarding usage, the Agencies' own data shows that *millions* of brace-equipped pistols are in now lawful common use. Br. of Appellants at 45 (citing 86 Fed. Reg. 30,845-46 (June 10, 2021)). In particular, data gathered in the Final Rule's own notice of proposed rulemaking shows that recent sales of brace-equipped pistols total *3 to 7 million units*:

> "stabilizing braces." Anecdotal evidence from the manufacturers of the affected "stabilizing braces" indicates that the manufacturers have sold between 3 million and 7 million "stabilizing braces" between the years 2013 to 2020 or over the course of eight years. For the purposes of this analysis, ATF uses 3 million as the low estimate and primary estimate of affected "stabilizing braces." This proposed rule may affect upwards of 1.4 million individuals, 13,210 Type 1 Federal Firearms Licensees ("FFLs"), and 3,881 Type 7 FFLs. For more details, please

86 Fed. Reg. 30,845-46 (page break omitted). Given that 3-7 million is the Agencies' "low estimate" for just eight years, *id.*, the real total is most certainly higher.

Against this compelling evidence, the Agencies offer only hypothetical guesswork. Their main counterpoint (at 54-55) hypothesizes that some percentage of those 3-7 million units might entail illegal behavior. But there is no citation for that *ipse dixit*. To the contrary, short-barreled rifles are lawfully used in at least 46 states. *See* Amicus Br. for Texas Public Policy Foundation at 17.

*United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (per curiam) (cited by the Agencies at 49), gave no holding at all on this point because the common use question was "not presented for de novo review." *Id.* at 329; *see id.* (and the Plaintiff supplied zero common use data). *Stepp-Zafft* therefore refused to "agree or disagree" with the Agencies' current position. *Id.*

*United States v. Gilbert*, 286 F. Appx. 383 (9th Cir. 2008) (cited by the Agencies at 49), does not help the Agencies' either. It doesn't even say the words "common" or "dangerous" or "unusual," let alone render a useful holding on point.

*United States v. Cox*, 235 F. Supp. 3d 1221 (D. Kan. 2017) (cited by the Agencies at 49), does no better. That plaintiff did not make any common use "suggestion or showing" whatsoever, *id.*, let alone do as Plaintiffs here and cite the Agencies' own rulemaking data back to them.

Short-barreled *shotguns* do not necessarily have the same historic or current "common use" status as brace-equipped pistols or short-barreled rifles. So whatever lasting value *United States v. Miller*, 307 U.S. 174 (1939) (cited by the Agencies at 48-49), has regarding the former certainly does not control the latter. If common use data about something besides brace-equipped pistols in particular must be looked to, the reference should not be to shotguns or to different rifles. Instead, the point of "common use" reference for brace-equipped pistols should be none other than pistols at large, which *Heller* and *Bruen* already deem in lawful common use.

## II.    The requisite irreparable harm exists.

### A.    The Final Rule causes harm independently of the statute.

For irreparable harm, the Agencies try to shift blame away from the Final Rule to the statute. As the argument goes, "no plaintiff has identified any injury stemming from the Rule, because the relevant burdens stem from the underlying statute and no plaintiff has identified a particular weapon that the Rule and the statute would classify differently." Agencies Br. at 12. The Court should reject this argument by holding that the Final Rule itself inflicts the injuries in question by dramatically altering the Agencies' longstanding prior "firearm" definition.

History proves the key point with ease. *See* Br. of Appellants at 4-9. When the Agencies enacted the Final Rule in 2023, they were by no means *codifying* a longstanding prior practice. They were disrupting it, and massively so. In reality, the Final Rule "constitutes a marked departure from the Agencies' past position about whether brace-equipped pistols still constitute 'pistols.'" *Id.*; *see Mock v. Garland*, 75 F.4th 563, 585-86 (5th Cir. 2013).

Under the prior regime, which the Agencies had maintained for over a decade through dozens of classification letters and other administrative actions, most (if not all of the brace-equipped pistols in question did *not* constitute short-barreled "rifles." *Id.* (citing 88 Fed. Reg. at 6,502 & n.84). But then, as part of the Final Rule, the Agencies determined that it was necessary to nullify every single one of their own prior classification decisions. The Agencies opted to expressly terminate "all such prior classifications" and deem them "no longer valid as of January 31, 2023." 88 Fed. Reg. at 6480. This sent shockwaves through the system as to the "many parties in possession of weapon and 'brace' combinations that ATF did not specifically classify in the past as being subject to the NFA." *Id.* No wonder that the Final Rule itself estimates an annualized cost of at least "$266.9 million." *Id.* at 6481. If the Final Rule had really done nothing more than codify existing understandings of the statute, none of these shockwaves would have occurred.

Because of this history and the Final Rule's evident impact across the nation, the Agencies are wrong to say that "an injunction against the Rule could not alleviate any harm." Agencies Br. at 12. If Plaintiffs obtain their requested preliminary injunction, the Agency's enforcement stance will revert to the status quo ante—the well-established prior regime that deemed the NFA's reach far narrower than the Final Rule does. Though turning back the regulatory clock in this fashion may not supply a totally complete remedy in the long run, it will certainly supply the kind of meaningful relief from irreparable harm that preliminary injunctions exist to provide.

### B.  Plaintiffs' injuries constitute sufficient irreparable harm.

Next, the Court should hold that all of the Final Rule's injuries to the Plaintiffs meet the test for preliminary injunctive relief. *See* Br. of Appellants at 47-58. With plenty of supporting precedent, the first brief showed how the district court erred both by refusing to recognize the legal legitimacy of Plaintiffs' injuries and by giving short shrift to the evidentiary support proving them up. *Id.* Then the Court issued *Career Colleges & Schools of Texas. v. United States Department of Education.*, 98 F.4th 220, 234 (5th Cir. 2024), a critical new decision that squarely supports the Plaintiffs.

First, *Career Colleges* holds that analogous "increased costs of compliance" constitute the irreparable harm needed for a preliminary injunction. *Id.* at 234. What sufficed in *Career Colleges* was an agency action that "expanded the category of

actionable" activity so as to require more "defensive recordkeeping." *Id.* So too here, as the Final Rule now requires at a minimum that Plaintiffs dealing in brace-equipped pistols satisfy all of the NFA's recordkeeping requirements. (And of course, if Plaintiffs take the options of surrendering or altering their firearms, the costs of such compliance would easily meet the test as well.)

Second, *Career Colleges* holds that analogous "necessary alterations in operating procedures" constitute the irreparable harm needed for a preliminary injunction. *Career Colleges*, 98 F.4th at 234, 237-38. This applies with particular force to Plaintiff Rainier Arms, who benefits from this key conclusion: "Parties who have made substantial efforts to comply with existing regulations and who operate in highly regulated industries do not face a heightened burden of showing irreparable harm compared to entities operating in previously unregulated fields and those that have previously under-resourced their compliance efforts." *Id.*

As to all of these harms, the Plaintiffs did *not* have to "convert each allegation of harm into a specific dollar amount." *Career Colleges*, 98 F.4th at 234. "Stringently insisting on a precise dollar figure reflects an exactitude our law does not require." *Restaurant Law Center v. United States Department of Labor*, 66 F.4th 593 (5th Cir. 2023). These costs needed only be more than "de minimis," *Career Colleges*, 98 F.4th at 234, which the uncontradicted affidavits from each Plaintiff showed to be the case.

The Agencies' other main harm argument calls (at 6) all of Plaintiffs' injuries "self-inflicted." But nothing about this situation entails harms that the Plaintiffs *chose* to suffer. They just want to be left alone to peacefully keep and bear their Arms free from the Final Rule's illegal dictates. Where as here a challenged government program forces a Hobson's choice, the fact that challenging plaintiffs must pick one of the evils to suffer does not make their injury self-inflicted. *See Texas v. United States*, 809 F.3d 134, 157 (5th Cir. 2015).

## III. The balance of harms and public interest favor relief.

Plaintiffs' first brief showed that the balance of harms and public interest favor relief for reasons that are common to many of this Court's modern APA cases. Br. of Appellants at 58-60. The preliminary injunction requested here would preserve the true status quo and serve the public's interests in making agencies abide by federal law, *see Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021), and preserving constitutional rights, *see, e.g.*, *O'Donnell v. Goodhart*, 900 F.3d 220, 232 (5th Cir. 2018), with no major counterbalances because "the government suffers no injury when a court prevents it from enforcing an unlawful law." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 287 (5th Cir. 2024).

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) (cited by the Agencies at 14), is not to the contrary. The government there litigated issues of harm and public interest with real proof—an affidavit by the Chief of Naval Operations done for that very case. *See id.*; *NRDC v. Winter*, 518 F.3d 704, 705 (9th Cir. 2008). Here by contrast, the Agencies opposed the preliminary injunction below by submitting no evidence whatsoever. They instead opted to rely solely upon the regulation's own ipse dixit of effectiveness. That does not carry their burden, especially in this law's context. *Cf. Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 615 (2016) ("Determined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to adopt safe practices by a new overlay of regulations.").

## Conclusion

The Court should reverse the district court's denial of preliminary injunctive relief and enter the decision that the district court should have—a preliminary injunction lasting until this litigation's conclusion that postpones the Final Rule and enjoins the Agencies from enforcing it against the Plaintiffs, including SAF's members and Rainier's customers.

Respectfully submitted,

/s Chad Flores
Chad Flores
cf@chadflores.law
Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Counsel for Appellants

## Certificate of Compliance

This filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32 because it contains 5,735 not-exempted words.

This filing complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 and Fifth Circuit Rule 32 because it has been prepared in a proportionally spaced typeface in 14-point font using Microsoft Word for Mac Version 16.74.

/s/ Chad Flores
Chad Flores